UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA             :

     vs.             :   CRIMINAL NO.  3:99-CR-67 (JBA)

            :

ADRIAN PEELER             :   May 1, 2020

## MEMORANDUM IN SUPPORT OF FIRST STEP ACT MOTION

### CONTENTS

BACKGROUND ...........................................................................................................3

  I. RETRACING STEPS ............................................................................................3

  II. THE DESCENT……………………………………………………...…………………8

ARGUMENT ...............................................................................................................13

  I. 21 U.S.C. § 841(b)(1)(a) IS A "COVERED OFFENSE" UNDER SECTION 404 OF THE FIRST STEP ACT, AND THUS MR. PEELER IS ENTITLED TO RELIEF. ...........................13

    A.The Offense of Conviction—and Not Specific Drug Quantity—Determines Eligibility. ......13

    B. Mr. Peeler's Plea to the Superseding Indictment Does not Establish a Specific Drug Quantity……………………………………………………………………………………16

  II. MR. PEELER'S 23 YEARS IN CUSTODY IS SUFFICIENT TO SATISFY THE GUIDELINES AND ACHIEVE THE GOALS OF SENTENCING ...........................................18

    A. A sentence of time served in state custody—23 years—is consistent with the sentencing guidelines and the § 3553(a) factors...........................................................................18

    B. A sentence imposed expressly concurrently with Mr. Peeler's state sentence is appropriate and consistent with Judge Nevas' judgment. ...........................................................24

CONCLUSION .............................................................................................................26

**facilis descensus Averno: noctes atque dies patet atri ianua Ditis;
sed revocare gradum superasque evadere ad auras, hoc opus, hic
labor est.**

**[the descent to the Underworld is easy, night and day the gates of
shadowy Death stand open wide, but to retrace your steps, to
climb back to the upper air—there the struggle, there the labor
lies.]**

- **Virgil, The Aeneid Book 6**

Mr. Adrian Peeler submits this memorandum in support of his motion for resentencing (ECF No. 388) with respect to his sentence of 420 months' imprisonment imposed by Judge Nevas on May 31, 2000, for conspiring to possess with intent to distribute and to distribute fifty grams or more of cocaine base, then in violation of 21 U.S.C. § 841(b)(1)(A).

As a result of the First Step Act, Mr. Peeler's applicable mandatory minimum sentence is now 5 years' incarceration, and he is therefore eligible for resentencing under the Act. For the reasons that follow, the Court should order Mr. Peeler resentenced to the time he is serving in state custody on charges including conspiracy to murder—a period of 23 years.[1] The time Mr. Peeler has already served in prison would fall well within the appropriately calculated Guidelines range of 210 – 262 months (assuming elimination of the crack/powder sentencing disparity under *Kimbrough*). Moreover, a sentence imposed explicitly concurrent with Mr. Peeler's state sentence would be consistent with the intent of Judge Nevas' judgment that Mr. Peeler "shall receive credit for time served from April 14, 1999." Doc. 232.

Absent the Court granting the proposed relief based on this written submission, Defendant requests and in-court hearing at which Mr. Peeler (who is currently incarcerated in Connecticut) would be able to address the Court.

---

[1] Mr. Peeler has to date served 21 years of that sentence. He is scheduled to complete his sentence in April of 2022.

2

## BACKGROUND

"Adrian was a kid when he went in, he has grown into a man." **Exhibit 1**. The following discussion takes up these words from Mr. Peeler's father, Russell Peeler Sr., which aptly pinpoint the offense conduct in this case as a moment bisecting the two halves of Adrian's life: the 23 years he lived up to his arrest, and the 21 years he has spent gradually becoming the person he is today.

## I.    RETRACING STEPS

The question of who Adrian Peeler is today finds an answer in a chorus of voices from an unexpected place: faculty at Yale University who have been teaching a small group of inmates at the MacDougall Correctional Institution since 2018. Adrian is in the inaugural 12-person class of participants in Yale's Prison Education Initiative, and the faculty who have interacted with him in this context have had an extraordinary window into what is otherwise a nearly hermetically isolated world of life behind bars. A letter from the program's director Zelda Roland, attached as **Exhibit 2**, outlines the program and Adrian's participation.

The faculty who have met Mr. Peeler have universally recognized his intellectual gifts. But more important—both to the faculty and for this motion—they have seen in him, in the words of a moral philosophy professor, the human virtues of "humility and tenacity." Elaborating on what this means, Professor Sam Berstler writes in **Exhibit 3**:

> Despite his academic giftedness, Adrian is humble and tenacious. Early in the class, Adrian approached me with a handful of papers that I had graded and written feedback on. He was receiving middling grades on them (Cs and Bs), and he was distraught. "I'm sorry that I'm doing so poorly," he said, "Can you tell me what I'm doing wrong?" I had to assure Adrian that his performance was exactly what I expected at this point in the course and that his grades were in line with matriculated Yale undergraduate students. Adrian said, "That's no excuse. I want to do better."
> And he did. He faced the challenge of philosophy head-on. When my undergraduate students at Princeton and Yale have not score the anticipated A+, they

3

have often cried, or given up, or decided that philosophy is not for them. Adrian was nothing like that: he acknowledged that philosophical ethics was far more challenging than anything he had encountered before, and he worked at it. He scored A's on both the mid-term and final exam and received an A- for the course overall.

You can't teach that kind of intellectual humility and tenacity. I've tried, with some of my most gifted Yale and Princeton undergraduates. A student either makes the decision to develop humility and tenacity, or he doesn't. Adrian had both in spades.

And what Adrian has, he also shares. Professor Berstler continues by reflecting on how Arian's attributes not only make him a natural leader, but also a generous one: "Adrian seemed to genuine *value* having productive and kind and respectful social interactions, and he used his status as a leader to cultivate a better and kinder and more respectful classroom. As a teacher, particularly a very young one, Adrian's presence was a gift and inspiration."

