UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT


| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 3:99cr67(AWT) |
| v. | |
| ADRIAN PEELER | May 22, 2020 |


## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MEMORANDUM IN SUPPORT OF FIRST STEP ACT MOTION

Defendant Adrian Peeler filed a motion for a resentencing pursuant to Section 404 of the First Step Act of 2018, which made retroactive the portions of the Fair Sentencing Act of 2010 that lowered statutory penalties for certain offenses involving crack cocaine.

The defendant is currently in state custody serving a combined 25-year state sentence for three offenses:  (1) conspiracy to commit murder for his role in the horrifying slayings of 8-year-old Leroy "BJ" Brown and his mother, Karen Clarke; (2) escape from a Department of Correction ("DOC") halfway house while serving a previous term of incarceration for narcotics distribution, and (3) assault of a DOC employee while serving his current term.

Peeler is scheduled to complete his state term of imprisonment on April 9, 2022 and will be transferred to the Bureau of Prisons to begin serving his consecutive sentence of 35 years' imprisonment for his role as a leader in a large-scale crack cocaine distribution operation.

The Government submits that Peeler is not eligible for relief under the First Step Act because retroactive application of the Fair Sentencing Act does not lower his statutory penalties. Further, even if Peeler is eligible for consideration of a reduction in sentence, this Court should

decline to grant such relief under the facts and circumstances of this case. Finally, contrary to the defendant's suggestion, no hearing is necessary.

## I.     Background

The following summary of facts is taken from the Presentence Report ("PSR") to which the defendant did not object and which Judge Nevas adopted. *See* Statement of Reasons [Doc. 390]. See also *United States v. Kennedy,* 21 Fed. Appx 82, 87 (2d. Cir. Nov. 8, 2001) (affirming Peeler's sentence because, *inter alia,* Peeler had ample opportunity to contest his PSR).

### A.  Peeler's Drug Trafficking Operation

During the 1990s, the defendant, along with his brother Russell Peeler ("Russell") were the leaders of a large-scale drug trafficking operation in Bridgeport, Connecticut.  PSR at ¶ 7.

In November of 1995, the defendant was arrested for selling narcotics.  PSR at ¶ 64.  On January 19, 1996 (while on bond for the narcotics case), Peeler was arrested and charged with reckless endangerment and risk of injury for firing several rounds of a "machine gun type weapon" into an apartment with four children ranging in age from 4 to 13.  PSR at ¶ 65.  The defendant subsequently pled guilty to those offenses.  He was sentenced to concurrent terms of 7 years' imprisonment with 30 months to be serve and 3 years' probation.  PSR at ¶ 25.

In February of 1998, Peeler was released to a halfway house in Hartford.  PSR at ¶ 64.  In April 1998, the defendant escaped from the halfway house and returned to Bridgeport.  PSR ¶ at 35.

Peeler immediately reestablished his drug partnership with his brother, Russell.  PSR at ¶ 35. They initially started selling on George Street in Bridgeport, but that location was eventually shut down by law enforcement.  *Id.*  Undeterred, they then began operating out of Marina Village until Peeler was shot in both legs. PSR at ¶ 36. After he was discharged from the hospital (using

a fictitious name to avoid being detected for his escape), Adrian moved to an apartment on Lincoln Avenue.  PSR at ¶ 38.  The Lincoln Avenue apartment was the "stash house" for the Peeler's drug distribution organization.  PSR at ¶ 44.  In addition to narcotics, Peeler stored cash and firearms at the "stash house."  *Id.*

Peeler and his drug trafficking operation used weapons, including AR-15s and AK-47s, as part of their drug operation.  PSR at ¶¶ 37, 42, 43, 50.

In June of 1998, the Peeler brother's expanded their distribution operation to Iranistan Avenue where the drug operation "flourished" PSR at ¶ 49.  The operation was active 24 hours per day for 7 days a week. *Id.*  Three shifts operated each day with one "shift lieutenant" and four distributors working each shift.  *Id.*  The Iranistan Avenue operation sold approximately one kilogram of crack cocaine *every week*.  *Id* (emphasis added).

In addition, the Peeler brothers used a different location, a residence on Earl Avenue, to convert kilograms of powder cocaine into cocaine base ("crack"). PSR at ¶ 47

### B.  The Indictment and Guilty Plea

In August 1999, the defendant, Russell and four co-defendants were charged in a Superseding Indictment related to drug trafficking.[1]

Count One of the Superseding Indictment charged:

From in and about January 1997and continuing through and including January 1999, in the District of Connecticut and elsewhere, RUSSELL PEELER, JR., ADRIAN PEELER, COREY KING, RYAN PEELER, DAMON CLARK a.k.a. "CHEESE" and ANGELINA KEENE, the defendants herein, along with Shawn Kennedy and David Jennings, did knowingly, intention and willfully combine, conspire, confederate and agree together and with others known and unknown to the Grand Jury, to possess with intent to distribute, and to distribute, ***multi kilo-gram quantities of cocaine base*** ("crack"), a Schedule II

---

[1] In addition to the defendant, there were a total of seven individuals charged as co-conspirators.  David Jennings waived indictment and pled guilty.  *United States v. Jennings,* 3:99cr66(AHN).  Shawn Kennedy pled guilty to the Indictment prior to the federal grand jury's return of the Superseding Indictment.  [Doc. No. 75].

controlled substance, in violation of Title 21 United States Code Section 841(a)(1). In violation of 18 United States Code § 846.

