

# State of Connecticut
## DIVISION OF CRIMINAL JUSTICE

OFFICE OF
### THE STATE'S ATTORNEY
JUDICIAL DISTRICT OF FAIRFIELD

JOSEPH T. CORRADINO
STATE'S ATTORNEY

C. ROBERT SATTI, JR.
SUPERVISORY ASSISTANT STATE'S ATTORNEY

1061 MAIN STREET
BRIDGEPORT, CONNECTICUT 06604
TELEPHONE (203) 579-6506
FAX (203) 382-8401

December 31, 2020

VIA EMAIL

Mr. John Durham
United States Attorney
District of Connecticut
157 Church Street
New Haven, Connecticut 06510

RE: ADRIAN PEELER FIRST STEP ACT SENTENCE REDUCTION MOTION

Dear Mr. Durham:

I have learned that Adrian Peeler has applied for a sentence reduction pursuant to the recently enacted First Step Act. I write on behalf of the State of Connecticut to oppose a sentence reduction for this defendant. I was involved with the prosecution of the Peeler Crew during the successful joint State and Federal effort to bring to justice this criminal organization during the late 1990's and early 2000's. The effort was a model of State and Federal cooperation and forged lasting bonds between your office and mine that are still bearing fruit today. My colleague, Susan Campbell has been involved in the extensive post-conviction Peeler litigation. I thus take the liberty to weigh in on this important matter.

The defendant, Adrian Peeler, has filed a motion for resentencing pursuant to Section 404 of the First Step Act of 2018 on May 1, 2020. The Government filed a memorandum in opposition the defendant's request on May 22, 2020. In light of the Government's thorough memorandum of law, I will not wish rehash those concepts. Instead, the State seeks to use this letter to bring more details of the Clarke/Brown/Snead murders to light, highlight the purpose of the First Step Act, discuss the authority of a sentencing court, and to analyze the letters the defendant presented to the Court in support of his motion from the perspective of one who has been involved in this matter from the beginning.

Specifically, the State of Connecticut wishes to highlight for you and the Court that the defendant is not the type of offender for whom the First Step Act was intended because he is a) a recidivist, and b) a violent drug offender. As will be shown below, Adrian Peeler was a half-way house escapee when he conspired to kill an eight-year-old child and his mother whose testimony threatened to bring down his brother and confederate in a narcotics distribution operation for which he is serving the instant federal sentence.

**Factual Background of the Adrian Peeler's State Case**

The defendant, along with his brother, Russell Peeler (Russell), and another associate, Garry Garner (Garner), were convicted of various offenses arising out of the execution of eight-year-old Leroy "BJ" Brown, Jr. and his mother, Karen Clarke.

Russell was convicted of the murder of Rudy Snead and sentenced to 60 years' incarceration, and in a separate trial, the murders of child witness Leroy "B.J." Brown and his mother Karen Clark. Russell was sentenced to death for the Clark/Brown murders, which was subsequently commuted to life without release when Connecticut abolished the death penalty. *State v. Russell Peeler,* 321 Conn. 375 (2016).

Gary Garner was convicted of capital felony for the deaths of Clark and Brown and sentenced to life without release. *State v. Garner,* 270 Conn. 458 (2004). The State sought the death penalty for Adrian Peeler for the Clark/Brown murders. Adrian Peeler was acquitted of murder, but convicted of conspiracy to commit murder. *State v. Adrian Peeler,* 267 Conn. 611 (2004).

The facts surrounding the tragic deaths of Brown and Clarke are essential to this action. The defendant's memorandum portrays him as a hero, comparing the defendant to Aeneas. The myriad letters from educators, fellow inmates, and family members paint a picture of the defendant as one committed to bringing about change in whichever community he settles down upon release. They describe him as a leader, as a caring and compassionate man, as an intellectual, a thinker. Like Virgil's epic poem, this version of Adrian Peeler is a myth.

The facts of the defendant's offenses and his position throughout post-conviction proceedings in the State court reveal the nugget of truth in the Sibylline oracle's warning: the descent to the nether world is easy and it is a place of death. *Arma virumque cano...* The tale of Adrian Peeler the man is one of arms and the consequences of their use on innocents.

The truth that underlays the defendant's carefully constructed myth is that Adrian Peeler, his brother, and their associates are not refugee Trojans who gave birth to a great civilization on the banks of the Tiber, but rather killers who created and defended their drug empire by taking human lives and leaving a trail of terror on the banks of the Pequonnock.

Certainly, the defendant may be some decades older now, but the specter of the Peeler family has left its mark on the city of Bridgeport. The story of the senseless killings has turned the Peeler brothers into real-life boogeymen who haunt parents' nightmares for fear that their children might one day meet the same fate as Clarke and Brown. Try as he might, the defendant's motion should not be considered without looking to his past and evaluating his callous actions which took the lives of an innocent mother and child. Indeed, if he be likened to Aeneas, then he should have learned the lesson the poet teaches with subtlety in his recounting of both the death of Dido and the wars in Latium as commentary on his own age: violence begets violence. If he had, his submission to this Court would be replete with contrition, remorse, and grief. It isn't. What follows is a summary of the Peeler Crew's curriculum vitae, drawn primarily from the decisions of the various courts which have addressed this tragic story.

"In the late 1990s, the defendant and his brother, Russell Peeler (Russell), operated a large-scale drug trafficking network that sold crack cocaine throughout the city of Bridgeport." *State v. Russell Peeler*, 271 Conn. 338, 348 (2004). "The defendant and Russell divided the profits derived from the operation, which were estimated to be as much as $38,000 per week." *State v. Adrian Peeler*, 267 Conn. 611, 615 (2004). "Rudy Snead (Snead) began assisting Russell with the drug operation when [the defendant] was incarcerated in federal prison for narcotics violations until April, 1998." *State v. Garner*, 270 Conn. 458, 463 (2004). "Snead's responsibilities included providing [Russell] with powdered cocaine, which [Russell], with the help of several associates, processed into crack and then sold on the streets. The partnership began to sour when, in 1997, [Russell] accused Snead of overcharging him for the powdered cocaine." *Russell Peeler*, 271 Conn. at 348-49. "As a result of this dispute, Russell attempted to kill Snead on September 2, 1997." *Adrian Peeler*, 267 Conn. at 615.

On that day, "[Russell], Corey King, Shawn Kennedy, and [the defendant's] cousin, Ryan Peeler, were driving in Bridgeport when [Russell] noticed Snead's car parked in the lot of a barber shop. [Russell] observed Snead leave the barber shop, get into his car and drive away. At the time, [Russell] was aware that two young boys, later identified as Leroy Brown, Jr., and Tyrell Snead (Tyrell), were passengers in Snead's car." *Russell Peeler*, 271 Conn. at 349. "One of the children, Brown, was the son of Snead's girlfriend, [Karen] Clarke." *Garner*, 270 Conn. at 463.