Suzanna Zak, who taught a theoretical and studio art class that Adrian took saw Adrian's community-building in action when for a final project "[h]e created a large scale collage focusing around community, the required facilitating the participation of every single classmate, myself, the teaching assistants, and even our assigned classroom guard. The scope of the project was such that it not only involved our entire class, but also moved everyone who participated." **Exhibit 4**.

Adrian's American Literature professor, David Gorin, shares in **Exhibit 5** his insight into what Adrian's peer mentorship has looked like not only in the context of group dynamics, but in one-on-one interactions:

Here's one moment I remember seeing Adrian shine. One afternoon, I was sitting with Adrian and another student to talk together about short pieces of critical writing they had done in anticipation of a longer paper. We were looking together at the other student's writing, and I was trying to explain some problem I noticed in that writing. I don't remember exactly what the problem was; all I remember is that the

point I sought to make about it was somewhat complicated, and that my efforts of explanation left the student looking confused. But as I continued to explain, a look of recognition came to Adrian's face. He had clearly understood the point I was trying to make. And as soon as he did, he reached for his peer's essay and began to explain the problem in his own way.

This moment was small in itself, but it says a lot about the person Adrian Peeler has become. I saw in that moment how his curiosity and attention led him to insight, and how that insight was something he wanted to pass on. I saw him using his energy, as a teacher does, to help someone else grow. In that moment, I thought: *this man belongs in a college, not a prison.*

Close observation from course teaching assistants likewise reflects Adrian's generosity with his fellow students. Leslie Gross-Wyrtzen, a teaching assistant who was able to observe Adrian during study sessions "During literature study sessions he would often pull up a chair next to someone else who was struggling and they would talk things out. Adrian would gently push or challenge his partner to go deeper with the text while really listening and affirming his partner's perspective." **Exhibit 6**. Another teaching assistant, Minh Vu, shares her observation of Adrian's approach to peer mentorship: "Funnily enough, what is unfortunate about this—though telling about his character—is that he does all of this work without expectation of returns, so I can never walk up to him and thank him after seeing him help a student without seeming nosy! Simply put, Adrian's sense of community is not performative and solely done in the presence of an instructor nor for the sake of grade; it is a steadfast principle that is constantly practiced." **Exhibit 7**.

The most telling accounts of who Mr. Peeler has become, however, come not from faculty or even teaching assistants, but rather from the fellow students—fellow inmates—who have known

Adrian for many years and have written on his behalf. In his letter, attached as **Exhibit 8**, Bryan Jordan recalls meeting Adrian ten years ago:

> I met Mr. Peeler over a decade ago while incarcerated. We were both young men trying to find meaning in a place devoid of any such reality. This was a very depressing reality for me to accept. Meeting him during that point in my life allowed a voice of reason to reach me. I can still recall his encouraging words, "[Y]ou have to begin to reframe your mind through education, then you will find a life worth living." At that time I could truly appreciate what those words meant. What I did know was I was not hearing that from anyone else. Years later, as I took his advice, I found the value of "a life worthy of living"- something I never had.

Another participant in the Yale program, Maurice Blackwell, has known Adrian even longer. He writes in **Exhibit 9** of Adrian's presence in his life in prison over the past twenty years:

> It's not often that you come across an individual with an optimistic view on life while incarcerated. It's difficult to carry a positive outlook when there's so much negativity around. Adrian has always been the exception. Since the beginning of my sentence, Adrian has encouraged me to read as much as I can and stay focused on using my time wisely. He stressed how valuable information is and the necessity to be informed. He constantly gave me literature on world history and would initiate discussions on what I've read. Whether he knew it or not, he assisted me in realizing my true potential.

Years—decades—before Yale professors began appearing in prison, Adrian was there, seeding the ground for their arrival. As Bryan and Maurice share, he seeded it with hope. But he also seeded with dissatisfaction, with the spirit of struggle and the will to move onward and upward, intellectually even when physically confined.

It is this spirit of struggle that inspires the opening epigraph, drawn from a passage of the Aeneid that Adrian highlighted one day during a class discussion. Professor Victoria Baena explains in her letter, attached as **Exhibit 10**:

6

To my understanding, Adrian sees his ability to participate in YPEI as a gift and as an opportunity for redemption. As we discussed Vergil's *Aeneid* last spring, Adrian pointed the class to a line in Book Six, when Aeneas is about to travel to the underworld: the Sibyl warns him that "the descent to the Underworld is easy […] but to retrace your steps, to climb back to the upper air—there the struggle, there the labor lies." Adrian noted that he—and, he proposed, his fellow incarcerated students as well—knew very well what the Sibyl meant. It was a moving moment, one that I've thought of often since, and one that has helped me read this classic text with new eyes. I am convinced that Adrian is committed to "climb back to the upper air," with all the struggle and labor that may entail.

The Sybil's words, Adrian has come to realize, are not only a warning come too late, but also an opportunity: a source of hope of climbing out of the underworld. As Bryan and Maurice share, this is a hope Adrian holds out not only for himself, but for his fellow inmates as well. And here the analogy to the Aeneid breaks down. Where Aeneas calls on his privileged divine ancestry to seek safe passage only for himself in and out of the underworld, for Adrian the struggle out of darkness has always been collective as well as personal. Maybe the myth of Orpheus and Eurydice better captures Adrian's efforts to pull both himself and others out of darkness. But unlike Orpheus, Adrian is not looking backward. He looks forward, to the light. And those who have known him in prison look forward to living in a community that he is a part of once again. As Professor Sarah Mahurin puts it unflinchingly in her letter, attached as **Exhibit 11**:

Let me say now: I am not naïve when I make these claims. I have been teaching in correctional institutions (MacDougall-Walker, Cheshire, York) for many years, and I operate under no illusions that my incarcerated students are blameless, mistakeless, faultless. Further, I don't wish to make any claims about Adrian's original conviction. What I *do* wish to claim – very strongly – is that Adrian is a person with much to offer any community he inhabits, and indeed society at large; I believe wholeheartedly in his capacity to do good in the world.

Additional letters from faculty in the YPEI program are attached as **Exhibit 12**.