Superseding Indictment [Doc. No 80] (emphasis added). Throughout the summer and fall of 1999, the co-conspirators each pled guilty to Count One. [Doc. Nos. 123, 124, 128, 131] On November 2, 1999, a jury was selected for the trial of the defendant and Russell. [Doc. No. 163] The same day, the Government filed an information pursuant to 21 U.S.C. § 851 citing Peeler's prior felony drug conviction. As a result, his statutory mandatory minimum sentence was increased from 10 years to 20 years pursuant to 21 U.S.C. § 841(b)(1)(A). [Doc. No. 161]

Evidence was scheduled to begin on November 15, 1999. On November 9, 1999, Peeler entered into a written plea agreement with the Government. [Doc. No. 176]. The first page of the plea agreement explicitly stated, "Peeler agrees to plead guilty to Count One of the First Superseding Indictment which charges him with conspiracy to possess with intent to distribute kilogram quantities of cocaine base…." *Id.*

During a change of plea hearing, the Honorable Holly B. Fitzsimmons, United States Magistrate Judge, Peeler acknowledged that he had read the Superseding Indictment and that he had discussed it with his attorney and he understood it. Plea Transcript at 10-11 [Doc. No. 257] He also acknowledged that he understood the penalties, including that he faced a mandatory minimum 120-month term of imprisonment, a maximum of lifetime imprisonment, a mandatory minimum term of supervised release of five years, as much as lifetime supervised release following any term of imprisonment imposed, and $ 4,000,000 in fines. *Id* at 20-22.

THE COURT:    Okay. Now, Mr. Peeler, you've said that you want to plead guilty to Count One of the First Superseding Indictment, and in that count you're charged with conspiracy to distribute and possession with intent to distribute, multi-kilogram quantities of cocaine base. That's a violation of Title 18, United States Code, Section 846.

Have you read that charge?

THE DEFENDANT:  Yes.

THE COURT:      I'll have it read out loud to you again unless you tell me that you will waive a reading of the charge.

THE DEFENDANT:  I will waive it.

*Id.* at 26.  As part of the plea agreement, the Government withdrew the 851 notice.  [Doc. No. 175].

The following week, Russell proceeded to trial.  On November 19, 1999 the jury convicted him of Count One (the same count to which Adrian Peeler pled guilty).  "The evidence at [Russell's] trial, consisting largely of testimony from cooperating coconspirators, established that Russell and Adrian Peeler ran a large-scale crack cocaine distribution operation."  *Kennedy,* 21 Fed. Appx. at 85.  On March 24, 2000, Judge Nevas sentenced Russell to life imprisonment to run concurrent to a state life sentence Russell was already serving for murder.  *Id.*

## A.  The Sentencing

Following Peeler's plea of guilty, the U.S. Probation Office prepared a PSR, assigning him a Total Adjusted Offense Level of 43 and a Criminal History Category of V. PSR at ¶¶ 62, 67. The PSR noted that the defendant possessed with intent to distribute more than 1.5 kilograms of cocaine base.[2]  PSR at ¶ 55.  The PSR did not recommend reducing Peeler's offense level for

---

[2] In addition to the language in the Superseding Indictment and the plea colloquy regarding multi-kilograms of cocaine base, the sentencing hearing also noted the testimony during Russell's trial about Peeler's role in the drug trafficking organization  As the AUSA noted, "There was considerable testimony introduced before this Court, through sworn testimony of witnesses, indicating that during Adrian Peeler's involvement, the conspiracy, at various times, was responsible for the distribution of approximately a kilogram of crack cocaine on a weekly basis."  Sentencing Tr. At 40.

acceptance of responsibility (because Peeler was not able to be interviewed).  PSR at ¶ 61.  As a result, his guideline range was life imprisonment. PSR at ¶ 84.

On May 30, 2000, the district court held a sentencing hearing.  Initially, the defendant requested a continuance arguing that he was unable to make any statements at sentencing to support his acceptance of responsibility because he had an upcoming state trial for murder.[3] Sentencing Transcript at 5-6 [Doc. No. 258]. This argument was resolved when the Government agreed that Peeler should receive two points for acceptance without making any statement.  *Id.* at 6-7.

The defendant also requested a continuance expressing concern that the sentencing could taint a prospective jury pool from which a jury in his then-pending state murder prosecution would be drawn. *Id.* at 12.  The court denied the continuance stating:

> "I'm not sure what relevance [this motion to continue] has at all to this proceeding. I certainly see none, based on the charges to which Mr. Peeler pled guilty and based on the charges to which this Court will be sentencing him.  It has to do with another case pending in another court."

Sentencing Tran. at 5, 10.  In fact, throughout the sentencing hearing, Judge Nevas repeatedly commented that he was not considering the murders of Leroy Brown or Karen Clarke in his sentencing decision.

> THE COURT:  I'm not sentencing – You're not here for what you're charged with in state court.  It's a totally separate matter.  You're not here for that.

*Id*. at 33.  See also page 46 ("the Court can make a finding right now that the Court considers it [the information in the PSR relating to the murder of Leroy Brown and his mother,

---

[3] At the time of Adrian Peeler's sentencing hearing, he was awaiting trial for the murders of Leroy "BJ" Brown and Karen Clarke.

Karen Clarke] background information, but that it is not information that will influence the Court in determining the propriety of the sentence to be imposed.").

The Government agreed that the federal sentencing was limited to the drug conspiracy and that the Court should not consider the pending murder charges. *See* Sentencing Tr. at 52 ("There are underlying state charges that aren't part of this case. We're only sentencing Mr. Peeler based on the narcotics case and his criminal history that he's accumulated to date, and looking at that criminal history and looking at the underlying facts in the narcotics conviction, the testimony adduced before Your Honor demonstrated a well organized, well structured, extraordinarily lucrative crack cocaine distribution organization operating in Bridgeport of which Mr. Peeler was a prominent member…").