"[Russell's] car followed Snead's car to the Lindley Avenue entrance ramp to Route 25. As Snead proceeded up the ramp, he slowed down and pulled off to the side. [Russell's] vehicle pulled up next to Snead's car, and [Russell], who was seated in the right front passenger seat, fired several shots at Snead from a .40 caliber, semi-automatic handgun. [Russell] kept shooting until his gun jammed." *Russell Peeler*, 271 Conn. at 349.

"Several of the shots fired by [Russell] hit Snead, injuring him, but not so severely that he was unable to drive away. A Bridgeport police officer, who noticed glass falling from Snead's car as he drove by, stopped the vehicle. After Snead explained what had happened, the officer sent him to St. Vincent's Medical Center for treatment." *Id.*

"At the hospital, another officer from the Bridgeport police department interviewed Snead and his two young passengers, Brown and Tyrell. The officer's investigative report included the names of all three interviewees. On the basis of Snead's identification of [Russell] as the person who had shot him, [Russell] was arrested and charged with attempted murder." *Id.*

"[Russell], however, posted bond and was released from custody. After his release, [Russell] made it clear to his associates that he was furious with Snead for reporting the Lindley Avenue shooting to the police, and that he was going to 'get' him for giving a statement to the police." *Id.* at 350. Subsequently, "on May 29, 1998, while [Russell] was free on bond following his arrest for the drive-by shooting ...[on Lindley Street], [Russell], who had covered his face to conceal his identity, murdered Snead at the Boston Avenue Barbershop in Bridgeport. [Russell] was represented initially by [the late] Frank Riccio in connection with [the Lindley Street shooting] and, thereafter, by Gary Mastronardi, who filed his appearance on July 23, 1998, in connection with both [the Lindley Street Shooting and Snead's murder case]." *State v. Russell Peeler,* 265 Conn. 460, 463 (2003*), cert. denied,* 541 U.S. 1029 (2004).

"While investigating Snead's death, the Bridgeport police department performed ballistics tests comparing the shell casings retrieved from the murder scene with those from the

3

Lindley Avenue shooting. The tests revealed that all of the bullets had been discharged from the same gun. The police were also aware that Brown could identify [Russell] as the shooter in the Lindley Avenue shooting, thus linking him directly to Snead's murder. On the basis of this information, [Russell] was arrested and charged with Snead's murder." *Russell Peeler*, 271 Conn. at 350.

"Russell *again* secured his release by posting bond. As a condition of his release, Russell was required to be in his house on Chopsey Hill Road in Bridgeport by 9 p.m. each evening. He also was required to wear an electronic ankle bracelet so that his compliance with the court imposed curfew could be monitored." (Emphasis added.) *Adrian Peeler*, 267 Conn. at 616. "Despite these precautions, [Russell] continued operating his drug trafficking business, albeit from a new location." *Russell Peeler*, 271 Conn. at 350.

"In January, 1998, during the course of pretrial discovery in connection with the Lindley Avenue shooting, the state provided defense counsel with the police report identifying Brown and Tyrell as the two passengers in Snead's car when that shooting had occurred. The trial court, however, ordered counsel to conceal the names of the two children from [Russell] to ensure their safety." *Id.*

"During the fall of 1998, [Russell] frequently discussed his pending cases with his attorney, and often speculated as to the identity of the state's witnesses." Id. "[Russell] told Angelina Keene, King, and Kennedy that he would kill the witnesses once he knew who they were. He suspected that Clarke and Brown, among others, were the state's witnesses because he knew that Brown was in the back of Snead's car during the attempted murder." *Garner*, 270 Conn. at 463. Additionally, "[a]fter Snead's murder, the Bridgeport police had protected Clarke and Brown as undisclosed witnesses for the state, but they discontinued protection when Clarke and Brown moved to a house on Earl Avenue in Bridgeport." *Id.*

"[Russell] noticed that his attorney had made an extraordinary effort to prevent him from learning the name or names of the state's witnesses. [Russell], however, remembered that during the Lindley Avenue shooting Snead had been accompanied by two children, Tyrell and Brown. He therefore surmised that those children could be the state's witnesses in the cases pending against him." *Russell Peeler*, 271 Conn. at 350-51.

"Following the consolidation of the two cases [involving Snead], on August 11, 1998, the state filed a motion for a protective order to preclude disclosure to the defense of the identity of certain witnesses, including the two minor victims, Brown and Tyree (sic.) Snead. At the hearing on that motion, held on October 6, 1998, the trial court, Ronan, J., provided Mastronardi with two alternatives: (1) the court would order disclosure of the names and addresses of the state's witnesses to Mastronardi, but would prohibit him from disclosing that information to [Russell]; or (2) the court would grant [Russell's] discovery motion with the names and addresses redacted. The court assured Mastronardi that, prior to trial, he would be able to share the information with [Russell] to prepare his defense. Mastronardi advised the court that he knew that there were two minors involved in the drive-by shooting and that he and [Russell] already knew their names. On December 9, 1998, the court nevertheless issued an order precluding Mastronardi from disclosing to [Russell] the names and addresses of any witnesses who had given statements to the police. Pursuant to that court order, on or about December 23, 1998, senior assistant state's attorney C. Robert Satti, Jr., provided Mastronardi with the statement by Brown regarding the drive-by shooting and filed with the clerk of the court notice of service of disclosure with an attached supplemental disclosure listing, *inter alia*, the statement given by Brown. Tragically, on

January 7, 1999, [just 15 days after discovery was provided to Russell] Brown and his mother, Karen Clarke, were brutally murdered in their apartment on Earl Avenue in Bridgeport, where they recently had moved." *Russell Peeler*, 265 Conn. at 463–64.

"Russell and his drug trafficking associates were using a house located at 200 Earl Avenue in Bridgeport to process crack cocaine. The residents of that house...were crack cocaine users who obtained their drugs from Russell and the defendant's drug operation." <u>Adrian Peeler</u>, 267 Conn. at 617. "Norman Williams owned the house at 200 Earl Avenue, which was across the street from the Clarke residence [at 207 Earl Avenue], and lived there with his son, Marcus Williams, Josephine Lee and Kathy Esposito. All of them used crack cocaine. Russell regularly visited 200 Earl Avenue to use the kitchen to 'cook' crack cocaine. In exchange for the use of the kitchen, [Russell] gave Norman Williams some of the finished product. In addition, Russell frequently sold crack cocaine to Norman Williams and delivered it to the house. ... One afternoon, when Russell was at 200 Earl Street to deliver crack cocaine, he saw Brown in the driveway across the street. Brown froze and ran inside his house when he saw Russell. At that time, Russell became convinced that Brown was one of the witnesses he had been looking for." *Garner*, 270 Conn. at 464.