## II.    THE DESCENT

The accounts above reflect who Adrian Peeler is today; they are testaments of the man he has become in the course of working to climb back into the light. But as Adrian's focus on the above passage from the Aeneid recognizes, the path to the light follows a descent into darkness. The events of this case are outlined in the Presentence Report, but this motion provides a vehicle for sharing (in a way that was not possible at the time of the original presentence investigation due to Adrian's pending state charges) Adrian's own account. Adrian shares, in his letter attached as **Exhibit 13** the circumstances of his descent and an outline of where he has come since:

> I was sixteen the first time that I sold drugs. What precipitated this descent was an argument that I had with my mother. One Saturday morning, in the early summer of 1992, I woke up to a slap and the sight of the phone bill, inches from my face. After overcoming a brief period of disorientation, I realized what was happening. The month before, I had run my parents phone bill up to $419, calling a "girlfriend" who lived in Hartford at the time. $419 is not an insignificant sum for a working mother. However, I did not understand that at the time. Embarrassed, hurt, and angry at myself for disappointing the person who loved me the most, I left.
>
> I ran away from home that day with nothing but the clothes on my back. It was summer; school was out, the days were warm and long, but the nights were something else entirely. Those first couple of nights, I slept in a friend's basement. However, when my friend's older sister discovered me there, and said that my friend would get in trouble if his parents found out, I left and never went back. For the next week or so, I slept in stolen cars, until I finally found myself at my girlfriend's apartment. She was 15, pregnant (by someone else), and had recently moved to Bridgeport to live with her older sister and her sister's two young children. My girlfriend and I shared a room in that space.

At this time I had nothing left but my pride, my selfishness, and my ignorance, which were more than enough to prevent me from returning home to my family.

About a month later, someone I knew told me that there was a place where we could make money by "working" for some guys on the other side of town. I was dirty, disheveled, and desperate. For me, the decision seemed like an easy one; I wanted to "work" (which is what we called selling drugs then).

After working and making very little or sometimes nothing at all each day for the first couple of weeks, I eventually met someone who was kind of like a "block manager," who knew my situation and who helped me make enough money to sustain myself: clothes, food, etc.

However, not long after that, my girlfriend and I had a heated argument after her sister had second thoughts about allowing two children to live like adults under her roof, with her own two children present. She told me that she loved me, but she said that it was too much. I understood when she asked me to leave. I left.

The school year was about to begin and because I would need a stable place to stay, I asked my cousin if I could stay with her for a while. She welcomed me in. She understood because some years earlier, my brother had moved in with her for a brief period after a similar experience.

To say that I ran away implies that I was missing. I was not; I was just not living at home with my family. My parents were aware of my whereabouts (most of the time), and in those early days, my mother even came to the "block" (drug area) in her squad car asking for me, though she never found me. My brother lived about a 10 minute walk away from the block. However, I knew that he was my mother's agent. If I went to his apartment, he may not have allowed me to leave until my parents arrived. So for the most part, I stayed away.

A couple of months into the school year, my father came to my cousin's apartment in an attempt to get me to come back home. After that failed, my brother tried. My mother did not. Pride, pettiness, and ignorance had deafened me and made me unrelenting. It wasn't until my grandmother suggested that I go back home that I allowed myself to hear what they were all saying. So I left, and returned home.

As I have matured and reflected on my childhood, I believe that some of my behavior was due to my inability to communicate effectively. I do not come from a family of bed time stories, hugs, kisses, and I love yous. That has never been my mother's way. My mother was an extremely loving woman. However, the way that she expressed that love was through actions, not words. And at times, that silence made it difficult to understand what she was saying.

After being back home, the dynamic was different — I felt different. My time away had given me an independence that made me "feel" like an adult. I was 16. I didn't ask for money, for clothes, or pretty much anything. If I needed money I would simply wait until the weekend and go "work." For a while, I felt like a tenant in my parents' house. I made it awkward.

Then, about a month after being home, my mother was diagnosed with cancer. It all happened extremely fast. So much so, that it is still difficult for me to ascertain what happened and when. But what I do know is that at some time in early 1993, she went from being a healthy, full-figured, full of energy, working woman, to, one day, not. In the months that followed, I continued to go to school, worked (a real job) occasionally, and came home to be with her. I did not sell drugs during this time. I prayed. I tried to be the son that I should have been before that moment, at that moment.

When she passed away in December of 1993, it was difficult for all of us: my father, my brother, my grandmother, my aunts, and my cousins. However, we dealt with it in the only way that we knew how: with silence.

The following year (`94), I went to prom, graduated, got a job, and attended community college. But I was just wandering aimlessly. And with no one left to disappoint, I was selling drugs again by the end of that year. Which is ultimately what landed me here.

Your honor, I give no reasons for, nor do I make any excuses for the choices that I have made. I only relay this story to explain where and how it began — the drug dealing. But there are no excuses. My parents were working hard to position me for success. But somewhere along the way, that was not good enough for me. In life there are always going to be negative and positive influences. At that time, I chose

10

the most detrimental to myself, my family, and my community. I realize now, and have for some time, the negative impact my decision to sell drug has on my community. It was a selfish attempt to gain trivial success at the expense of others. And I regret it every day. And while I cannot unmake those decisions and actions, what I can do and what I have been doing is making better ones. Decisions and actions that will benefit and enrich the community instead of decimating it. At the end of the day my choices have been mine and mine alone. And I take full responsibility for them. And I am deeply sorry for them.

My incarceration has been a journey — that is the only way to describe it. Early on it was filled with challenges that I did not particularly handle well. Four of my first six years were spent in solitary confinement. Although difficult, while within the confines of those silent spaces, I developed a passion for reading and learning. The last 12-13 years have been relatively quiet, but productive.

I have pursued my education with a passion. And I have devoted myself to my own personal growth and development. My personal education began with a dictionary and an almanac and it has grown exponentially since. Even though higher education in prison was not available to me for my first 17 years of incarceration, I still pursued education. I realized that education would be the key to a successful life in or out of prison. So when Second Chance Educational Alliance (a non-credit college-level education program) came to the prison, I applied and was accepted. Then later this year when Yale, through the Yale Prison Education Initiative, came into the prison with rigorous, credit-bearing Yale courses, I was prepared. I applied, and was successful.