During the sentencing hearing, Peeler moved to withdraw his plea. The district court denied this request but still gave him a two level adjustment for acceptance of responsibility-- resulting in a guideline range of 360 months to life--and imposed a sentence of 420 months imprisonment. *Id.* at 41. In so doing, the Court noted the benefit he was giving Peeler as well as the seriousness of the defendant's drug operation:

> "I must say that your comments here today would indicate to me that I would have clearly been justified in not giving you acceptance of responsibility, which would have then resulted in a mandatory sentence of life, but weighing all the considerations, I determined it was the fair thing to do, not that your conduct merits fair consideration. Y***ou certainly didn't think in terms of fairness when you pumped kilograms of cocaine into the streets of Bridgeport during all the years that you were running this drug conspiracy and filling the noses and veins of young people with crack and cocaine. That never seemed to bother you, your sense of fairness.*** So, I'm not going to sentence you at the bottom of the guideline range. You don't deserve it."

*Id.* at 53-54 (emphasis added). The Statement of Reasons reflects that the Court adopted the factual statements in the PSR without change. [Doc. No.390].

### B. The Appeal

On November 8, 2001, the Second Circuit affirmed the defendant's conviction and sentence. *United States v. Kennedy,* 21 Fed. Appx. 82 (2d Cir. Nov. 8, 2001). Among the issues the Second Circuit considered was a challenge by Peeler to the sentence under *Apprendi v. New Jersey,* 530 U.S. 466 (2000). The Court found that Peeler did not raise a cognizable Apprendi claim. *89.

> "He pled guilty to conspiracy to possess with intent to distribute multi-kilogram quantities of cocaine base and expressly agreed to the prosecutor's factual proffer that described a complicated and elaborate drug operation."

*Id.* On June 28, 2006, the Second Circuit denied Peeler's petition for a writ of habeas corpus. 2006 U.S. Dist. LEXIS 45811 (2d Cir. June 28, 2006) ("Peeler and his brother…ran a highly-structured narcotics trafficking organization in Bridgeport, Connecticut, that was responsible for the distribution of approximately one-kilogram of crack cocaine per week.").

### A. The Court Should Deny the Defendant's Request for Resentencing

The defendant's motion for a sentence reduction should be denied. The Government is in agreement with the United States Probation Officer's Addendum to the Presentence Report (the "Addendum"), that the offense of conviction is not a "covered offense" as described by the First Step Act because the statutory penalties pertaining to the quantity to which the defendant pled guilty were not modified by the 2010 Act. *See* Addendum at 1-2. Moreover, even if the Court had discretion to resentence the defendant, it should decline to exercise its discretion to do so because (a) the entire record confirms that the defendant is responsible for the distribution of multi-kilogram quantities of crack as set forth in the Indictment, admitted to during the plea

colloquy, included (without objection) in the PSR and relied upon by the Court during sentencing results; and (b) the 3553(a) factors, including Peeler's violent criminal history, do not support resentencing.

## A.  First Step Act

The Fair Sentencing Act of 2010 (the "2010 Act")[4] modified the statutory penalties for cocaine base ("crack") offenses by increasing the quantity of crack required to trigger the enhanced penalties of 21 U.S.C. § 841(b)(1).   Section 2 of the 2010 Act increased the amount of crack needed to trigger the statutory range of 10 years to life in prison from 50 grams to 280 grams; and it raised from 5 grams to 28 grams the amount of cocaine base needed to trigger the (b)(1)(B) statutory range of five years to forty years in prison.  Because Congress in 2010 did not make these revised thresholds retroactive, defendants who had previously been sentenced could not obtain a sentence reduction based on the revised thresholds. That changed on December 21, 2018, when the First Step Act made the 2010 Act's revised drug-weight thresholds retroactive.

Under Section 404(b) of the First Step Act, the Court *may* impose a reduced sentence on a "covered offense" as if Sections 2 and 3[5] of the 2010 Act had been in effect at the time the offense was committed.   Section 404(a) defines a covered offense as follows:

(a)  Definition of covered offense.  In this section, the term "covered offense" means a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010 (Public Law 111–220; 124 Stat. 2372), that was committed before August 3, 2010.

---

[4] Public Law 111–220; 124 Stat. 2372
[5] Section 3 eliminated the 5-year mandatory minimum for simple possession of crack.  This provision does not apply to the facts of the instant case.

Finally, Section 404(c) provides, *inter alia,* that "Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section.

The threshold question for a court facing a First Step Act motion, therefore, is to determine what "violation" the defendant committed. In other words, the Court's task is, essentially, to go back in time and determine whether the defendant would have faced different statutory penalties for his "violation" if Sections 2 and 3 of the Fair Sentencing Act had been in place at the time of the crime.

**B. The Defendant Pled Guilty to Count One of a Superseding Indictment Charging him with Conspiracy to Distribute Multi-Kilogram Quantities of cocaine base, which is not a Covered Offense.**

Peeler pled guilty to Count One of the Superseding Indictment charging him with conspiracy to distribute "multi-kilogram quantities" of cocaine base ("crack"). The 2010 Act did not alter the statutory penalties for offenses over 280 grams of crack. Thus, Peeler remains subject to the same statutory penalties before and after the 2010 Act, and there is no basis for a sentencing reduction in this case.