"Russell did not learn, however, until December 23, 1998, that Brown and his mother, Clarke, had given the police sworn, written statements about the Lindley Street shooting." *Adrian Peeler*, 267 Conn. at 616. "Upon learning that Brown's testimony linked him to the Lindley Street shooting and that the ballistics evidence connected that shooting with the murder of Snead, Russell began to speak about killing Brown and Clarke. On one such occasion, Russell and the defendant had a heated discussion in which Russell repeatedly implored the defendant to kill Brown and Clarke. The defendant declined to do so, however." *Adrian Peeler*, 267 Conn. at 617.

"In December, 1998, [Russell] told his girlfriend, Angelina Keene, that she should move away from Bridgeport because he was going to start killing the witnesses against him. At about the same time, [Russell] offered Kybarris Taylor (Taylor) $10,000 to kill two people. Specifically, [Russell] told Taylor that he wanted to eliminate 'two nobodies.' Taylor refused the offer. [Russell] also asked ... [the defendant] and Josephine Lee, a crack addict and prostitute who lived across the street from Clarke and Brown, to carry out the killings. They too initially refused. Ultimately, however, [the defendant] agreed to commit the double homicide." *Russell Peeler*, 271 Conn. at 351-52.

"[Russell] also told his associates that he wanted the witnesses killed with a revolver because, unlike a .40 caliber semi-automatic handgun, the shell casings would not be discharged from the revolver, making it more difficult to link the shootings to the gun. In October, 1998, one of [Russell's] associates in the drug trade, Albrent Daniels (Daniels), procured for [Russell] the revolver that was to be used to kill Clarke and Brown. Michael Lanier, a drug user, went to a crack house that was controlled by [Russell] and offered to trade Daniels a .357 magnum revolver in exchange for drugs.[1] Daniels contacted [Russell] and asked whether he was interested in acquiring the gun. [Russell] agreed, and Daniels subsequently traded for the revolver. King, another associate of [Russell], then picked up the gun from Daniels and delivered it to [Russell]." <u>Id.</u>

---

[1] "Marshall Robinson, the state's firearms expert, testified that Brown and Clarke were both killed by bullets from a .357 Magnum." *Russell Peeler*, 271 Conn. at 386.

5

"King testified that at one point after [Russell] had gained possession of the gun, [Russell] described to several of his associates, including [the defendant], what he intended to do with it. He said that he would put the gun to Brown's head and go '[p]ow,' simulating the sound of a gunshot. The gun eventually was given to [the defendant]." *Id.*

"Lee testified that on January 6, 1999, the day before the Clarke and Brown murders, [Russell] and an associate, later identified as King, were at the house located at 200 Earl Avenue. According to Lee, the two men spent time in the dining room observing Clarke and Brown's residence. Lee further testified that [Garner and the defendant], also came by the house that day. At some point, King left Lee's residence and, thereafter, Lee observed [the defendant] and [Russell] conversing in the dining room." *Id.* at 353. "When Lee left the house to buy cigarettes, she noticed [Garner] walking back and forth on the street in front of the Clarke house but he was gone when she returned." *Garner*, 270 Conn. at 464.

"[Russell] and [the defendant] then entered the kitchen and 'cooked' some crack. Lee testified that [Russell] asked her if she would 'do him a favor ... [and] kill the woman across the street ....'" *Russell Peeler*, 271 Conn. at 353. "Russell offered Lee 'a couple hundred' dollars if she would kill Clarke. Lee, who testified that she never had handled a gun, declined to do so, however." *Adrian Peeler*, 267 Conn. at 617. "[Russell] thereupon asked [the defendant] if he would kill Clarke and her son. According to Lee, [the defendant] indicated that he would 'take care of it.'" *Russell Peeler*, 271 Conn. at 353.

"Russell asked Lee to assist [the defendant] by calling him when Clarke and Brown were at home and by helping [the defendant] gain entry into the Clarke house." *Garner*, 270 Conn. at 464. "[Russell] wrote down his beeper number for her to call. [Russell] then gave Lee a handful of crack cocaine as payment for her cooperation." *Russell Peeler*, 271 Conn. at 353.

"Lee testified further that, the next day, in the late afternoon, she was at home 'getting high' when she observed Clarke pull into her driveway. Both Clarke and Brown exited the car and entered Clarke's house. Lee then called Russell's beeper number. Upon receiving the beeper message, Russell called Lee back. Lee told Russell that 'the little boy and lady [were] home.' A few minutes later, Lee entered her living room and saw the defendant standing there. The defendant, who was dressed in black and had a gun in his hand, greeted Lee and then left Lee's house through the front door. Lee followed him." *Adrian Peeler*, 267 Conn. at 618.

"The defendant crossed the street and walked toward Clarke's house. The defendant stopped, however, to speak to Garner, who was the lone occupant of a car that was parked in front of Clarke's house. Lee testified that she heard the defendant tell Garner that 'he was going in.' According to Lee, Garner then warned her that if she 'said anything,' she and the 'whole house' were 'going to get it, too.' *Adrian Peeler*, 267 Conn. at 618.

"[The defendant] and Lee approached Clarke's residence and Lee rang the front doorbell while [the defendant] remained behind her. Lee heard a voice from inside the house ask, '[w]ho is it?' Lee responded, '[t]he girl across the street.' Clarke cracked open the door, at which time [the defendant] pushed past Lee and forced the door open." *Russell Peeler*, 271 Conn. at 354. "[The defendant] forced his way in and fired a shot. Lee followed and saw Clarke and Brown run upstairs with [the defendant] in pursuit, shooting at them". *Garner*, 270 Conn. at 465.

"Lee testified that she heard the rustle of grocery bags, which were later found strewn across the floor, and the sounds of a struggle inside. When Lee entered the house, she saw Clarke and Brown running up the stairs trying to escape from [the defendant], who was chasing them. According to Lee, once Clarke and Brown reached the top of the stairs, she heard a gunshot, and then heard Brown scream out, 'mommy, mommy, mommy, mommy,'[2] from the top of the stairs. Lee then saw [the defendant] pursue Clarke into a bedroom and heard him mention something about Brown being a witness to a shooting. Lee, who by this time was at the top of the stairs, testified that she had heard another gunshot and, immediately thereafter, observed [the defendant] emerge from the bedroom." *Russell Peeler*, 271 Conn. at 354.