Yale and education in general has truly had a transformative impact and influence on my life — and not just my on life but also on the lives of others, and specifically those around me. The difference is not just quantified by better grammar, a grasp of literature and mathematical principles. It is visible. It alters men's attitudes, changes perspective, and redirects our purpose. Even in the beginning my desire to learn was not solely based on acquiring knowledge for myself. I thought of education as a tool that could help make me an asset to whatever community I might

11

find myself in. Education challenges you to see the world differently, which enables you to be in the world differently. This is what education has done for me.

While I recognize that I have not always been the perfect prisoner, I have been in the process of becoming a better person. And I will continue to grow. The truth is that I no longer see the world at 43 in the same way that I saw it at 22.

I realize, sadly, that I stole a lot from my community. Now I would just like the opportunity to give back in a more meaningful way. Whatever talents I may have I would like to share them with those who may be able to benefit from them. Whether that is through teaching, speaking, or just simply being a positive source of inspiration or an example. Through Yale and SCEA, I have made personal, institutional, and academic connections, and have built a supportive network through which I believe I can succeed and share what I have learned beyond myself.

Finally, I spoke of everyone and everything else, except my family and loved ones who have loved me and supported me in ways that I cannot explain, and to whom I owe such much, and who deserve more from me than my past disappointments. I would like to make them proud: my Aunt Mildred; my cousin Nikki; my father.

I would humbly implore the court to allow me to be with my father who is advancing in age and who is not in the best of health, although he will not admit it. He lives in Las Vegas alone. He has never remarried. I am all that he hopes for. I will be a better son to him than I was. I humbly ask the court to consider my words and I ask your mercy, compassion, and trust.


Mr. Peeler wishes to further convey his thoughts and feelings to the Court in person in connection with the requested re-sentencing hearing.

## ARGUMENT

I.   **21 U.S.C. § 841(b)(1)(a) IS A "COVERED OFFENSE" UNDER SECTION 404 OF THE FIRST STEP ACT, AND THUS MR. PEELER IS ENTITLED TO RELIEF.**

This Court (as well as other judges in the District) has previously ruled on many of the broad legal issues that have been raised in the context of the First Step Act, and the present brief therefore does not specifically address these matters.[2] Rather, because Probation's Addendum to the Presentence Report in this case opines that Mr. Peeler's conviction does not qualify as a covered offense for legal reasons, the following discussion addresses the relevant aspects of the First Step Act as it relates to Mr. Peeler's eligibility for relief.

A.   *The Offense of Conviction—and Not Specific Drug Quantity—Determines Eligibility.*

On December 21, 2018, the president signed the First Step Act of 2018, PL 115-391, 132 Stat. 5194 (2018) ("the Act"). The Act addressed a number of issues related to criminal justice reform. At issue in this case is Section 404 of the Act, which addressed the application of the formerly passed Fair Sentencing Act of 2010. The Fair Sentencing Act of 2010 had reduced the disparities between the penalties for crack and powder cocaine.[3] Section 404 of the First Step Act now retroactively

―――――――――――――――

[2] If the Government raises issues related to these settled issues in its response—or if the Court wishes further briefing—Defendant is happy to address these matters in the context of a reply brief.

[3] The Fair Sentencing Act of 2010 was enacted because Congress recognized that the 1986 Anti-Drug Abuse Act's penalty scheme for crack cocaine offenses was far too harsh and had a disparate impact on African-American defendants. *See Kimbrough v. United States*, 552 U.S. 85, 97–99 (2007); *Dorsey v. United States*, 567 U.S. 260, 268–69 (2012). Specifically, Section 2 of the Fair Sentencing Act changed the penalty structure for crack cocaine offenses, under both 21 U.S.C. § 841(b) and 21 U.S.C. § 960(b). Relevant to this case, the Fair Sentencing Act altered Section 841(b) as follows:

- Section 841(b)(1)(C) now provides for a sentencing range of up to 20 years if the offense involved less than 28 grams or an unspecified amount of crack cocaine;

applies those reduced penalties to crack cocaine offenses committed before the Fair Sentencing Act of 2010 came into force.

Section 404(a) of the First Step Act defines what offenses are covered by Section 404's remedy:

> Definition of Covered Offense: In this section, the term "covered offense" means a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010 (Public Law 111-220; 124 Stat. 2372), that was committed before August 3, 2010.

First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, § 404(a) (2018). Mr. Peeler's offense is a "covered offense" because Section 2 of the 2010 Fair Sentencing Act "modified" the "statutory penalties" under § 841(b) for "violation[s]" of 21 U.S.C. §§ 841(a) and 846, the offense to which Mr. Peeler pled guilty, and he committed such offense before August 3, 2010.

As this Court has previously held, Mr. Peeler's eligibility in this respect turns entirely on his offense of conviction—it makes no difference to the analysis whether the facts of the case show that he was convicted of an offense covered by § 841(b)(1)(A) based on 51 grams of crack or 51 kilograms. This Court explained the reasons for this in *United States v. Benjamin*:

> A "growing number of courts have concluded [that] 'it is the statute of conviction, not actual conduct, that controls eligibility under the First Step Act.' " *United States v. Allen*, 384 F. Supp. 3d 238, 241 (D. Conn. 2019) (quoting *United States v. Martin*, 2019 WL 1556617, at *3 (E.D.N.Y. Apr. 10, 2019)); *see, e.g.*, *United States v. Davis*, 2019 WL 1054554, at *3 (W.D.N.Y. Mar. 6, 2019) ("Under the plain language of the [FSA], whether an offense is a 'covered offense' is determined by examining the statute that the defendant violated," not by the offense conduct.). And "[t]o the extent the statutory text is ambiguous, the ambiguity is dispelled by considering the purpose underlying the First Step Act," "further[ing] the Fair

---

- Section 841(b)(1)(B)(iii) now provides for a sentencing range of 5 to 40 years if the offense involved "28 grams or more" but less than 280 grams of crack cocaine;
- Section 841(b)(1)(A)(iii) now provides for a sentencing range of 10 years to life if the offense involved "280 grams or more" of crack cocaine.