Count One's inclusion of a quantity of crack that far exceeds 280 grams of crack makes this case different from those cited by the defendant in his brief.[6] It also makes it different from

---

[6] See e.g., *United States v. Benjamin,* 2019 U.S. Dist. LEXIS 177494 (D. Conn Oct. 11, 2019) (noting the difference if Benjamin had been sentenced for the "drug quantity noted in the count of conviction" rather than the offense conduct); *United States v. Pride,* 2019 U.S. Dist. LEXIS 97768, *8 (W.D. Va. June 11, 2019) (defendant indicted for distribution of 50 grams or more of crack cocaine, but PSR attributed 280 grams or more); *United States v. Boulding,* 379 F.Supp. 3d 646,648 (W. D. Mich. 2019)(the jury found the quantity of crack involved in the conspiracy beyond a reasonable doubt was 50 grams or more of crack cocaine, but the PSR held the defendant responsible for 650.4 grams).

most cases considering resentencing under the First Step Act.  See *United States v. Willis,* 417 F.Supp.3d 569, 583 (E.D. Pa 2019) (noting that the "Our experience in this District may be unique because our grand juries return indictments charging a criminal defendant with a specific quantity of crack cocaine [rather than the applicable threshold amounts]")

Prior to passage of the Fair Sentencing Act, indictments relating to the distribution of crack  generally alleged either five grams or 50 grams of crack, even when the actual quantities were much higher, because those were the threshold quantities that triggered application of Section 841(b)(1)(B) or 841(b)(1)(A), respectively.  The Government then proved the actual quantities at sentencing, for purposes of application of the Guidelines.

In most reported cases under the First Step Act, the argument focuses on whether a court, when considering whether there is a "violation," should consider a broad or narrow spectrum of information.  That is, should a court only consider the information contained in the Indictment that was the basis of a defendant's conviction (whether by trial or plea), or should it consider information from outside the indictment (such as stipulations in a plea agreement, facts set forth in a PSR and/or findings made during sentencing).  This debate (which is discussed in more detail below) is immaterial here because the indictment explicitly charged that the offense involved multi-kilograms of crack (far above 280 grams).

Of the few courts that have considered this scenario, where the indictment alleges an actual quantity, rather than the threshold minimum, there is agreement that the defendant is not eligible for a sentencing reduction under the First Step Act.  In *United States v. Rogers,* 2019

U.S. Dist. LEXIS 126301 (E.D. Pa July 25, 2019), the district court held that the defendant was

not entitled to relief under the First Step Act because:

> The superseding indictment here did not simply charge Rogers with a quantity
> in excess of 50 grams. It explicitly charged Rogers with "50 grams or more, that
> is 15 kilograms" of crack. Rogers also stipulated to responsibility for 15
> kilograms of crack in his guilty plea agreement. Thus, Rogers was in fact
> charged by the grand jury with and was convicted of a crime involving more than
> 280 grams of crack, as required to trigger the ten-year mandatory minimum
> under the First Step Act. Unlike many of the cases cited by Rogers, we therefore
> need not and do not rely on the drug quantity as calculated in the Presentence
> Report to reach this result. Because the statutory penalty applicable to his crime
> was not altered, he is not entitled to relief under the First Step Act

*Id. United States v. Dennis,* No. CR 06-00108-KD-B, 2019 WL 3936449, at *3 (S.D.

Ala. Aug. 20, 2019) (holding that the First Step Act did not authorize a sentence reduction where

defendant was charged by indictment with "possession with intent to distribute approximately 34

grams of crack cocaine" because, although the Fair Sentencing Act increased the quantity of

crack cocaine from 5 grams to 28 grams for a mandatory minimum, the defendant's conviction

for 34 grams still subjected him to the same statutory mandatory minimum).

In arguing to the contrary, Peeler simply ignores the fact that a federal grand jury charged

him with "multi-kilograms" of cocaine base and he pled guilty to that charge. Instead, he

attempts to minimize that important fact by describing the inclusion of "multi-kilograms" as

"colorful language" in the indictment. Def. Mem. at 18. Peeler fails to cite a single case (and

the Government has found none) in which a court found a "violation" when the quantity charged

by indictment was in excess of the 2010 Act's revised threshold amounts.

The absence of such case law is understandable. The unambiguous purpose of Section

404 of the recent First Step Act was to place crack cocaine offenders who were sentenced before

August 3, 2010, in the same position as like offenders who were sentenced later. But if a pre-Fair

Sentencing Act offender could gain relief simply because the statute under which he was sentenced has changed—in other words, if *everyone* sentenced before August 3, 2010, under Section 841(b)(1)(A) or (B) may be considered for relief—then that turns the statutory purpose on its head, resulting in disparate and more favorable treatment of *earlier* offenders in relation to later offenders. Using this case as an example, it is undisputed—the defendant admitted—that the crime involved more than 280 grams of cocaine base. Anybody who committed the same crime and was sentenced after August 3, 2010, was subject to Section 841(b)(1)(A), just as the defendant was when he was sentenced. Allowing the defendant to be resentenced now would treat him better than identical, later offenders, in manifest derogation of Congressional intent. This is not permitted by either the language or purpose of the First Step Act. This would create inequities which is contrary to the exact purpose of sentencing.

2. **Alternatively, Consideration of the Plea Agreement, PSR and Sentencing Demonstrates that the Defendant is Ineligible for Resentencing.**

Even if the Court is not inclined to accept that the language in the count of conviction renders him ineligible for consideration under the First Step Act, the Government submits that the term "violation" refers more broadly to the actual offense conduct, to the extent that can be discerned from the record – for example, admitted by a defendant during a guilty plea, or as established in factual findings by a court at sentencing. Here, not only did the Superseding Indictment allege "multi-kilogram" quantities of crack cocaine, it was also part of the defendant's plea colloquy, the PSR and the sentencing.

At no point did anyone – the Court, the Government or the defense – refer to the "multi-kilograms" quantity as merely "colorful language" in the Indictment.

The Government recognizes, however, that there is a split in authority with respect to the whether the term "violation" in Section 404 of the FSA refers narrowly to the statute cited in the charging document or, more broadly, to the actual offense conduct, to the extent that can be discerned from the record either during a guilty plea or in factual findings by the court at sentencing.