"[The defendant] then went back into the hallway and shot Brown in the head, killing him. [3] [The defendant] passed Lee as he went down the stairs and threatened to kill her if she said anything about what she had witnessed." *Garner*, 270 Conn. at 465. "Lee, who was still at the top of the stairs, testified that she initially had stood frozen, but eventually left to return to her residence at 200 Earl Avenue. On her way out of Clarke and Brown's house, Lee noticed [the defendant] was gone, as was the car in which Garner had been sitting. Louis Ellis, who also lived at 200 Earl Avenue, corroborated Lee's account, testifying that on the evening of the murders, he heard four or five gunshots, and shortly thereafter, he heard Lee run into the house breathing hard, as if out of breath." *Russell Peeler*, 271 Conn. at 354-55.

"After the shootings, the defendant drove to a Comfort Inn motel in Milford and checked in under a false name. He subsequently went with Kennedy and King to the mall in Stamford." *Adrian Peeler*, 267 Conn. at 619. "[The defendant] told Kennedy that they were going to meet [Garner] there because he was 'stranded.' After the group met [Garner] at the mall, [the defendant] gave [Garner] some money. Kennedy testified that [Garner] was not stranded, but was using [Russell's] blue rental car. The next day, Ryan Peeler drove Russell to the Comfort Inn in Milford to meet [the defendant]. Ryan Peeler saw [Garner] in the hotel parking lot." *Garner*, 270 Conn. at 465.

"The defendant eventually returned to the Comfort Inn where he remained until the next morning. The next day, the defendant purchased a round trip plane ticket to North Carolina under another false name. The defendant was to leave for North Carolina on January 10, 1999, and was to return to Connecticut on January 16, 1999. The defendant thereafter changed his departure date for January 17, 1999, and his return date to January 23, 1999. The defendant never used the ticket, however, and did not exchange it or seek a refund." *Adrian Peeler*, 267 Conn. at 619.

Subsequently, "[Russell] was arrested for the murders of Clarke and Brown and charged with one count of murder, two counts of capital felony—one for the murder of Brown, and the second for the double murder—and one count of conspiracy to commit murder." *Russell Peeler*, 271 Conn. at 355. "Soon thereafter, the Bridgeport Post ran a story about Russell's arrest that included a photograph of the defendant. That same day, at the defendant's request, Kennedy drove the defendant to New York City where the defendant boarded a train headed for North Carolina. On January 21, 1999, members of a Federal Bureau of Investigation (FBI) fugitive task force apprehended the defendant in North Carolina in connection with the murders of Brown and

---

[2] At the defendant's trial, Lee described Brown as "hollering out for his mommy."
[3] Evidence at the defendant's trial would show that Clarke was shot twice, after reaching a telephone, presumably to call for help. Brown, the defendant's eight-year-old victim, was shot four times. *Adrian Peeler*, 267 Conn. at 650.

Clarke. The defendant subsequently was charged with two counts of capital felony..., one count of murder, and one count of conspiracy to commit murder." *Adrian Peeler*, 267 Conn. at 619-20.

Several days after the defendant's arrest "FBI Special Agent Mark Rozzi, one of the arresting officers, was informed that the defendant wished to speak with him. When Rozzi arrived at the jail where the defendant was being held, the defendant expressly waived his Miranda rights. Rozzi then asked the defendant what he wanted to say. The defendant began the conversation by mentioning a cellular telephone that he had possessed from early December until the date of his arrest. Rozzi asked the defendant why he wanted to discuss his cellular telephone, and the defendant responded that he wanted to clear his name regarding the murders of a young boy and his mother.[4] In particular, the defendant indicated that he wanted to explain his whereabouts at the time of those murders. Rozzi told the defendant to tell him where he had been on the day of the murders, from the beginning to the end of the day. The defendant, however, began by informing Rozzi that he was at the Comfort Inn between 5 and 7 p.m. that day, and that he went to the mall in Stamford later that evening. Thereafter, he returned to the Comfort Inn where Latosha McKnight, the defendant's girlfriend, joined him sometime between 9 and 10 p.m. According to the defendant, McKnight stayed with him in his motel room until 2 or 3 a.m. the next morning. The defendant further indicated that he could not recall his whereabouts prior to 5 p.m. on the day of the murders." *Adrian Peeler*, 267 Conn. at 643–44.

Prior to trial, the State sought to add a fifth count alleging conspiracy to violate the Corrupt Organization and Racketeering Activity Act (CORA) to the defendant's long form information. Contained within the CORA count, the State charged eight separate incidents of "'street gang' allegations and more specifically individual instances of narcotics activities on the part of Adrian Peeler in November 1995 (1st Incident Substitute Information CR99 148397T), a 1996 shooting (2nd Incident), other narcotics trafficking in January of 1995 and June of 1996 (3rd Incident), additional narcotics counts in both April of 1999 (sic) and January of 1999 (4th Incident), complicity in the murder of Rudolph Snead, Jr. in May of 1998 (5th Incident). A separate murder is also included as Incident Six in the CORA count (Karen Clark's murder). Incident number seven of the CORA count alleges another murder (Leroy Brown's) and lastly, the 8th Incident of the CORA count charges another murder conspiracy, involving an agreement to kill Karen Clarke and her son." *State v. Adrian Peeler*, No. CR99148397, 2000 WL 1683408, at *1. The defendant filed a motion to sever and dismiss the fifth count. The Court granted the motion to sever, but denied the motion to dismiss. *Id.*

At the defendant's trial, coconspirator statements were presented through the defendant's cousin, Ryan Peeler. "Ryan ... testified that, on the evening of the murders, he drove Russell's car, which he had borrowed earlier that day, to Russell's house on Chopsey Hill Road where the two men played video games. Russell told Ryan that he had been home all day and that the defendant was 'doing something' for him. That same evening, Russell asked Ryan to take Russell's car when he left. The next morning, Ryan drove to Russell's house, picked him up and, at Russell's direction, took him to the Comfort Inn motel in Milford where they met the defendant. On their way to Milford, Russell told Ryan that the defendant 'did something' for him and warned Ryan 'not to say anything about it.' Upon their arrival at the Comfort Inn, Russell

---

[4] The defendant's cell phone records would reveal that "there were both incoming and outgoing calls at or around the time of the murders. According to the state's version of the offenses, the defendant planned these incoming and outgoing calls to buttress his alibi that he was otherwise occupied at the time of the murders." *Adrian Peeler*, 267 Conn. at fn. 24.

went inside and Ryan waited outside. Russell eventually emerged from the motel with Garner." *Adrian Peeler*, 267 Conn. at 627.