*See* 21 U.S.C. § 841(b); PL 111-220, 124 Stat. 2372.

Sentencing Act's objective of mitigating the effects of a sentencing scheme that had a racially disparate impact." *Allen*, 384 F. Supp. 3d at 242 (citation omitted). "Given this remedial purpose, the First Step Act should be construed to provide courts with discretion to reduce a sentence when the statute the defendant violated has been modified by the Fair Sentencing Act to provide less severe penalties." *Id.* (citation omitted). **This Court agrees with the majority of district courts to consider this issue and concludes that "violation" in the First Step Act's definition of a "covered offense" refers to the statute under which a defendant was convicted, not to "the actual offense conduct, to the extent that can be discerned from the record,"** as the Government argued.

*United States v. Benjamin*, No. 3:09CR265 (JBA), 2019 WL 5092246, at *3 (D. Conn. Oct. 11, 2019) (emphasis added, footnote omitted).

Because the First Step Act predicates eligibility on the statutory offense of conviction, not the specific facts of a particular case, it does not matter that the superseding indictment to which Mr. Peeler pled guilty refers to "multi-kilogram" quantities of crack. As one court, addressing this issue head-on (and following reasoning consistent with *Benjamin*) has stated: "Under the 2018 FSA, the quantity of drugs involved in the conviction are not a condition of eligibility, **whether such quantity was charged in the indictment**, found by a jury, admitted by the defendant, or determined in a presentence investigation report." *United States v. Pride*, No. 1:07CR00020-001, 2019 WL 2435685, at *4 (W.D. Va. June 11, 2019) (emphasis added).

In reaching its conclusion the court in *Pride* looked to the reasoning of *United States v. Boulding*, 379 F. Supp. 3d 646 (W.D. Mich. 2019). In *Boulding*, the court proposed a hypothetical case in which a defendant charged in an indictment under Section 841(b)(1)(A)(iii) is convicted by a jury of a crack cocaine offense and sentenced before the Fair Sentencing Act and where the jury verdict form specified "50 grams or more" of crack cocaine but the PSR established a 300-gram quantity. The court in turn reject the notion that there was any analytic significance either to the 300 grams in the PSR *or* the 50 grams specified in the verdict. As the court explained, the statute of conviction alone matters:

For purposes of eligibility alone, quantity determinations are unnecessary. The statute rests eligibility on the nature of a defendant's prior conviction: specifically, whether it was a "covered offense." First Step Act § 404(b). A "covered offense" is one for which the Fair Sentencing Act modified the penalties, which includes any crack cocaine offense under Section 841(b)(1)(A) or (B). "Under the plain language of the Act, whether an offense is a 'covered offense' is determined by examining the statute that the defendant violated. If that statute is one for which the statutory penalties were modified by section 2 or 3 of the Fair Sentencing Act, it is a 'covered offense.' " *United States v. Davis*, No. 07-CR-245S, 2019 WL 1054554, at *3 (W.D.N.Y. Mar. 6, 2019) (internal citations to Section 404 omitted). Quantity is simply not part of the statutory test for eligibility under the First Step Act. Eligibility turns entirely on the categorical nature of the prior conviction. All other issues, including the proper quantity determination, are a part of a reviewing court's discretionary call on whether to modify an eligible defendant's sentence.

*Id*. at 652. *See also, e.g., United States v. Bean*, 2019 WL 2537435, *4 (W.D. Mich. June 20, 2019) ("[T]he quantity of narcotics (whether admitted, found by a jury, or found by a court) [does] not factor into the question of eligibility."); *United States v. Askins*, 2019 WL 380022, at *3-4 (D. Ariz. Aug. 6, 2019) ("Quantity is simply not part of the statutory test for eligibility under the First Step Act."); *United States v. Lewis*, 2019 WL 3227453, *2 (E.D. Tenn. July 15, 2019) (if the "'offense of conviction was a crack cocaine offense affected by the Fair Sentencing Act[,] … the defendant is categorically eligible for consideration regardless of actual quantities'"); *United States v. Cole*, 2019 WL 3406872, at *3 (N.D. Ind. July 29, 2019) ("Nearly every district court considering the issue has interpreted the plain language of the First Step Act [to mean] that it is 'the statute of conviction, not actual conduct, that controls eligibility under the First Step Act.'").

B. *Mr. Peeler's Plea to the Superseding Indictment Does not Establish a Specific Drug Quantity*

For the reasons above, the fact that the indictment refers to a "multi-kilogram" conspiracy is irrelevant. What matters is that the offense of conviction was § 841(b)(1)(A). This categorical approach is appropriate in this case not only because of the plain language of the First Step Act discussed above, but also because Mr. Peeler's plea does not establish the truth of the allegations in the indictment except as to the facts necessary to support a conviction.

16

This is true because "[a] guilty plea to a conspiracy does not constitute an admission as to the overt acts charged in the accusatory instrument, or to the specific manner in which the conspiracy was alleged to be effectuated. . . . However, it is an admission of the essential elements of the conspiracy charged." *UCAR Int'l, Inc. v. Union Carbide Corp.*, No. 00CV1338(GBD), 2004 WL 137073, at *16 (S.D.N.Y. Jan. 26, 2004), *aff'd*, 119 F. App'x 300 (2d Cir. 2004). Or as a court in the District of New Jersey has elaborated,

> In matters affecting criminality, not only statutes but also pleas of guilty must be construed strictly and must be limited to the narrowest confines consistent with an intelligent interpretation of the effect thereof. With this in mind the court concludes that a plea of guilty to a charge of conspiracy does not include a judicial admission of responsibility for the acts set forth in the recital of deeds done 'as part of the conspiracy', but establishes an evidential admission which may be used as such in other proceedings. The specifications of illegitimate activities appended to the bald charge of conspiracy may be considered in the nature of a bill of particulars, advising the accused of the acts upon which the Government bases its denunciation.
>
> That such limitation of the effect of the plea is valid may be deduced from the fact that the acts set forth in the expository part of the indictment may be the ground for indictment for the substantive derelictions therein set forth. It does not seem tenable that an admission of guilt with respect to a comprehensive indictment for conspiracy would estop the persons so pleading from entering a defense to charges of substantive offenses recited in the conspiracy indictment.