At present, no Court of Appeals has yet had occasion to consider this question, and so there is no binding precedent one way or the other. The district courts that have considered the issue across the country are divided, with some decisions adopting the Government's view, *see, e.g.*, *United States v. Glover*, 2019 WL 1562833, at *7–*10 (S.D. Fla. Apr. 11, 2019) and a greater number of decisions finding to the contrary, *see, e.g.*, *United States v. Allen*, 384 F. Supp. 3d 238, 241–42 (D. Conn. 2019). Recognizing that these decisions are merely persuasive authority, the Government offers these observations for the Court's consideration:

First, Section 404(a) defines a covered offense as a "violation . . . *that was committed* before August 3, 2010." (emphasis added). This temporal reference makes it clear that Section 404(a) is referring to something that the defendant actually did – in the words of the statute, "committed" – at a certain point in time. By tethering Section 404(a) to real-world conduct by a defendant at a specific moment in time suggests that Congress meant a "violation" to refer to what the defendant *actually did*, not merely a *legal characterization* of what the defendant did.

Second, a focus on the defendant's actual conduct or violation – as opposed to the statute at issue – makes more grammatical sense, and avoids rendering part of Section 404(b) superfluous. Section 404(a) defines a "covered offense" as a "violation of a Federal criminal statute, *the statutory penalties for which were modified . . . .*" (emphasis added). Under the most natural reading of this sentence, the phrase "the statutory penalties for which were modified"

must modify the critical definitional word "violation" (the direct object of the sentence), not the prepositional phrase "of a Federal criminal statute" (which itself modifies the direct object).

Indeed, it would make no sense for Congress to describe a "*statute*" as having had its "*statutory* penalties*" modified, because that would render the word "statutory" redundant. It is a canon of statutory interpretation that "[a] statute should be constructed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Marx v. General Revenue Corp.*, 568 U.S. 371, 393-94 (2013) (internal quotation marks omitted); *see also United States v. Menasche,* 348 U.S. 528, 538–539 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute' " (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883))). In addition, if it is the "violation," rather than the "Federal criminal statute" which the Court must examine to determine whether the "statutory penalties" have changed, the Court is required to look at something more than simply what the charged statute says.

Indeed, a charging document alone cannot always inform a reviewing court of what "violation" was involved in a case. For example, a count in an indictment might cite 21 U.S.C. § 841(b)(1)(A), but the defendant might plead guilty to a lesser-included offense covered by § 841(b)(1)(B) because the offense involved a smaller quantity of drugs than originally thought. To discern the violation at issue, the court would be required to look at additional documents such as the plea transcript and plea agreement, to determine what the defendant admitted. A judgment of conviction alone will not always shed fulsome light on the "violation" either, even under the defense's view – for example, for a defendant who was convicted and sentenced before the Supreme Court decided *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the judgment might have referenced only 21 U.S.C. § 841(a), and not the penalty provisions of § 841(b)(1). In short,

Section 404(a) of the First Step Act becomes unworkable if its definition of "violation" is limited exclusively to the text of the statute at issue.

In short, the First Step Act defines "violation" as the actual offense conduct, to the extent that can be discerned from the record. Here the record is clear, the defendant's violation was conspiracy to traffic ***multi-kilogram*** quantities of cocaine base. Accordingly, the defendant was not convicted of a "covered offense' under the First Step Act and the Court lacks authority to revisit the 35 year sentence imposed on Count One.

### C. Alternatively, if the Court Finds Peeler Committed a Covered Offense, the Court Should Not Modify the Defendant's Sentence.

Defendant asks the Court to resentence the defendant in two respects: First, by reducing the defendant's sentence from 35 years to 23 years; and Second, to alter the judgment imposed by Judge Nevas by running Peeler's sentence concurrent to the state offense. The Government submits that the Court should not resentence the defendant.

As a preliminary matter, any re-sentencing under the First Step Act are limited by 18 U.S.C. § 3582(c)(1)(B), which permits modification of a sentence to the extent that a statute expressly permits. *United States v. Holloway,* 2020 U.S. App. LEXIS 12376 (2d Cir. April 24, 2020). In reaching a similar conclusion, this Court agreed with the Government that "'[t]he process for determining whether an eligible defendant should receive a reduced sentence, and what any reduction should be, is not a plenary resentencing.'" *United States v. Thompson,* 3:09cr1111 (D. Conn. Oct. 18, 2019) (quoting *United States v. Boulding,* 379 F. Supp. 3d 646, 652 (W.D. Mich 2019).

In order to address the defendant's arguments, it is necessary to review Peeler's murder conviction. As noted above, after he was sentenced on the federal drug conspiracy charge,

Peeler was convicted by a state court jury for conspiracy to murder Leroy "BJ" Brown and Karen Clarke. The facts of that case are well documented in prior decisions affirming his conviction and will not be repeated in detail. However, a brief discussion is necessary for consideration of the consecutive nature of the sentences as well as the 3553(a) factors.

### a. The State Conviction

The following summary of facts are derived from the Connecticut Supreme Court's opinion affirming the defendant's conviction. *United States v. Peeler,* 266 Conn. 611 (2004).

On September 2, 1997, Russell Peeler shot at Rudolph Snead because he believed Snead owed him money. At the time of the shooting, Snead was in a car with two children, one of whom was Leroy "BJ" Brown. Snead survived the shooting and Russell was arrested for the drive-by shooting.

On May 29, 1998, while out on bond, Russell Peeler shot and killed Snead. Forensics from the scene confirmed that the same gun was used in the drive-by shooting and the subsequent murder.

In December 1998, Russell learned that Leroy Brown and his mother had provided statements to the Bridgeport Police Department, which would link him to the attempted murder of Snead. Russell began to inquire about killing Brown and Clarke to prevent the little boy from testifying against him. Initially, Adrian Peeler declined to kill Brown and Clarke, but on January 6, 1999, he was heard telling Russell that he would "take care of it." *Id.*

On January 7, 1999, Brown and his mother were shot to death in a horrifying murder in their apartment in Bridgeport. An eyewitness testified that Peeler chased Clarke and Brown up a

flight of stairs and Brown was "hollering out for his mommy" when Peeler shot Clarke and then turned his gun on Brown. *Id.* at 619.