Ryan also testified that "[a] day or two after the murders, Ryan, Russell and Kennedy were together in an apartment on Lincoln Avenue in Bridgeport when Russell received a telephone call. Ryan heard Russell ask the unidentified caller, 'Did you file that down?' Ryan also heard Russell use the word 'river' during the telephone conversation." *Adrian Peeler*, 267 Conn. at 627.[5]

Additional evidence was presented in Garner's case that "[a]fter Russell was arrested for the murders, he told Keene to get the remaining money from the drug operation from Kennedy. She did so and gave a portion of it to [Garner]." Garner, 270 Conn. at 465-66. Additionally, "Demetrius Geter, [Garner]'s half-brother, testified that sometime after the murders [Geter] approached [Garner] about procuring a gun. [Garner] responded that the only gun he had access to had been used in a homicide and that [the defendant] had given it to him." *Id.*, 270 Conn. at 466.

Further, in Garner's case, "[t]he jury was presented with tape recordings of [Garner's] telephone conversations with associates while he was incarcerated after the murders of Clarke and Brown. The tape recordings contain the following statements made by [Garner]:

1. 'Although, I'm not the actual person, you know what I'm saying, that committed anything, uh, and, the way the lady got it was wrong; I, I wasn't even driving in the same car as him, you know what I'm saying. I explained that I was driving in another car like scoping out the area, you know what I mean, so whatever he's going to do, he, he, he's come clean doing it, you know what I'm saying....'
2. '[A]s long as you do your thing and get away clean, then yeah, nobody's going to be under any pressure, but now man, uh, he made a blunder, by carrying out whatever he carried out in front of that, in the presence of a woman, who witnessed it, okay....'
3. 'Yo, look, the bottom line is this, I may have assisted, I mean, you know, I mean, it's like, uh, I mean, you boys, you do favors for them, you know what I'm saying....'
4. 'But I'm saying this, right, truth is, I wasn't there on the scene with who did that. I know he did it, you know what I'm saying, but, I was in another car, I was in another rental car, you know what I'm saying, and I, and making sure that it was clear. That was it.'
5. Garner also stated that he was 'patrolling the area' and that '[h]e just told [me] to watch his back...so I did.'
6. '[H]e came and he picked me up from East Avenue.... [H]e brought me over um, to his father uh, house where his brother was at and he gave me the keys for the

---

[5] It is important to note here that "the trial court improperly instructed the jury that Ryan's testimony regarding Russell's statements could be considered only in regard to the conspiracy charge. When a hearsay statement is admissible under the coconspirator exception to the hearsay rule, its admissibility is not limited to proving the existence of the conspiracy or any other element of the conspiracy charge. As long as the statement at issue is relevant to the other charges, the jury may consider it for the truth of the matter asserted in connection with those other charges. *See* 2 C. McCormick, Evidence (5th Ed. 1999) § 259, p. 159 ('[a] conspiracy need not be formally charged for coconspirator statements to be admissible if a conspiracy in fact exists')" *Adrian Peeler*, 267 Conn. at fn. 13.

car. And he, you know, briefly ran down, you know what I'm saying, what he was trying accomplish, you know, I'm like pshh, so I imagine, um, I mean it, it wasn't the most, uh, let me see, wise decision I could have made, I mean it's stupid ....'"

*Id.*, 270 Conn. at 473–74.

"As part of the joint investigation into [Russell's] drug trafficking business, a FBI confidential informant ... agreed to engage Keene ... and Ryan ... in a conversation while wearing a concealed recording device. During that conversation, Keene stated that she directed [the defendant] to tell [Russell] to stop sending her letters from jail with other people's names in them. She also stated that she thought David Jennings, who cooked crack for [Russell], was an FBI informant and that someone needed to kill him. Ryan agreed that 'he needs to die.' Keene and Ryan then discussed Lee, and Keene stated 'that bitch Josephine [Lee] needs to die.' Nevertheless, both agreed that there was no way to kill Lee while she was incarcerated." *Russell Peeler v. Comm'r of Corr.*, 170 Conn. App. 654, *cert. denied*, 325 Conn. 901 (2017).

"While incarcerated and awaiting trial, [Russell] inculpated himself [and the defendant] to fellow inmates. Two of those inmates, Aundrey Holeman and Thomas Kerr, testified that while each was incarcerated with [Russell], [he] had bragged about his involvement in the murders. Holman (sic) testified that he had overheard [Russell] tell another inmate that his brother would not testify against him because [Russell] had murdered one person, but his brother had murdered two, and that [Russell] was pleased with his brother because [the defendant] 'had done something righteous' for him 'that nobody else ... would do ....' Kerr testified that [Russell] had told him that 'that bitch,' Clarke, rather than [Russell] himself, was responsible for both of the deaths, and that '[s]he should have known not to mess with him.' ... After a jury trial, [Russell] was found guilty on all counts." *Russell Peeler*, 271 Conn. at 355.

"After [his] jury trial, the defendant was convicted of conspiracy to commit murder and acquitted on the other charges." *Adrian Peeler*, 267 Conn. at 620. "The trial court sentenced the defendant to a term of twenty years imprisonment, to run consecutive to a previously imposed federal sentence of thirty-five years imprisonment for the commission of certain federal narcotics offenses." *Id.*, 267 Conn. at fn. 3. Ultimately, the State chose not to pursue the CORA count in light of the defendant's conviction and sentencing of a total of nearly six decades. In 2013, nearly twelve years after his conviction, the defendant filed a habeas petition claiming, *inter alia*, actual innocence on the basis that Lee had lied and later recanted her story to a therapist. The Habeas Court concluded that "the [defendant] was unable to produce any competent or credible evidence that Josephine Lee ever made such a statement." *Adrian Peeler v. Warden*, No. CV044000151, 2013 WL 6912821, at *11. In the end, the defendant's entire petition was summarily denied. *Id.*

The defendant was also prosecuted federally, along with several other individuals,[6] including his brother, Russell. "[Russell] proceeded to trial on November 15, 1999, and on November 19, the jury convicted him of conspiracy to possess with intent to distribute multi-kilogram quantities of crack cocaine. The evidence at trial, consisting largely of testimony from cooperating coconspirators, established that [Russell] and [the defendant] ran a large-scale crack cocaine distribution operation. On March 24, 2000, the district judge sentenced [Russell] to life

---

[6] Among the Petitioner's co-defendants were Shawn Kennedy, Damon Clark, Ryan Peeler, Angelina Keene, and Corey King.

imprisonment, to run concurrent to a state life sentence Russell was already serving for murder." *United States v. Kennedy*, 21 Fed. Appx. 82, 85 (2d Cir. 2001). "At [Russell's] trial, the government sponsored seven cooperating witnesses, each of whom had pled guilty to a federal crime and entered into a cooperation agreement." *Id.*, 21 Fed. Appx. at 87. Russell has since filed numerous habeas petitions and appeals in state and federal court.