*United States v. Am. Packing Corp.*, 113 F. Supp. 223, 225 (D.N.J. 1953), *accord Alsco-Harvard Fraud Litig.*, 523 F. Supp. 790, 803 (D.D.C. 1981).

This principle is one the Second Circuit endorsed over 60 years ago:

> Obviously a general verdict of guilty, or for that matter the entry of a plea of guilty, on a count for conspiracy does not determine which of the particular means charged in the indictment were used to effectuate the conspiracy. . . . We are satisfied both on principle and on the authority of decided cases that the court below was in error in holding that plaintiff's proof established not only the defendant's participation in the conspiracy but also their guilt for every overt act set forth in the indictment.

*United States v. Guzzone*, 273 F.2d 121, 123 (2d Cir. 1959). Other circuits have held likewise. *United States v. White*, 883 F.3d 983, 989 (7th Cir. 2018) ("a guilty plea admits only the essential elements

of the offense"); *United States v. Louchart*, 680 F.3d 635, 637 (6th Cir. 2012) ("a guilty plea does not constitute an admission of facts included in an indictment when those facts were not necessary to sustain a conviction"); *United States v. Cazares*, 121 F.3d 1241, 1247 (9th Cir. 1997) ("allegations not necessary to be proved for a conviction—in this case the overt acts—are not admitted by a plea").

In short, the colorful language of the indictment describing a "multi-kilogram" conspiracy was, as the Second Circuit has put it, "superfluous," and not necessarily established by virtue of a guilty plea to the indictment containing that language. *Guzzone*, 273 F.2d at 123. The quantity reference to a "multi-kilogram" conspiracy does nothing to change the actual essential elements of the offense to which Mr. Peeler pled—which included that the conspiracy involved at least 50 grams of crack.

## II.   MR. PEELER'S 23 YEARS IN CUSTODY IS SUFFICIENT TO SATISFY THE GUIDELINES AND ACHIEVE THE GOALS OF SENTENCING

*A.   A sentence of time served in state custody—23 years—is consistent with the sentencing guidelines and the § 3553(a) factors.*

1. Mr. Peeler's updated guidelines are 210 –262 months, consistent with a time-served sentence.

As stated in the PSR addendum prepared in response to Mr. Peeler's First Step Act motion, "Under a *Kimbrough* analysis, if treated as powder cocaine, the base offense level would be at least 30 for an offense involving at least five kilograms, but less than 15 kilograms of cocaine. USSG §2D1.1(c)(5). After applying the other noted adjustments, the total offense level would be 34, resulting in a guideline imprisonment range of 235 months to 293 months." Doc. 390.[4]

---------------------------------------

[4] Absent application of a 1:1 crack to powder ratio, the offense level would be 40, with a Guidelines range of 360 – life.

The guidelines calculation prepared in connection with this motion appropriately updates Mr. Peeler's offense level computation in response to changes in the law, including applying retroactive guidelines reductions that post-date Mr. Peeler's sentencing. The updated PSR leaves in place, however, a criminal history point that no longer applies under current law. Specifically, Mr. Peeler received one criminal history point because "pursuant to 4A1.1(e), the defendant committed the offense within two years of his release of imprisonment on a sentence counted under 4A1.1 (a); Risk of Injury and Reckless Endangerment imposed on July 15, 1996." PSR ¶ 67. This guidelines provision, § 4A1.1(e), no longer exists as an enhancement.[5] Absent this 1-point enhancement, Mr. Peeler's Criminal History drops from 10 points to 9—and from Category V to Category IV. Accordingly, his 1:1 ratio guidelines fall to 210 – 262 months.

Mr. Peeler is scheduled to complete his sentence on April 3, 2022, almost exactly 23 years—276 months—after he entered state custody. This time, moreover, reflects actual time served, not the nominal sentence imposed. A sentence of 324 months, with good time, would be expected to lead to this 276 month period. A 324 month sentence far exceeds the high end of the currently applicable 1:1 guidelines range, even with Mr. Peeler's no longer accurate criminal history calculation.

Mr. Peeler's effective sentence of 276, moreover, approaches the 360 months that represented the low end of the 1999 guidelines range—and the sentence Judge Nevas planned to impose based on the offense conduct. At sentencing Judge Nevas stated: "I'm sentencing him for the narcotics case. I'm not sentencing him for what occurred and for which he's going to go to trial in the state court. That's not the basis of my sentence. I'm sentencing him for what he was convicted of in this court,

---

[5] The 1998 Guidelines manual instructed in this provision: "Add 2 points if the defendant committed the instant offense less than two years after release from imprisonment on a sentence counted under (a) or (b) or while in imprisonment or escape status on such a sentence. If 2 points are added for item (d), add only 1 point for this item."

19

which is the narcotics violation, and in the Court's view, 360 months is an adequate sentence." Doc. 258 at 31. Only after Adrian made comments seeking to withdraw his plea did Judge Nevas, based upon Mr. Peeler's now-questionable acceptance of responsibility, increase the sentence to 420 months. *Id*. at 54.

In short, updating Mr. Peeler's sentencing guidelines to reflect both the present guidelines and the modern understanding that sentencing disparities between crack and powder cocaine are not warranted leads to a recommended sentence of 210 to 262 months. By the time Mr. Peeler will have completed his state sentence, he will have been in custody for substantially longer than that period. For the reasons below, this time in custody is more than sufficient to achieve the goals of sentencing.