On January 14, 1999, Russell was arrested for the murders of Brown and Clarke. *Id.* That same day, Peeler boarded a train headed for North Carolina. On January 21, 1999, members of a Federal Bureau of Investigation (FBI) fugitive task force apprehended the defendant in North Carolina. *Id.*

In March of 2000, the defendant's murder case was severed from Russell. *State v. Peeler,* 2000 Conn. Super. LEXIS 2705 at *1 (Oct. 12, 2000). On June 3, 2000, following his conviction for murder, two counts of capital felony and conspiracy to commit murder, Russell was sentenced to life in prison. *Id.* at *2.

Peeler went to trial and was acquitted of the murder and capital felony counts, but was convicted on conspiracy to commit murder. On April 27, 2001, the Court imposed a 20-year sentence and expressly ordered it to run "consecutive to his federal sentence." During the sentencing hearing, the judge (who had presided over the trial) made the following record:

> There isn't a lot that needs to be said about this. I know in my heart what the defendant did, and he does, too. He might not be the worst that I've ever met in this work, but he's right up there.
>
> This crime was committed for an evil motive. The victims were innocent people, a child and his mother. This scheme was senseless, represents a lot of what's wrong with our society; use of drugs, the prevalence of guns, individuals like Mr. Peeler and his brother who have no morals, no values. Anyone who would be willingly involved in an offense of this nature is a monster.
>
> The victims should have been allowed to live their lives happily. That's every American's right. The little boy should have been getting ready for a summer of Little League baseball and swimming in a lake, riding a bike, and he won't because you were involved in a scheme to kill him and his mother.
>
> In comparison to the two innocent lives lost here, a review of the defendant's life reveals that it is without meaning or merit. It is a list of negatives with no positives. He is an

extremely dangerous and cruel and heartless person. Jails were made for people like Adrian Peeler and his brother. Quite frankly, it's difficult to think of him as a person with a soul or with any kind of human feelings. He's a self-centered, self-absorbed coward."

*State v. Peeler,* 2006 Conn. Super. LEXIS 1257, *5 (April 25, 2006). His conviction and sentence was subsequently affirmed on appeal. *State v. Peeler,* 267 Conn. 611, 620, 841 A.2d 181 (2004). A further review also affirmed the imposition of the twenty-year sentence consecutive to the thirty-five year federal sentence. *State v. Peeler,* 2006 Conn. Super. LEXIS 1257 (April 25, 2006). In affirming the consecutive sentences, the court held that

the twenty-year sentence of incarceration the petitioner received on April 27, 2001 was not inappropriate or disproportionate by its length or because the sentence is to be served consecutive to his federal sentence. The petitioner committed a State of Connecticut crime and received a State sentence. That he chose to commit a federal offense does not entitle him to a concurrent sentence.

*Id* at *5-6.

### b. The First Step Act Cannot Be Used to Retroactively Order a Concurrent Sentence for a Subsequently Imposed State Conviction

The defendant argues that the Court should not only reduce the defendant's sentence, but modify it so that the sentence itself runs concurrent to the state sentence that was imposed after he was sentenced by the district court. Defendant, however, cites no authority for using the First Step Act as a conduit to modify the concurrent/consecutive nature of a sentence.[7] The Government submits that, in accordance with *Holloway,* the First Step Act limits a court to only considering whether to reduce a sentence in accordance with the 2010 Act. 2020 U.S. App.

---

[7] Instead, defendant cites *Dean v. United States,* 137 S.CT. 1170, 1176 (2017) which simply provided guidance to a sentencing court regarding the considerations when imposing the mandatory consecutive sentence for 924(c) and the predicate offense. There is simply no authority provided for using the First Step Act to reconsider whether a sentence should run consecutive to a sentence that was not implicated in any way by the 2010 Act.

LEXIS 12376. The Court should not revisit other sentencing considerations that were not considered in the 2010 Act, such as whether to change the consecutive/concurrent nature of the sentence imposed.

Alternatively, if the Court concludes that it can revisit whether the sentence should run consecutive or concurrent to Peeler's state conviction, the record demonstrates that a consecutive sentence is appropriate. At the time of the defendant's sentencing, Peeler was awaiting trial. He had not yet been found guilty. A federal sentencing court has the authority to determine whether a federal sentence will be concurrent or consecutive to an anticipated but not yet imposed state sentence, but it is not required to make a determination before the anticipated sentence is imposed. *Setser v. United States,* 566 U.S. 231, 234-42, 132 S. Ct. 1463, 182 L. Ed. 2d 455 (2012).

As defendant correctly notes, Judge Nevas did not express whether the federal sentence should run consecutive or concurrent to the state case. The absence of such a statement necessitates that they run consecutive. 18 U.S.C. § 3584(a) ("multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently.").[8]

---

[8] The defendant argues that the court should consider the sentence imposed on Russell – a life sentence to run concurrent to the state's previously imposed life sentence for murder – to evidence the court's intention to run Peeler's sentence concurrent to the state. Of course, the opposite is true. The court expressly provided for a concurrent sentence when it was its intention to do so. Here, no such intention was expressed and the case law is clear that, in the absence of such a statement, the sentences should run consecutive. Moreover, any analysis of the court's decision to run Russell's sentence concurrent must consider the posture of Russell's case at sentencing (where he had already been convicted and sentenced by the state to life in prison) and Peeler's case at sentencing (whose trial had not yet begun).

Significantly, throughout the sentencing hearing, Judge Nevas repeatedly mentioned that he was not considering the defendant's pending state charges in his sentence. The sentence he imposed was solely for the defendant's culpability in a large-scale drug trafficking operation.