Russell's last habeas petition consisted of, *inter alia*, a *Brady* claim that the state did not disclose the recorded conversation between Ryan Peeler and Angelina Keene. The Court determined that "[t]he state's murder case was premised on the Peeler family running a major cocaine distribution network in the Bridgeport area, and the extreme efforts employed by that organization to maintain that network and remove threats to members of the group by brutally murdering antagonists, including a young child. ... [T]he recorded conversations reinforced the prosecution's characterization of the enterprise and the extent to which this gang's members were willing to go to preserve the business and insulate themselves from the reach of the law. ... The content of the conversations portrays the cocaine trafficking outfit, led by [Russell] and [the defendant], as a cold-blooded crew of calculating criminals willing to employ extreme measures to protect the family from prosecution." *Peeler v. Warden*, No. TSRCV084002745S, 2014 WL 12616206, at *7-8.

**The First Step Act and Non-violent Drug Offenders**

The defendant seeks resentencing under Section 404 of the First Step Act of 2018. Despite his attempts to hide his true character, however, the defendant is far from the poster child for this unprecedented bipartisan legislation. When the First Step Act of 2018 was passed, it did so with wide support from both sides of the aisle, as well as the ACLU, the National District Attorneys Association, and even the Fraternal Order of Police. The legislative history of the First Step Act of 2018 repeatedly mentions the need to remedy draconian sentences passed down to nonviolent drug offenders. Yet the intent does not contemplate someone of the defendant's background. On December 17, 2018, Senator John Cornyn of Texas addressed his colleagues regarding the First Step Act:

> The goal of this bill is not to release broad swaths of criminals – in fact, it is just the opposite. This legislation allows prisons to help criminals transform their lives, if they are willing to take the steps and responsibility to do so, so that we are not perpetuating the cycle of crime that continues to plague communities across the country and to drain taxpayer dollars in the process and damage public safety.

164 Cong. Rec. S7639-03, 164 Cong. Rec. S7639-03, S7642.

The concern for community and public safety was echoed in the sentiments of Senator Dick Durbin of Illinois.

> As a result of mandatory minimums, the families of nonviolent offenders are separated for years on end. Most of these families are people of color. This has a destructive impact on their communities and erodes faith among them in our criminal justice system.... The First Step Act would eliminate this mandatory life sentence for nonviolent drug offenders like Alton Mills [a low-level drug runner for a local street gang who received a life sentence at the age of 24], and the bill would also give a

chance to thousands of people still serving sentences for nonviolent offenses involving crack cocaine under the 100-to-1 standard.

164 Cong. Rec. S7639-03, 164 Cong. Rec. S7639-03, S7645.

One would be hard-pressed to consider the defendant as among those deserving of such legislation. While at first blush the defendant's federal convictions might seem to place him in the "eligible category" for the First Step Act, these cannot be looked at in a vacuum. It would be incongruous to isolate his federal crimes from everything else, choosing to ignore the man, himself. The legislators spoke of healing communities with this legislation. They spoke of young men, doomed to a lifetime of prison walls, simply for selling a few "dime bags" on the street— young men who were mere pawns for the gangs and kingpins that ran the streets with an iron fist. Adrian Peeler is not one of those men. In the early 1990s, Adrian Peeler was not a big fish in Bridgeport's little pond, he was *the* big fish. Simply put: the defendant is not a nonviolent drug offender for whom this legislation is intended. He and his brother terrorized the streets of Bridgeport, destroying the very community that raised him, disgracing the memory of their mother who was a Bridgeport police officer, and leaving drugs and bodies in their wake. In fact, the Peelers provoked a change in Connecticut's Rules of Practice. Following the murder of Clark and Brown, the Connecticut Judiciary modified Practice Book 40-10 to restrict dissemination of material provided by the State in discovery. The Connecticut General Assembly also reacted, passing the Leroy Brown, Jr. and Karen Clarke Witness Protection Program codified at Conn. Gen. Stat. §54-82s et seq. The defendant's legacy in his community renders him undeserving of the First Step Act and this Court should deny his motion.

## Sentencing Considerations

The defendant seeks to have his federal sentence reduced in light of the time he has spent in state prison. While it is well established that a state court may impose a consecutive sentence on a previously imposed federal sentence, a brief discussion of law is necessary here. "A state court's inherent right to impose consecutive sentences has been recognized at common law in Connecticut and elsewhere. ... The power to order a consecutive sentence includes the authority to impose a sentence consecutive to one imposed by a court in a different jurisdiction." (Internal citations omitted.) *State v. Walzer*, 9 Conn. App. 365, 367 (1986), *cert. denied*, 202 Conn. 802 (1987).

The logic behind such a common law rule is clear: no two defendants are alike. A court enjoys the discretion at sentencing to evaluate the defendant and not simply his crime. *See Williams v. New York*, 337 U.S. 241, 247 (1949) (recognizing that the "prevalent modern philosophy of penology that the punishment should fit the offender and not merely the crime.") In making such an evaluation, the Court may then determine whether the individual before the tribunal would be best served with a concurrent or consecutive sentence. Such a decision should also take into account not simply the offender, but also what is best for justice and for society as a whole. Among the factors to consider is whether the nature of the crimes makes cumulative punishment appropriate. *See, e.g. State v. McKaughen*, 700 P.2d 93, 94 (Idaho App.1985).

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). "Consistent with this principle, [the

Courts] have observed that both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law. In particular, [they] have emphasized that [h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant." *Pepper v. United States*, 562 U.S. 476, 488 (2011), *quoting Williams, supra*, 337 U.S. at 246–247.

A sentencing court's discretion is truly sacred. They are privy to the very best and the very worst of the person standing before them. The defendant, in many ways, is the poster child for this concept. On April 27, 2001, less than two years after the defendant's own participation in an extra-judicial death sentence for an innocent little boy and his mother, the defendant received his own relatively light sentence. When the Superior Court chose to impose a sentence of twenty years to serve, consecutive to the defendant's thirty-five-year federal sentence, it was done so in consideration of the gravity of the defendant's conduct and role in the conspiracy to kill this family.

Several years after the defendant's trial, he sought a sentence review. The three-judge state panel evaluating his sentence relied heavily on the state trial court's words at sentencing.

> After reviewing the record in its entirety, the Division agrees with the sentencing court's rational for the sentence it imposed. The Court stated as follows:
>
> There isn't a lot that needs to be said about this. I know in my heart what the defendant did, and he does, too. He might not be the worst that I've ever met in this work, but he's right up there.
>
> This crime was committed for an evil motive. The victims were innocent people, a child and his mother. This scheme was senseless, represents a lot of what's wrong with our society; use of drugs, the prevalence of guns, individuals like Mr. Peeler and his brother who have no morals, no values. Anyone who would be willingly involved in an offense of this nature is a monster.
>
> The victims should have been allowed to live their lives happily. That's every American's right. The little boy should have been getting ready for a summer of Little League baseball and swimming in a lake, riding a bike, and he won't because you were involved in a scheme to kill him and his mother.
>
> In comparison to the two innocent lives lost here, a review of the defendant's life reveals that it is without meaning or merit. It is a list of negatives with no positives. He is an extremely dangerous and cruel and heartless person. Jails were made for people like Adrian Peeler and his brother. Quite frankly, it's difficult to think of him as a person with a soul or with any kind of human feelings. He's a self-centered, self-absorbed coward.