2.   <u>A 23-year sentence is substantively reasonable and appropriate.</u>

Adrian's path through life over the past two decades has led him to be a person who has caught the attention—and admiration—of many people around him. Their words, and Adrian's own words, speak for themselves in reflecting who Mr. Peeler has become. Far from a person who poses a threat to the community or who needs to be further deterred from crime, he has become a man who would be a great credit to the community. He has already shown himself to be a person whose influence on the inmates around him has been to serve as a positive mentor who has worked to divert people from criminality.

More broadly, the sentence fits appropriately in the broader context of modern criminal justice. In 1999 Judge Nevas, applying the then-current guidelines and sentencing norms, determined that a 30-year sentence was appropriate. In response to Adrian's attitude at sentencing he increased that number to 35 years. Since that time, understandings of drug crime and punishment have appropriately changed. The long era of "get-tough era of punishment" had little positive effect on crime rates, and some studies have shown that increased punishment has had a negative effect on crime rates.

20

"Incarceration has been declining in effectiveness as a crime control tactic since before 1980. Since 2000, the effect of increasing incarceration on the crime rate has been essentially zero. . . . In fact, large states such as California, Michigan, New Jersey, New York, and Texas have all reduced their prison populations while crime has continued to fall."[6] "[I]t is no longer reasonable to even hypothesize that crime patterns can be explained in terms of punishment policies or imprisonment rates."[7] Significantly, states that reduced their imprisonment rate between 2010 and 2015 saw a greater average decline in their crime rates (14 percent) than states that increased imprisonment during those years (8 percent average crime rate).[8] Public opinion supports the view that mass incarceration is unnecessary and ineffective. "The Guidelines and congressionally directed ranges are significantly harsher than community sentiment recommends."[9] There is a growing consensus that rehabilitation should principally replace incarceration as a tool for addressing crime. "A majority of the American public favors alternatives to incarceration. Eighty-seven percent of respondents in one national survey indicated they would be more likely to support alternatives to incarceration for non-violent justice-involved individuals (40% when it comes to a violent crime) if research consistently showed there are ways other than incarceration to reduce the likelihood that they will commit new

_____

[6] Brennan Center for Justice, What Caused the Crime Decline? 15 (Feb. 2015), https://www.brennancenter.org/publication/what-caused-crime-decline.

[7] Michael Tonry, Why Crime Rates Are Falling throughout the Western World, Minnesota Legal Studies Research Paper No. 14-41 (Oct. 2014), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2520500.

[8] Pew Charitable Trusts, State Reforms Reverse Decades of Incarceration Growth 9 (2017), http://www.pewtrusts.org/~/media/assets/2017/03/state_reforms_reverse_decades_of_incarceration_growth.pdf.

[9] Hon. James S. Gwin, Juror Sentiment on Just Punishment:  Do the Federal Sentencing Guidelines Reflect Community Values?, 4 HARV. L. & POL'Y REV. 173, 195 (2010).

crimes (National Institute of Corrections [NIC], n.d.). A review of more than 50 public opinion research studies conducted since 2000 demonstrates growing and broad support for alternatives to incarceration, rehabilitation, and treatment (Opportunity Agenda, 2014). Eighty-four percent of respondents from one study support alternatives to prison (such as drug treatment, community service, or probation) for nonviolent offenses (Lake, Gotoff, & Pultorak, 2013)."[10] Another article concluded that "[s]erious doubts about our system of mass incarceration emerge in a nationally representative survey, even in more politically conservative, rural parts of the country. Indeed, in an era of broad speculation about a growing urban-rural divide, there is general consensus between rural America, small cities and major metropolitan areas that our system of criminal justice is not working and communities should focus on priorities other than spending millions on prisons and jails."[11]

Moreover, in *United States v. Simons*, 375 F. Supp. 3d 379, 381 (E.D.N.Y. 2019), the court addressed the issue of public safety. The *Simons* court reasoned: "In imposing a reduction of defendant's sentence, this court considered Congress's intention, first with the Fair Sentencing Act of 2010 and now with the First Step Act of 2018, to limit government spending on incarceration and to decrease the number of inmates in federal custody. *See* 18 U.S.C. § 3553(a)(5). Public safety is not served by a defendant spending more time in prison than necessary. An overly harsh sentence may prove counterproductive, increasing a defendant's likelihood to recidivate. The money it costs to keep a defendant behind bars can be better spent on other means of crime control and prevention." *Id.* at 389 (citations omitted).

--------

[10] National Institute of Corrections, <u>Myths and Facts:  Why Incarceration is Not the Best Way to Keep Communities Safe</u> 8 (2016), https://s3.amazonaws.com/static.nicic.gov/Library/032698.pdf.

[11] Greenberg Quinlan Rosner Research, <u>The Evolving Landscape of Crime and Incarceration</u> (Apr. 2018), https://storage.googleapis.com/vera-web-assets/inline-downloads/iob-poll-results-summary.pdf.

The concept of incremental punishment also favors relief. Prior to his conduct in this case, Adrian's only prior period of incarceration was a 30 month sentence. (At the time proceedings in this case began he had begun serving a further 3-year sentence for escaping from a halfway house at the end of that sentence). He has already served a sentence that is more than eight times as long as that 30-month sentence. The concept of incremental punishment, as addressed in *United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001), favors "an appropriate relationship between the sentence for the current offense and the sentences . . . for the prior offenses." Here, a sentence of 23 years is an incrementally proportionate punishment and is sufficient to meet the purposes of sentencing. There is no reason to believe that a substantial further term of imprisonment is necessary, particularly when, as here, Adrian has shown that over the past two decades o imprisonment, he has rehabilitated himself.

Finally, the rapidly deteriorating health conditions in Connecticut prisons as a result of Covid-19—and the measures the Department of Correction has taken in response—are likely to materially harshen the conditions of confinement that Mr. Bell endures for the coming months or years in ways the court could not have anticipated at sentencing. As the Court is well aware, state and federal prisons across the country have become hotspots for Covid-19 infection. Indeed, as reflected in recent reporting by the *New York Times*, of the top 50 hotspots in the country, approximately half are prisons.[12] On that list is Northern Correctional Institution, Connecticut's maximum security facility where Covid-19-positive inmates are being transferred. This facility was singled out in a 2019 federal court order as inflicting unconstitutionally harsh conditions of confinement on at least some of its inmates.[13]

---

[12] https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#clusters.