Finally, as noted above, the state court expressly and clearly determined a consecutive term was appropriate and necessary.

### c. The Court Should Exercise its Discretion Not to Reduce the Defendant's Sentence

As discussed above, the Court lacks the authority to grant the relief sought. However, even if it concluded that it had such authority, the Government respectfully submits that it should exercise its discretion not to disturb Peeler's sentence.

At its core, Peeler's criminal history and offense conduct shows that he is not the type of offender that Congress intended to be re-sentenced or release under the First Step Act. As the Hon. Vanessa L. Bryant noted in *United States v. Slutzkin*, No. 3:09-CR-00060 (VLB), 2019 WL 5696122, *7-8 (D. Conn. Nov. 4, 2019):

> In passing the Fair Sentencing Act in 2010 and the First Step Act in 2018, Congress' objective was to stop over-penalizing non-violent drug offenders. The penalties in place prior to 2010, Congress determined, sometimes served to turn some young people, who may have made one unfortunate mistake, after many years of being housed in federal prison, into career criminals. Hence the Fair Sentencing and First Step Act's desire to lower, at a Court's discretion, sentences for individuals who were within Congress' contemplation when passing these statutes.

Peeler was convicted for his role in as co-leader of a large and prolific drug trafficking operation. He also has convictions for (1) his role in the conspiracy to murder two innocent people to prevent them from testifying against his brother; (2) assaulting a DOC employee and

(3) firing an assault weapon into an apartment with small children present. He simply does not fall into the category of people that Congress had in mind when it passed the Fair Sentencing and First Step Act because he is not the typical non-violent, street level crack dealer for which these drug reforms were intended.

### (i) The nature and circumstances of the offense and the history and characteristics of the defendant – 18 U.S.C. § 3553(a)(1)

Reducing Peeler's sentence would be contrary to the important goals of sentencing set forth in 18 U.S.C. § 3553(a). Peeler's criminal history includes one of the most chilling cases in Connecticut's history -- the cold-blooded murder of an eight-year-old child and his mother because they had the audacity to help law enforcement by agreeing to testify at his brother's murder trial.

In addition, to the conspiracy to murder, Peeler's criminal history includes convictions for (1) reckless endangerment and risk of injury for shooting an automatic weapon into an apartment with four young children inside; (2) escape for walking away from a halfway house; and (3) the assault of a correction official.

As to the instant offense, the record from the Indictment, plea and sentencing is clear that the defendant distributed multi-kilogram quantities of crack for a long period. See *United States v. Morrison,* No. 07-CR-003 (LAP), 2019 WL 6732877, at *3 (S.D.N.Y. Dec. 11, 2019) (holding that, where the defendant stipulated to 150 grams of crack cocaine in his plea agreement, an amount above the 5 grams charged in the indictment, and above the 28 grams now required for a 5-year mandatory minimum under the Fair Sentencing Act, reducing his sentence would give him an undeserved windfall, so a reduction was denied); *United States v. Brown,* No. 1:00-CR-290, 2019 WL 6170574, at *2 (N.D. Ohio Nov. 20, 2019) (holding that, where the defendant

admitted in his plea to possessing 365.9 grams of crack no reduction was appropriate); *United States v. Curb,* No. 06 CR 324-31, 2019 WL 2017184, at *3 (N.D. Ill. May 7, 2019) (holding that, where the defendant stipulated to 4.5 kilograms of crack, his mandatory minimum sentence remained the same before and after the Fair Sentencing Act, so a reduction was not authorized).

Peeler's responsibility for distributing massive quantities of crack in Bridgeport was confirmed in the USPO's Addendum.

> Using an extremely conservative approach, the probation officer believes that the quantity of cocaine base that was readily foreseeable to Mr. Peeler was at least 8.4 kilograms, but less than 25.2 kilograms, triggering a base offense level of 36. USSG §2D1.1(c)(2). After a two-level increase under §2D1.1(b)(1) for possession of a firearm, a four-level increase under §3B1.1(a) for leadership role, and a two-level decrease for acceptance of responsibility under §3E1.1, the total offense level would now be 40. Given Mr. Peeler's placement in criminal history category V, the resulting guideline range would be 360 months to life imprisonment.
>
> Addendum at 4.

While incarcerated, Peeler received numerous disciplinary tickets in the DOC. These include security tampering, assault, destruction of property and five separate instances of contraband. Addendum at 5. He has been infraction free for just over five years – a relatively short period of time for an individual when viewed in perspective to his many years of illegal activity, including an additional criminal offense that he committed while incarcerated, as well as numerous disciplinary issues.

The Government reviewed the complimentary letters submitted on behalf of Peeler from his family, friends and several members of the Yale faculty. The remarkable educational opportunities available to Peeler during his incarceration and the fact, in the past few years, that he took advantage of these programs is commendable. Certainly, the letters of support show Peeler has impressed the faculty with his academic achievements and leadership skills. It was

difficult to read those letters, however, without noticing that not one of his references indicated whether they were aware of the path of destruction Peeler caused as a leader of the drug trafficking operation. There was not a single word acknowledging, as Judge Nevas did, the years spent "filling the noses and veins of young people with crack and cocaine." Similarly, there was not a single word about Leroy "BJ" Brown or Karen Clarke, an 8-year-old boy and his mother whose lives were violently cut short at the hand of Peeler.

Finally, while Peeler's own letter discusses his personal growth during his incarceration, it also continues to evidence his selfishness – focusing on his own upbringing and losses and only giving a generic acknowledgement of the "negative impact my decision to sell drugs has on my community" and that he "stole a lot from my community" Def.'s Mem. At 11-12. Not one mention, in any specific way, of the lives that were damaged by Peeler's conduct --- the co-defendants who served as his "lieutenants" who also spent years of their lives incarcerated; or the customers whose addictions were fueled by Peeler's business. Similarly, Peeler's letter omits any repudiation of his brother, his partner in the drug conspiracy and the person who murdered Snead and then sought Adrian's help to silence the witnesses against him.