*State v. Adrian Peeler*, No. CR99148397, 2006 WL 1319835, at *1–2. The State, at that same hearing, lamented that the defendant's twenty-year sentence, albeit the maximum imposed, certainly did not reflect the gravity of the defendant's monstrous acts. *Id.* at *1.

The Sentence Review panel concluded as follows: "Accordingly, the twenty-year sentence of incarceration the [defendant] received on April 27, 2001 was not inappropriate or disproportionate by its length or because the sentence is to be served consecutive to his federal sentence. The petitioner committed a State of Connecticut crime and received a State sentence. That he chose to commit a federal offense does not entitle him to a concurrent sentence." *Id.*, at *2.

Simply put, the Superior Court made a calculated decision to sentence the defendant to the maximum sentence, and, further, to run that sentence consecutively to the defendant's federal exposure. It was a decision that was deliberately made after evaluating all of the evidence, including the evidence presented on the defendant's behalf. To grant the defendant's motion now, twenty years later, would be not only undermine the careful reasoning of a court who had a full picture of the case, but would also reopen old wounds for the victims and their family, and undermine the purposes of the First Step Act under which this defendant brings his claim. Therefore, the State of Connecticut respectfully urges the District Court to deny the defendant's motion in the interest of justice, safety of society, the integrity of the intent of Congress, and most notably, to give finality to cases such as these. I ask you to highlight this for that Court's consideration.

**The Need for Accountability**

The defendant has now been incarcerated for two decades. It has been just as long since the gruesome murders of Clarke and Brown. In that time, the defendant mentions that he spent the first six years or so of incarceration as an angry young man. He indicates that he spent much of that time in solitary confinement, but that he turned a corner when he realized that education was his way to the surface. He began reading and studying and was lucky enough to be accepted into the Yale Prison Education Initiative. Countless letters discuss his coursework and his dedication to academics, but two in particular are noteworthy, not for what they said, but, rather, what they did not say.

The first letter, from Sam Berstler, the defendant's "Introduction to Ethics" professor, stated as follows: "Because I teach moral theory, I am often privy to students' most cherished beliefs and values about ethics. When we were discussing the course material, Adrian once or twice told me, with great honesty, 'I'm in prison because I'm a selfish person.' He was not asking for pity: he was acknowledging that he hadn't been as good a person as he felt he ought to be. In my conversations with Adrian, it was clear that he deeply valued others and saw himself as bearing weighty obligations towards them. He saw himself as bearing especially strong obligations to members of his family and friends and members of his (current and past) communities. He was particularly ready to admit that we are sometimes morally required to make great personal sacrifices on behalf of others." The defendant's choice of words—"I'm in prison because I'm a selfish person"—is striking; it highlights that even with his professors, who laud him for his excellence in every way, the defendant is not being honest. While the defendant might be in prison, in some small part, because of his selfish attitude, the reality is that the defendant is in prison because he took the lives of two innocent people, a child and his mother. Perhaps he was motivated by selfishness and greed in many ways, but the clear motivator, without question, was the fact that Clarke and Brown posed a threat to his power, to his brother's

power. They stood in the way of his empire and he did what he needed to do in order to keep that empire afloat. Thus, the defendant appears less like a character of Virgil, and more like one of Milton.

A second passage stands out in a similar fashion. Sarah Mahurin, the defendant's Reading and Writing the Modern Essay professor writes: "My courses study texts that raise difficult philosophical and ethical questions, questions about what it means to be human, questions about what it means to fall short and to make amends, questions about how we can best inhabit spaces and share those spaces with others. Adrian tackles all those questions (and many others) with an astonishing sense of openness and purpose." She indicates that the defendant has studied various ethical questions, including those about making amends, and yet, the defendant's own personal statement fails in this regard.

The defendant discusses in detail about how he slept on couches the summer he was sixteen, how he and his girlfriend lived a life of freedom before returning home. He paints a clear picture of his life in the early 1990s. He transitions to the topic of his mom's death and his family's struggle with the grief. Then very quickly he leaps to the end: "I was just wandering aimlessly. And with no one left to disappoint, I was selling drugs again by the end of that year. Which is ultimately what landed me here. ... I realize now, and have for some time, the negative impact my decision to sell drug has on my community. It was a selfish attempt to gain trivial success at the expense of others. And I regret it every day." Again, much like his comment to his "Introduction to Ethics" professor, this is merely half the truth—the convenient half. After all, being a drug dealer is easy to reconcile, but being a child murderer is a far more difficult concept to stomach. Thus, to borrow yet another literary theme, his own words show him inextricably immersed in the depths of Phlegethon, with no Virgil to guide him out.

The defendant's own father, in his anodyne contribution to the defendant's motion, fails, like his son, to acknowledge the enormity of the crimes that surround the drug sentence he is serving. In fact, Russell Peeler Sr. expends more energy talking about fishing and facial hair than he does acknowledging his son's actions. Adding insult to injury, he begins the second page of his letter by stating that "Adrian was a kid when he went in, he has grown into a man. He is aware of the wrongs he has done. He knows he has wasted half his life." Such a statement is difficult to read when viewed in the light of the defendant's complicity in the murder of an innocent boy and his mother. His father says "Adrian was just a kid." The defendant was a twenty-two-year-old man, full of power and greed, full of evil and hatred. BJ was just a kid. An eight-year-old boy, full of love and laughter, full of curiosities and wonder. The defendant was a man when he conspired to take the life of a child. That young boy will never grow to be a man. His mother, Karen, too, will never get to watch her son grow into a man. Their family will not get the pleasure of watching BJ graduate from high school or college. Karen will never be a grandmother. BJ will never be a father. And yet, the defendant's father, who moved out of Bridgeport twenty years ago, suggests that the defendant knows what it means to waste a life. He makes no acknowledgment of the full lives of Clarke and Brown that were truly wasted at the hands of his own sons. Much like the rest of the defendant's glowing letters of support, the elder Peeler fails to acknowledge that his son is unlike the non-violent drug offenders for which Congress intended the First Step Act, nor that the defendant's drug dealing operation rested on violence and his and his co-conspirators' willingness to employee it.