[13] *Reynolds v. Arnone*, 402 F. Supp. 3d 3, 12–13 (D. Conn. 2019) ("Despite the growing consensus among the scientific community that solitary confinement inflicts severe harm on prisoners, a select

Even short of transfer to a maximum security facility, the reaction to the Covid-19 crisis by the Connecticut DOC has resulted in extended periods of lockdown and the elimination of rehabilitative programming—a shift that particularly affects people like Mr. Peeler who have so actively engaged in that programming. Likewise the elimination of visits curtails Mr. Peeler's contact with his family, notably his Aunt Mildred who writes in the letter attached as **Exhibit 14**, "I love Adrian very much and am the consistent person that writes to him to keep him encouraged . . . . I remind him how much God loves and cares for him and I go to visit him whenever I can to talk with him and visibly see how he is doing." Those visits are now (and for no one knows how long) a thing of the past.

Mr. Peeler has worked hard to find the silver lining of prolonged incarceration. But now that lining is in tatters, and it is not poised to be repaired anytime soon.

B. *A sentence imposed expressly concurrently with Mr. Peeler's state sentence is appropriate and consistent with Judge Nevas' judgment.*

At the time of the judgment in this case, Adrian Peeler was in Connecticut state custody, awaiting trial on murder and associated conspiracy charges. He had been arrested by Connecticut state authorities on April 14, 1999. Approximately a week later, on April 22, 1999, Adrian entered an initial appearance in this case. In his judgment of conviction, Judge Nevas specified that "The Defendant shall receive credit for time served from April 14, 1999."

The sentencing transcript does not expressly address the question of concurrency, and the judgment likewise does not use the specific word "concurrent," nor does it reference Mr. Peeler's

---

group of "special circumstances high security" inmates in Connecticut are all-but-certain to be housed in prolonged isolation for the rest of their lives. Other than two daily hours of recreation and two 15-minute breaks to eat lunch and dinner, each such inmate is effectively condemned to spend the rest of his life in a cell roughly the size of a parking space.")

state detention nor specify the Connecticut DOC as the location where his sentence is to begin. Based on these features, there is a substantial risk that the Bureau of Prisons may decline to give effect to the judgment's intent that Mr. Peeler begin receiving prison credit as of April 14, 1999.[14]

Despite the absence of the talismanic language stating the sentence should be concurrent (or for that matter consecutive) to any state sentence Mr. Peeler received, the only logical reading of the Court's judgment is that Judge Nevas intended that Mr. Peeler's sentence should begin running immediately, and indeed that it should run from the time of his state arrest. This intent can only be realized through a concurrent sentence.

Additionally, further evidence of Judge Nevas' intent can be gleaned from his sentence imposed on Adrian's co-defendant (and older brother) Russell Peeler. Judge Nevas imposed a life sentence on Russell Peeler—to run concurrent with a separate state sentence for murder. Doc. 217. There is no apparent reason why Judge Nevas would have chosen to impose a consecutive sentence on the relatively less culpable of the two brothers.

A concurrent sentence, moreover, is substantively reasonable and appropriate here. As discussed above, the 21 years Mr. Peeler has already served has already imposed substantial punishment. More important, Mr. Peeler has demonstrated real growth while in prison. He has not only aged, he has matured. Far from the days of following his brother into the depths of the underworld, he has assumed responsibility for clawing his way back out—and helping others to do likewise. The Supreme Court has recognized that the imposition of a sentence can and should take into account the effect of other sentences. Addressing the appropriate calculation of sentences on predicate counts for a defendant subject to a 30-year mandatory minimum sentence for a § 924(c) offense, the Court stated:

> Dean committed the two robberies at issue here when he was 23 years old. That he will not
> be released from prison until well after his fiftieth birthday because of the § 924(c)
> convictions surely bears on whether—in connection with his predicate crimes—still more

---

[14] Indeed, because Mr. Peeler at the time of sentencing was (as he remains) in primary state custody the court could not effectively award credit prior to the date of sentencing except through a reduction in the sentence imposed.

> incarceration is necessary to protect the public. Likewise, in considering "the need for the sentence imposed ... to afford adequate deterrence," § 3553(a)(2)(B), the District Court could not reasonably ignore the deterrent effect of Dean's 30–year mandatory minimum.

*Dean v. United States*, 137 S. Ct. 1170, 1176 (2017). In this case, Adrian Peeler, who was also 23 when he committed this offense, will be a few years shy of his 50th birthday when he completes his state sentence two years from now. As in *Dean*, this very substantial sentence has already achieved the goals of sentencing.

Finally, even if Judge Nevas did not effectively impose a concurrent sentence originally, the Court now has the authority, notwithstanding with the five-year mandatory minimum under § 841(b)(1)(B), to impose a sentence of time served based upon time already spent in state custody. "[T]he effect of an adjustment [to account for time in state custody] is similar to that of a credit. In that sense, the adjustment is no less proscribed by the statutory minimum than where the prisoner is credited by the BOP for time already served. So long as the total period of incarceration, after the adjustment, is equal or greater than the statutory minimum, the statutory dictate has been observed and its purpose accomplished." *United States v. Rivers*, 329 F.3d 119, 122 (2d Cir. 2003).

## <u>CONCLUSION</u>

For the reasons explained above, Mr. Peeler requests that the Court, absent an order reducing his period of incarceration to time served, schedule his case for a resentencing hearing affording Mr. Peeler to address the Court concerning this motion.

Respectfully submitted,

THE DEFENDANT,
Adrian Peeler

OFFICE OF THE FEDERAL DEFENDER

Dated: May 1, 2020

/s/ James Maguire
James P. Maguire
Assistant Federal Defender
265 Church Street, Suite 702
New Haven, CT 06510
Bar No. ct29355
Phone: 203-498-4200
Fax: 203-498-4207
Email: james_maguire@fd.org

CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on May 1, 2020, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

 /s/ James Maguire
James P. Maguire