Respectfully, the Government submits that the record before the Court evidences a criminal history of significant violence and dangerousness and, only recently, an attempt to venture down a path that could allow him to use his intellectual capabilities in a positive manner. When reviewing the defendant's significant and violent criminal history,[9] the seriousness of his

---

[9] Defendant's argues that, the Court should recalculate the defendant's criminal history and find him to be a category IV (rather than V) because the enhancement for U.S.S.G. § 4A1.1(e)no longer exists in the Sentencing Guidelines. Def. Mem. at 19. Even if a recalculation of the defendant's criminal history category was properly before the Court, the Government submits that Peeler's CHC significantly under represents Peeler's criminal history because it does not include the conviction for conspiracy to commit murder (or his subsequent conviction for assault on a DOC employee).

offense and the characteristics of the defendant, the Government submits that the scale is tipped decidedly against granting any modification to the defendant's sentence.

### (ii) The Need for the Sentence Imposed to Reflect the Seriousness of the Offense 18 U.S.C. § 3553(a)(2)

At the time of Peeler's sentencing, Judge Nevas had sat through Russell Peeler's trial on Count One of the Superseding Indictment. He had heard the testimony of Peeler's co-conspirators, Damon Clark, Shawn Kennedy, Angelina Keene and Corey King about the prolific and dangerous drug operation led by Peeler and his brother. He had sentenced Russell. He was, therefore, in the best position to assess the defendant's criminal conduct and relative culpability.

During the sentencing hearing, Judge Nevas expressed his consideration of the seriousness of the defendant's crime and the need for just punishment. Sentencing Tr. at 54 ("You certainly didn't think in terms of fairness when you pumped kilograms of cocaine into the streets of Bridgeport during all the years you were running this drug conspiracy and filling the noses and veins of young people with crack and cocaine. That never seemed to bother you, your sense of fairness. So, I'm not going to sentence you at the bottom of the range. You don't deserve it").

While certainly the Government appreciates the letters of support offered, and is encouraged that Peeler recently has been more compliant in the prison system and has taken advantage of significant opportunities, they do little to assuage concerns of general and specific deterrence and protection of the public for an individual who, in partnership with his brother, terrorized Bridgeport with their violent drug distribution operation.

Defendant's recitation of studies about the "growing and broad support for alternatives to incarceration, rehabilitation and treatment" do little to counter the observations expressed by the

state court judge when he sentenced Peeler for conspiracy to murder Leroy "BJ" Brown and his mother, Karen Clarke.[10].

> He is an extremely dangerous and cruel and heartless person. Jails were made for people like Adrian Peeler and his brother. Quite frankly, it's difficult to think of him as a person with a soul or with any kind of human feelings. He's a self-centered, self-absorbed coward."

*State v. Peeler,* 2006 Conn. Super. LEXIS 1257, *5

## III.  No Hearing is Required

No hearing is required in this matter, which the Court may readily resolve on the papers, as Peeler is not entitled to relief as a matter of law.

The First Step Act does not mandate a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." Any sentencing reduction in the present matter is authorized under Section 3582(c)(1)(B) ("The court may not modify a term of imprisonment once it has been imposed except that . . . the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure."), which is subject to Rule 43(b)(4). As the Supreme Court explained in *Dillon v. United States,* 560 U.S. 817 (2010), Rule 43, which "requires that a defendant be present at 'sentencing,' *see* Rule 43(a)(3), . . . excludes from that

---

[10] In his brief, Peeler briefly mentions COVID-19 as a factor for the Court to consider when determining the appropriate sentence.  While the Government acknowledges the legitimate concerns and sense of urgency that the pandemic has caused among some prisoners, it should not overtake the Court's consideration of the 3553(a) factors when there is no showing that Peeler has any medical concerns or high risk factors.  See Def.'s Mem. at 23-24 (noting that COVID-19 has limited Peeler's ability to access programming and visit with his family – consequences which are common to all individuals in our society, not just those incarcerated).  Indeed, granting relief solely because COVID-19 exists would be a windfall.  See *United States v. Roberts,* No. 18-CR-528-5 (JMF), 2020 WL 170032, at *3 (S.D.N.Y. Apr. 8, 2020).

requirement proceedings that 'involv[e] the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c),' Rule 43(b)(4)." 560 U.S. at 827-28.

**CONCLUSION**

Based on the foregoing, the Government respectfully requests that the Court deny the defendant's motion for a sentencing reduction because he pled guilty to an offense that is not a "covered offense" under the FSA.  Moreover, even if the Court finds it is a "covered offense," the Court should exercise its discretion and deny the motion because Peeler's significant criminal history, including his role in the murder of two innocent people to prevent their testimony against his brother, and consideration of the § 3553(a) sentencing factors demonstrate that the term of imprisonment of 35 years imposed by Judge Nevas is sufficient but not greater than necessary to achieve the purposes of sentencing.[11]

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

*Nancy V. Gifford*

NANCY V. GIFFORD
ASSISTANT U.S. ATTORNEY
Fed. Bar. No ct16324
Nancy.Gifford@usdoj.gov
450 Main Street
Hartford, CT  06103
Tel.:  860-947-1101

---

[11] Should the Court decide that Peeler is entitled to a reduced sentence, the Government respectfully request an opportunity to submit additional briefing regarding the appropriate sentence in this case.

**CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2020 a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*Nancy V. Gifford*

_____
NANCY V. GIFFORD
ASSISTANT U.S. ATTORNEY