In the defendant's own statement, it is clear that he has not yet come to terms with his own actions. He glosses over the evil parts, failing to acknowledge the murders, failing to

address the victims' family. Instead, he finishes his statement to the Court by addressing his own family: "Finally, I spoke of everyone and everything else, except my family and loved ones who have loved me and supported me in ways that I cannot explain, and to whom I owe such much, and who deserve more from me than my past disappointments." Certainly, one can understand an inmate's need to show love and appreciation for his family, but this is no contrition. True contrition, true conversion, recognizes first the wrongs done to others. Only when that first step is taken, can an inmate begin a new journey, an ascent, *In excite Israel de Aegypto*, away from the past and the danger of recidivism that the First Step Act contemplates.

The State of Connecticut believes that the District Court should take the defendant's lack of acknowledgment and contrition into account when evaluating his motion. There are many reasons the defendant may refuse to acknowledge the murders. Perhaps he is in denial of his actions. Perhaps he is protecting his brother, Russell, who still to this very day is litigating his case.[7] If it is the latter, such loyalty is hardly a virtue. Whatever the reasons, none are so noble as to forgive this lack of accountability. The defendant has studied great minds and texts; he's written essays on ethics and philosophy. And yet, he fails to see that it is morally impossible to perform an evil act for a good purpose, even loyalty to family, nor does he realize that contrition and a firm purpose of amendment is necessary for remission of his unpaid debt.

**Final Thoughts**

The defendant's motion is replete with letters speaking of his leadership, of his intellect, of his curiosity, of his good nature. Those letters are noteworthy, but they are not enough to erase the enormous weight of the defendant's actions. It is not a surprise that the defendant is a leader in prison, as he was a brilliant leader of the Peeler gang until his arrest. He and his brother had the power to command followers to cook, traffic, and sell drugs, to procure weapons, and to even

---

[7] It is important to note here that Russell Peeler's continued litigations give great concern to the State. That concern is only further compounded by the strong bond between the defendant and his brother, Russell. Most recently, in Russell's current habeas action, he sought to have access to the State's file, including witness statements and their whereabouts. In a reply brief to this motion, the State wrote as follows:
"[Russell] seems to highlight at several points throughout his brief the notion that he is the victim in this scenario. He paints himself as a martyr, at one point, even outrageously stating that he has 'paid the ultimate sacrifice.' That is an interesting turn of phrase, particularly when painted against the backdrop of three execution-style murders. Apparently, the ultimate sacrifice, to [Russell], is not being gunned down outside of a barber shop. It's not being chased by a gunman in your own home, begging for your life, for the life of your child, before being shot in the head. It's not even being an innocent little boy, who watches the brutal murder of his mother, screaming her name in fear, as a gunman puts a bullet in your own head. Apparently, for [Russell], that's not the ultimate sacrifice.
"This tone of victimhood is carried throughout his brief. And despite his best efforts to elicit pity from the Court, it only serves to highlight his own shortcomings—his paranoia, his dearth of self-awareness, his complete and utter lack of empathy. It is those traits that give the [State] pause for concern. After all, it was those very traits that led to the brutal murders of three innocent people. [Russell] saw himself as a god among men. He ruled the streets of Bridgeport and sought to eliminate those standing in his way. With that power, however, came a fear that others were keen on taking him down.
"On September 2, 1997, [Russell] set into motion a series of events that he can never take back. In the months and years that followed that warm September day, [Russell] schemed and plotted his way through Bridgeport, leaving a sea of bodies in his wake. The State of Connecticut repeatedly expressed concern for the safety of its witnesses, but sadly, nothing would stop [Russell] from committing the heinous acts that ended the lives of eight-year-old Brown and his mother. The ultimate sacrifice was theirs to pay, not [Russell's]."
In light of Russell's words that the defendant had done something righteous for him, this Court should take into consideration the procedural posture of Russell's case and the bond between the two brothers. This is further exacerbated by the fact that the defendant may not make any acknowledgment of his wrongdoing out of a sense of protection for his brother, Russell.

16

silence those who threatened their empire. It is possible that the defendant has used his twenty years wisely—studying, bettering himself, helping others. But he is incarcerated for good reason and he clearly has much farther to go, given his lack of accountability for the murders of Clarke and Brown.

Incarceration certainly serves several purposes. Rehabilitation is but one of its functions; community protection and retribution are two other considerations. When one wreaks havoc on a community the way the defendant and his brother did some twenty years ago, when one pulls the trigger on an eight-year-old boy and his mother, simply in an effort to silence him, it is his ethical duty as a person to atone for his actions, to better himself, to find ways to serve his community in meaningful and helpful ways. The defendant's own childhood friend acknowledges that but for his incarceration, the defendant might not have had the opportunity to take for-credit classes at Yale. He has taken advantage of this opportunity, and that, in many ways, is admirable, but that does not entitle him to a shortened sentence.

The defendant's repeated comparison to Aeneas is ironic given Virgil's epic's violent and vengeful ending. The final verses describe a fearful Turnus pleading with Aeneas to spare his life.

> "Yet think, O think," he implores, "if mercy may be shown. Thou hadst a father once, and hast a son. Pity my sire, now sinking to the grave; …Or, if they vow'd revenge pursue my death, Give to my friends my body void of breath! The Latian chiefs have seen me beg my life; Thine is the conquest, thine the royal wife: against a yielded man, 't is mean ignoble strife."

Despite these words, however, Aeneas plunges a sword into Turnus' breast, killing him, and uttering vengeance for the death of his friend, Pallas. And thus ends the story of Aeneas, much like the way the story of Adrian Peeler begins. As Turnus begged for his life, so, too, did BJ and Karen. As the defendant read this passage, did it summon faces of his innocent victims in their final moments?

When the state trial court sentenced the defendant, he called him a soulless monster. Perhaps the defendant disagrees, but the fact remains that lives were taken by his conspiracy. He cannot undo that. He owes a debt to society for those actions. The State of Connecticut hopes that for the foregoing reasons, as well as those presented in the Government's opposition memorandum, that the District Court denies the defendant's motion, allowing him to continue to serve his sentence as intended, for the betterment of society, for the protection of the witnesses in his case, and to allow the souls of Leroy BJ Brown, Jr. and Karen Clarke to remain at rest.

Thank you for your ongoing assistance in this, and so many other matters. Should you require anything of me or my office in connection with this matter, I will gladly provide it. I a greatly appreciate the successful collaboration of our offices in the cause of making this community a safer and more secure place for those who live here.

I remain

Very truly yours,

*[signature: J. Corradino]*

JOSEPH T. CORRADINO
State's Attorney for the
Judicial District of Fairfield

*[signature: Susan M. Campbell]*

SUSAN M. CAMPBELL
Senior Assistant State's Attorney