## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA      :

     :     Docket No. 3:99-cr-00067-JBA-2

     vs.

ADRIAN PEELER      :     January 11, 2023

### MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR COMPASSIONATE RELEASE UNDER THE FIRST STEP ACT

Mr. Adrian Peeler respectfully moves this Court to reduce his sentence to time served and release him to home confinement at the Nevada residence of his father, in light of his father's worsening medical condition and the fact that Mr. Peeler is the only available caretaker for his father. Additionally, release is appropriate at this time because of Mr. Peeler's young age at the time of the criminal conduct leading to his incarceration, the fact that Mr. Peeler has been rehabilitated during more than two decades of incarceration, a better assessment of the appropriate guidelines applicable to his criminal conduct , and the § 3553(a) factors, as applied in his case.

Mr. Peeler's case involves an extended and complicated history that the defendant will assume that the Court is familiar with for purposes of this motion. Nonetheless, in brief summary, Mr. Peeler has been incarcerated since April 14, 1999. The indictment in this case was entered on November 9, 1999. Mr. Peeler pled guilty to Count One of the indictment, conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. §§ 846 & 841(b)(1)(A). On May 30, 2000, Mr.

Peeler was sentenced to 420 months' imprisonment, followed by ten years of supervised release.

However, from April 14, 1999, until December 12, 2021, Mr. Peeler was in state custody for his state convictions for conspiracy to commit murder in violation of Conn. Gen. Stat. §§ 53a-54a & 53a-48, escape in the first degree, in violation of Conn. Gen. Stat. § 53a-169, and assault on DOC personnel, in violation of Conn. Gen. Stat. 53a-167c.

On January 23, 2020, Mr. Peeler filed a motion seeking a reduction of his federal sentence under Section 404 of the First Step Act. On November 16, 2021, this Court held a resentencing and motion hearing where the Court resentenced Mr. Peeler to a term of 180 months of incarceration followed by 5 years of supervised release.

Mr. Peeler now returns to be heard on this motion under 18 U.S.C. § 3582(c)(1)(A)(i), requesting that the Court release the defendant due to the extraordinary and compelling circumstances set forth in this memorandum.

## BACKGROUND

To succinctly summarize the history of this case, and the basis for this renewed motion,[1] would be impossible. Any presentation of the facts is impossible to present in a summary fashion without leaving out critical components. Even presenting a thorough summary runs the risk of presenting the wrong emphasis, or adding to what is already an incredibly painful case. However, this case demands thoroughness, and it may well be impossible to perfectly present what is a complicated, conflicted, and extremely painful history. There is no way around some of the critical pieces of this history, and

---

[1] On October 30, 2021, while the First Step Act § 404 motion was pending, Mr. Peeler filed a § 603 motion to reduce his sentence. At the November 16, 2021 hearing the Court denied the motion without prejudice essentially at the request of the defendant.

with that in mind, the undersigned attempts to walk through them directly and respectfully.

## I.    The Drug Trafficking Organization ("DTO")

Mr. Peeler is serving a federal sentence for his role in running a drug trafficking organization ("DTO") in Bridgeport, Connecticut, in the 1990s, approximately from 1995 to early 1999. Adrian Peeler ran this organization with his older brother, Russell Peeler. The size and "success" of that drug organization has been set forth in a number of filings with the Court. There is no question that the organization was substantial and that the Peeler Brothers made enormous profits off of the suffering of vulnerable members of their community. Mr. Peeler has been articulate and open about his perspective and remorse for the damage that the drug operation inflicted on his community for profit.

## II.    The murders of Karen Clarke and Leroy "BJ" Brown

Mr. Peeler's state prison sentence for conspiracy to commit murder relates to the murders of Karen Clark and Leroy "BJ" Brown, murders that shook and continue to shake not only the families of Clarke and Brown, but the Bridgeport community and the entire State. The facts surrounding the state conspiracy case have been extensively detailed in prior filings to this Court,[2] and elsewhere. A summary is appropriate here.

Mr. Peeler's brother, Russell, had a significant dispute with a former associate, Rudolph Snead, Jr., in 1997. The dispute resulted in Russell attempting to kill Snead in September 1997, by firing a handgun into Snead's vehicle. Snead was injured. At the time of the shooting, Snead's car was occupied by two seven year old boys, one of whom

---

[2] Mr. Peeler is providing significant new materials with this motion, but also brings the Court's attention to materials filed related to the 2021 proceedings. Additionally, he incorporates by reference all the materials filed from those proceedings.

was Leroy Brown, Jr. Snead was injured but not killed. Police interviewed Snead and the two boys. Russell was arrested and charged with attempted murder. Russell posted bond and was released. He murdered Snead while out on bond. He was arrested again and again made bond.

Russell learned through the discovery from the attempted murder and murder cases that Brown was a witness against him in the attempted murder case, and that the shell casings between the attempted murder and murder had been linked. Russell began discussing his desire that Brown and Clarke be killed. Adrian declined Russell's request that Adrian kill Brown and Clarke.

The Peeler DTO was using an address at 200 Earl Avenue in Bridgeport to "cook" crack cocaine. The residents of the house were drug users who obtained drugs from the DTO. It was learned by the occupants of 200 Earl Avenue that Brown and Clarke lived across the street.

On January 7, 1999, Josephine Lee, a drug user and occupant of 200 Earl Avenue, informed Russell that Brown and Clarke had returned home. Russell offered Lee money to kill Clarke, but she declined because she had never used a gun. Shortly thereafter, Lee knocked on the apartment door of Brown and Clarke, and Clarke opened the door in response. An individual with Lee pushed into the home and shot and killed Brown and Clarke. The State alleged that Adrian was the individual who entered the apartment and killed Brown and Clarke.

Adrian went to trial, facing charges of capital felony, murder, and conspiracy to commit murder. The State's theory was, and apparently remains, that Russell Peeler had instructed Adrian to kill Clarke and Brown, and Peeler DTO member Garry Garner had remained outside as a lookout at the residence during the killings. Both Russell and

4

Garner were convicted of capital felony charges and are currently serving life without parole sentences. Adrian was acquitted of all charges except for the conspiracy to commit murder. Mr. Peeler received the maximum sentence for conspiracy to commit murder.

### III.    Incarceration and rehabilitation.

Adrian's path during his incarceration and the rehabilitation he has undertaken since coming to prison in 1997 was thoroughly documented for the Court in filings in 2020 and 2021 in support of his First Step Act Motion and the 2021 hearing. The relevant prior exhibits are attached hereto as exhibits, with additional materials provided as a supplement, and the prior legal filings are respectfully incorporated with this motion. However, a succinct summary is useful: Adrian Peeler followed the fairly common curve of young individuals who find themselves incarcerated serving lengthy sentences. At the beginning, he experienced disciplinary issues and remained fixated on a destructive belief system. However, as he matured, he recognized that his life had meaning and purpose despite the lengthy period of incarceration that he was facing. There were several central pieces of this awakening. First, there was the recognition that while his physical freedom was lost for the foreseeable future, his mind was as free as he decided it would be. Second, he recognized that he had not only wisdom but charisma, and that he was able to have a positive impact on younger inmates who had not yet experienced as extreme consequences as he had. He discovered that it was invigorating to see his mentoring have a positive impact on other inmates who he was able to help return to the community with a more positive mindset for success.

The reality, as the 2021 hearing brought into sharp focus, is that while the Adrian Peeler that has developed with time and dedication is worlds away from the Adrian

5

Peeler who came to prison in 1997, there is a mountain to climb when it comes to displaying not only that the change he has undergone is genuine, but also that even significant rehabilitation is worthy of close consideration when faced with crimes that shook and continue to shake the families they impacted, as well as the community that Mr. Peeler and his DTO so severely harmed. The question of whether you can "come back" from certain crimes is a difficult one to wrestle with, a question made significantly more complicated by the outcome of the state criminal proceedings, and the fact that his current sentence is not based upon those offenses.

The tension created by these questions is significant to the point of being jarring. To speak with Mr. Peeler today is to *know* that he is not the same person that came to prison in 1997. He is not only a genuine intellectual in the sense of being well-read, but he embodies a reflectiveness and a composure that reveals someone for whom prison is no longer serving any meaningful purpose. However, prison is where he resides, and since coming into federal custody nearly a year ago, the transition has been particularly harsh. The roots of the relationships and the resulting reputation that he built during his decades in state custody- with inmates, staff, and programming professionals – provided a clear reputation with all those involved in his state custody that he was recognizable as a model inmate worthy of trust, respect, and even friendship.

He brought no such reputation with him to federal custody, where he has been processed and treated like any inmate just arriving into the prison system. Instead of someone who has been rehabilitated after more than two decades in custody, he has been treated like a new admission, starting from the very beginning. Adrian shared an anecdote with me recently to this effect. He was scheduled for a medical procedure (the type that middle aged men, as distinct from younger men, are subjected to) and he

mentioned the medical procedure to family members during telephone calls. This was a reflex, only to relay to them what was happening in his life, and just in the course of normal conversation. Prison security heard the call and confronted Adrian as if he was plotting some sort of safety concern. He spoke to several officials and assured them that he had not acted with any intent to cause problems, and that he had simply not thought about the security implications. Officials seemed to understand, even though they told him that it had been a cause for concern. Finally, before leaving for the actual medical appointment, a captain or some other such higher ranked prison official was walking with Mr. Peeler to his transport. He informed Mr. Peeler that if anything happened to any of his officers on the medical trip, the captain would personally hunt Mr. Peeler down and kill him.

The anecdote demonstrates several important points embodied in this memorandum. Of course, on paper, Adrian's distant history displays that at one point, concerns about safety and security related to Mr. Peeler were legitimate. On paper, those concerns might still exist. However, to anyone that knows Mr. Peeler and the transformation that he has undergone would understand that the reaction was disproportionate. It also displays the tragedy of Mr. Peeler's continued incarceration, especially viewed in light of the non-retributive purposes of punishment. Such a statement by a prison official is inappropriate in any circumstances, but it brought about a deeper and painful reminder to Mr. Peeler about the reality of his circumstances.

## IV.    The 2020 First Step Act Motion and 2021 Hearing.

On January 23, 2020, Mr. Peeler filed a motion to reduce sentence under the First Step Act, requesting his release or a resentencing. At the time of the filing of that motion, Mr. Peeler was still in the custody of the Connecticut Department of Correction

for his state convictions. Subsequently, Mr. Peeler filed an amended motion, the government filed an objection, Mr. Peeler provided supplemental authority and responded to some of the materials submitted by the government objecting to Mr. Peeler's reduction in sentence. Mr. Peeler also filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i).

On November 16, 2021, the parties appeared before the Court, *Arteron, J.*, for a hearing on the motion reduce sentence under Section 404 of the First Step Act and Mr. Peeler's motion for compassionate release under Section 603 of the First Step Act. At the outset of the hearing, the Court denied the 603 motion without prejudice by agreement from Mr. Peeler.[3] The parties agreed that Mr. Peeler was eligible for reduction in sentence under 404 as Mr. Peeler had been convicted of a covered offense. 11/16/2021 Tr. 5.

The Court began the hearing by reviewing the revised guidelines relevant to Mr. Peeler's resentencing. The Court arrived at an offense level of 34 based upon a starting offense level of 30 based upon the quantity of drugs attributed to the DTO. *Id.* at 11. The enhancement for an offense within two years of a prior offense was removed, a four-level increase for a leadership role was attributed, a two-level increase for possession of a firearm, and a two-level reduction for acceptance of responsibility. *Id.* at 12. The Court calculated Mr. Peeler's criminal history score as a 6, as opposed to the 5 that had previously been calculated, based upon the addition for the conspiracy to murder and assault on corrections officer. *Id.* at 12-13. The Court noted that it was "certainly not

---

[3] One issue that the Court raised at the hearing was whether Mr. Peeler was eligible for compassionate release at that time since Mr. Peeler was not yet serving a federal sentence. Mr. Peeler is now serving his federal sentence and is clearly eligible for compassionate release on that grounds.

doing a plenary resentencing" in response to a comment from the Government about the procedure. *Id.* The Court stated that it found the guidelines calculation helpful to determining what an appropriate sentence would be in the event that a new sentence was imposed. The Court stated that the guidelines would be 262 to 327 months. *Id.* at 14.

Mr. Peeler, through counsel, requested that the Court impose a new federal sentence to run concurrent with the state sentence, arguing that this was consistent with some of the statements of the original federal sentencing judge, Judge Nevas. *Id.* at 17. Mr. Peeler reflected on the mandatory nature of the Guidelines at the time of the original federal sentencing and contrasted that with contemporary federal sentencing practices. Mr. Peeler's counsel spoke extensively about Mr. Peeler's rehabilitation during his state sentence. *Id.* at 19-22. His counsel reflected on the extraordinary nature of his rehabilitation especially in light of the fact that he was given what was imposed as effectively a 60-year sentence. He also reflected on the question of the purposes of continued incarceration and the proposition that the purposes of sentencing had already been served during Mr. Peeler's incarceration. *Id.* at 24-25. Responding to a question from the Court, counsel for Mr. Peeler indicated that the Court should look at the term of incarceration that had been served in the state sentence to determine "what more is needed" from a federal sentence when looking at the § 3553(a) factors. *Id.* at 25-26. In light of that, Mr. Peeler's counsel asked for a sentence between full time served as a concurrent sentence and some additional prison beyond what he was serving as a result of the state sentence. Counsel for Mr. Peeler argued that the Court had the authority to determine that no additional prison sentence was necessary based on the facts and circumstances. Counsel also pointed to the ambiguity in Judge Nevas' additional

sentence in regards to whether the state and federal sentences would be run concurrently or consecutively. *Id*. at 26-27. A discussion between the Court and counsel about the significance of Judge Nevas ordering credit for time served at the time of sentencing took place. *Id*. 27-28. Counsel conceded that Judge Nevas did not say the "magic words" about the sentences running concurrently. *Id*. However, counsel stated that the comments of Judge Nevas did indicate that imposing a concurrent sentence on Mr. Peeler in 2021 would not directly undermine Judge Nevas' intentions at the time of the initial sentencing. *Id*. at 30. Finally, the Court asked counsel to address Judge Nevas' comment at the initial sentencing hearing "[t]hat's 35 years, Mr. Peeler, you're 24 now, well, you figure out how old you'll be if you ever get out of jail." *Id*. at 31. Counsel explained the various interpretations that one could apply to that statement, and that they were not all consistent with the sentences being run consecutively. *Id*. at 31-33.

The Court heard from Adrian Peeler's father, Russell Peeler, Sr., first on behalf of Adrian. Adrian's father told this Court that he was a disabled Vietnam veteran and a retired maintenance technician. A devoted Chrisitan and proud homeowner. He detailed his relationship with Adrian, and the improvement and growth that he had witnessed in his son over the years. Adrian's father said that the troubles that Adrian got himself into as a younger man were "partly [his] fault" due to the fact that after the passing of Adrian's mother, Russell Sr. had to take on an additional job and that his lessened availability negatively impacted Adrian. Russell Sr. noted that Adrian had gone "astray" and fallen in with the wrong crowd, which resulted in his incarceration. *Id*. at 34.

Russell Sr. told the court that he had his own home in Las Vegas where he lived on his own. He told the Corut that having Adrian home to assist him would be a "big help" because Russell Sr.'s health had been failing. *Id*. at 34-35.

Tavon Alston, Adrian's cousin spoke next on Adrian's behalf, telling the Court about the positive influence that Adrian had been on Mr. Alston throughout his life. How Adrian had influenced him to stay and school and earn his college degree, despite having earlier stopped going to school. He detailed Adrian's positive energy, and how inspiring it was to have that positive energy from someone who had been in a "dark space" like prison for over 2 decades. *Id.* at 35-36.

Adrian's aunt, Mildred Manning, spoke next on Adrian's behalf, telling the Court about her relationship with Adrian over the years. She also told the Court about how her mother, Adrian's grandmother, had been instrumental in helping Adrian with his faith and encouraging him to move forward in his faith. Ms, Manning asked the Court to give Adrian an opportunity to prove to society that he had changed during his incarceration. *Id.* at 36-37.

Before hearing from Mr. Peeler directly, the Court invited the Government to deliver their presentation, which would give Mr. Peeler an opportunity to respond. *Id.* at 37-38. The Government started with the proposition that while the First Step Act, especially in addressing the crack cocaine sentencing disparity in a number of cases, served an important purpose, but that the Sentencing Guidelines, which had mandatory effect at the time of the initial sentencing were not the "driving" force behind the sentencing outcome that came as a result. *Id.* at 38. The Government insisted that the sentencing outcome were based on Judge Nevas' review of the facts of the case, and the Government detailed the information that was before Judge Nevas about the DTO. *Id.* at 38-41. The Government encouraged the Court to reimpose the original sentence, and then reviewed the § 3553 factors in the event that the Court did resentence Mr. Peeler. *Id.* at 41-43. The Government made arguments about why Judge Nevas did not intend to

11

run the sentences concurrently. *Id.* at 43-45. The Government spoke about the "history and characteristics" of Mr. Peeler under § 3553, and discussed Mr. Peeler's state conviction for conspiracy to commit the Brown and Clarke murders. *Id.* at 45. 47. The Government recounted the 2003 conviction for assault on DOC staff. *Id.* at 47-48.

    The Government discussed Mr. Peeler, acknowledging the impact of losing his mother at the age of 17, but connecting that to the Government's view that Mr. Peeler had a lack of remorse related to the murders of Brown and Clarke. *Id.* at 48. The Government also assessed that Mr. Peeler grew up in a loving family with a number of opportunities, and that he turned away from that to pursue the DTO. *Id.* The Government acknowledged that 20 years was a long time and that it was likely that Mr. Peeler had grown over that time. However, the Government returned to its view of the lack of remorse related to the Brown and Clarke homicides. *Id.* at 49. The Government noted its view of the contrast of the positive attributes expressed by supporters of Mr. Peeler in the materials submitted to the Court with the statement that none of those attributes of empathy and sensitivity had ever been directed towards the Brown or Clarke families. *Id.* at 49. The Government also noted the absence of an apology for those homicides in Mr. Peeler's letter to the Court. *Id.* at 50. The Government finished by acknowledging that there was evidence of rehabilitation in Mr. Peeler, but expressed its view that taking into account all of the § 3553 factors the 35 year sentence imposed by Judge Nevas remained just and appropriate. *Id.* at 50-51.

    The Court next heard victim impact. Kerryann Cassanova noted her frustration with the "free education from Yale University" that Mr. Peeler had received but that lives lost as a result of the DTO would not have any such opportunity. *Id.* at 51. Ms.

Cassanova spoke of the opportunities that Mr. Peeler squandered to take the path he chose. Ms. Cassanova asked that the Court not release Mr. Peeler. *Id.* at 51-52.

Ms. Janet Gordon, the sister of Karen Clark and the aunt of BJ Brown spoke next and expressed that she was happy for Adrian and the progress and change that he made during his incarceration. *Id.* at 52. However, Ms. Gordon noted the lack of an apology from Mr. Peeler for his involvement in the homicides. Ms. Gordon spoke vividly about her view of Mr. Peeler's involvement in the crimes. Ms. Gordon stated that she did not believe that Mr. Peeler could be ready to be released until he completed "the first step which is to apologize." *Id.* at 53-54. Ms. Gordon encouraged the Court to not release Mr. Peeler "until he's ready." *Id.* at 54.

Oswald Clarke, the brother of Karen Clarke, next addressed the Court. Mr. Clarke spoke of Ms. Clarke and Mr. Brown and the lives he expected they would have lived. Mr. Clarke expressed his strong objection to Mr. Peeler's release. He rejected Mr. Peeler's request for compassion given the lack of compassion that was displayed to Clarke and Brown. Mr. Clarke reviewed the opportunities that the Peeler brothers had as young people. He recounted his memories of the crime and the aftermath. He expressed his belief that Mr. Peeler would be dangerous if he were released. *Id.* at 54-58. Mr. Clarke expressed that Mr. Peeler had a lack of remorse because he had never acknowledged his involvement in the crimes. He accused Mr. Peeler of being manipulative. Mr. Clarke asked the Court to not release Mr. Peeler. *Id.* at 58-60.

The Court heard from Gary Knight, another family member of Clarke and Brown. Mr. Knight recounted his shock and pain from learning of the death of Clarke and Brown. He expressed that he was glad that Mr. Peeler was "rehabilitating himself and doing better." However, Mr. Knight expressed his belief that "for someone to kill a

mother and child, there's no coming back from that." *Id.* at 63. Mr. Knight asked that

Mr. Peeler not be released at least until he is able to apologize for what he had done. *Id.*

at 63-64.

After a brief discussion between Mr. Peeler's counsel and the Court about some of

the underlying facts relied upon about the Clarke and Brown murders, Mr. Peeler

addressed the Court. He accepted "full responsibility and accountability for all of my

actions that have led me here today" and discussed the specific harm caused by his

involvement in the drug trade. *Id.* at 65-66. He discussed how he tried to "do more than

feel that regret and remorse" but rather that he had "tried to show it." He discussed his

desire and action to become an agent of positive change within himself and those

around him. *Id.* at 66.

Mr. Peeler recounted the struggles that he faced earlier in his incarceration, and

the transformation in his thinking that led him on a path of transformation. His

transformation took place through education, which he described as "the tool that I've

used to try to change myself to try to grown and try to be better." *Id.*  at 67. He described

his intellectual journey, largely inspired by a class he took from another inmate, who

helped to transform his thinking about himself. *Id.* at 67-68. He discussed his desire to

continue his education and to also help grow educational opportunities for other

incarcerated men and woman so that others could have the same transformation

through education that he had experienced. *Id.*

Mr. Peeler stated that he struggled with how much to talk about himself and his

achievements, with the knowledge that none of those achievements could alter his past

or undo the wrongs that he had committed. *Id.* at 68-69. He thanked his family for the

support, and both thanked the Court and begged for its mercy. *Id.*

After a brief recess, the Court reconvened for its decision. Acknowledging that it was "a very difficult resentencing" the Court summarized the facts and procedural history. The Court discussed Mr. Peeler's request to receive a concurrent sentence. The Court stated that "as a matter of law, his conviction for the murder conspiracy is related now in this case as counted as a conviction in the calculation of his criminal history. It puts him in the highest category of the advisory sentencing guidelines... " *Id.* at 70.

The Court noted that the crime and Mr. Peeler's criminal history were not the only factors that the Court considered in determining the appropriate sentence. *Id.* at 71. The Court reviewed Mr. Peeler's upbringing, background, and early time in prison. The Court then noted:

> And then something seems to have changed. He redirected his intelligence and energy elsewhere. Inmate letters reflect a different sounding person who refocuses others as he refocuses himself. His participation and success in Yale's educational program and that community shows he didn't squander that opportunity but thrived on it. The disciplinary charges ceased.
>
> Several of the speakers from the Clarke-Brown family generously praised Mr. Peeler for this success. Their statements stand in stark contrast to Mr. Peeler's crabbed expression of remorse taking, quote, full responsibility for all actions and accountability for my actions, they are mine and mine alone. His speaking and recognition that he spread the disease of addiction and fractured lives and was trying to show remorse by changing and growing and bettering himself is fine. It reflects genuine insight including his recognition that education changes lives and was changing his.
>
> What was shockingly missing was any express remorse or apology to the families of Ms. Clarke and BJ, nothing. Most of the speakers here today expressed hurt and anger that he had never expressed remorse. And they spoke before Mr. Peeler spoke. But he didn't turn around to face them and simply say "I'm sorry."
>
> Restorative justice is repairing harm. Mr. Peeler didn't successfully try to do that today, but maybe this can happen in the future. The revised sentence that the Court will impose in a moment reflects the changes in the law, the changes in the man, a harshness of his state incarceration conditions in COVID times, but Mr. Peeler is far from being entitled to be released. He has much more rebuilding work left to do, to rebuild, to earn forgiveness.

*Id.* at 71-73. The Court then resentence Mr. Peeler to a sentence of 15-years of incarceration, followed by 5 years of supervised release, all to be served consecutively to his state sentence.

## V.     Reflection

The outcome of the 2021 First Step Act hearing brought bittersweet emotions to Mr. Peeler. He was tremendously grateful for the fact that the received significant sentencing relief from the Court from the initial term of incarceration imposed in this case. However, the outcome still felt unsettling for several reasons. Primarily, Mr. Peeler was left with the firm belief that he had failed to meet the moment when it came to discussing his feelings of remorse and responsibility for the Brown and Clarke murders that were the basis for the state conviction. The comments from the Court about restorative justice and rehabilitation struck a deep chord within Mr. Peeler, especially given his feeling that he had failed to adequately express himself related to the state matters. While many of the words from that hearing provided further insight and clarity, many of them also left him with the firm conviction that if he had simply expressed himself more clearly the Court would have understood that he was indeed remorseful and deserving of an opportunity for release now or in the very near future.

As discussed in detail below, the desire for immediate release is driven primarily by the feeling of duty and necessity to care for Mr. Peeler's aging and ailing father. Mr. Peeler felt like any failure to fully express his feelings at the 2021 hearing resulted in yet more harm to his father. Seeing his father at the 2021 hearing, in worse health than ever, expressing such pained feelings of responsibility for Adrian's action has been overwhelming for Adrian.

16

Driven by the desire to clearly express his feelings of remorse for the Brown and Clarke homicides, and the compelling need to get home to care for his father, Mr. Peeler took up the task of planning to file a motion for compassionate release. On July 5, 2022, Mr. Peeler submitted an administrative request for compassionate release to the Warden of FCI/FPC McDowell. *See* letter, attached hereto as Exhibit 1. On, July 21, 2022 the warden denied Mr. Peeler's request. *See* Exhibit 2 Having exhausted his administrative remedies with the BOP, Mr. Peeler now seeks this Court's grant of his compassionate release.

## LEGAL ARGUMENT

### I. The Court may reduce Mr. Peeler's sentence pursuant to the First Step Act if extraordinary and compelling reasons warrant reduction.

The First Step Act of 2018 grants sentencing courts the authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i). The statute provides:

(1) in any case--

(A) **the court**, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, **may reduce the term of imprisonment** (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), **after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that**--

(i) **extraordinary and compelling reasons warrant such a reduction**; . . .

. . .

**and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission**.

17

18 U.S.C. § 3582(c)(1)(A)(i) (emphasis supplied). Thus, the statutory requirements for sentence reduction are that the court (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant sentencing factors under 18 U.S.C. § 3553(a), and (3) ensure any reduction is consistent with *applicable* policy statements.

When Congress first created compassionate release in 1984, Congress also delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied, and a list of specific examples." 28 U.S.C. § 994(t). The Guideline issued in exercise of that authority, U.S.S.G. § 1B1.13, provides:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> (1)    (A)    extraordinary and compelling reasons warrant the reduction; or
>
> (B)    the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;
>
> (2)    the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3)    the reduction is consistent with this policy statement.

The Guideline provides examples of "extraordinary and compelling reasons" only in the application notes. The examples generally fall into four categories based on a defendant's (1) terminal illness; (2) debilitating physical or mental health condition; (3)

advanced age and deteriorating health in combination with the amount of time served; or (4) compelling family circumstances. U.S.S.G. § 1B1.13 *cmt.* 1(A)–(C). The commentary also includes a fifth catch-all provision for an "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the BOP. U.S.S.G. § 1B1.13, *cmt.* 1(D).

With the changes made to the compassionate release statute by the First Step Act, courts need not await a motion from the Director of BOP to resentence prisoners under 18 U.S.C. § 3582(c)(1)(A)(i) for "extraordinary and compelling reasons." Moreover, the reasons that can justify resentencing need not involve only terminal illness, disability, or urgent dependent care for minor children. *See United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020) ("the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release."). Indeed, courts around the country, including here in the District of Connecticut, are finding that "extraordinary and compelling" reasons include, for example, the need to care for a sick family member (*United States v. Patrick*, Docket No. 3:12cr141 (JBA), 2022 U.S. Dist. LEXIS 126469 (D. Conn. July 18, 2022) (*Arterton, J.*), an individual's age at the time of the crime (*United States v. Morris*, Docket No. 3:99-cr-264-17 (VAB), 2022 U.S. Dist. LEXIS 153822 (D. Conn. Aug. 26, 2022) (*Bolden, J.*), rehabilitative efforts (*United States v. Bernard*, Docket No. 3:97-cr-48 (RNC), 2020 U.S. Dist. LEXIS 138658, at *4 (D. Conn. Aug. 4, 2020) (*Chatigny, J.*) and other applicable factors.

Accordingly, this Court has authority to consider whether Russell Peeler Sr.'s compelling need for assistance and care, along with the other factors related to Mr.

Peeler's rehabilitation and remorse, present extraordinary and compelling circumstances that warrant a sentence reduction, regardless of whether BOP moves for compassionate release or whether the request falls within one of the existing categories in the commentary to U.S.S.G. § 1B1.13.

### A. Mr. Peeler's father, Russell Peeler Sr.'s medical condition constitutes an extraordinary and compelling reason to reduce Mr. Peeler's sentence.

Attached with this memorandum of law are a letter from Russell Peeler, Sr., (exhibit 4) Mr. Peeler's father, as well as medical records detailing his myriad medical ailments (exhibit 5). The primary focus of this compassionate release motion is that Mr. Peeler is seeking release to home confinement to care for his ailing and aging father, Russell Peeler Sr. Russell Sr. lives alone in the Las Vegas area of Nevada. He owns his home out there, a point of particular pride for Russell Sr. He moved out there years ago in order to get a fresh start and to focus on his health and wellness. Time and some of his decisions from earlier in life have started to catch up with him. The severe daily pain of dealing with his arthritic knees and his bad back is overwhelming at times. However, he has numerous medical appointments that he has to drive himself to, sometimes in absolutely excruciating pain. He sees a "kidney doctor," a "digestive disease doctor," a "diabetes doctor" as well as several others that he sees on a regular basis. Some days it is almost impossible to overcome the pain to get out of bed, let alone withstand the rigors of driving with his knees in such poor shape. To make matters even more difficult, Russell Sr. has developed a cataract which has started to make it even more difficult for him to drive.

Russell Sr. has no family in the area. He has occasional home health visits but those are no more than once every several months. His closest family, his two brothers,

have issues of their own. His older brother, Donald Peeler, who lives in South Carolina, is very ill as well, and has been struggling mightily with his own health problems. His younger brother, Aubrey Peeler, who lives in Connecticut, has been in the hospital for over a month with his own various medical ailments. In short, there is no other family that Russell Sr. could move to live with if he sold his home and headed back to the East Coast. As he tells me, everyone has their own set of problems to deal with. What's more, selling his home would be monumentally painful for Russell Sr., who has worked so hard to put his life in order out West.

Russell Sr. explains that if Adrian was home he would be able to help take him to his many medical appointments, help him run errands, and help him around the house. Help around the house would include helping Russell Sr. tend to cleaning the house and yardwork, which has become almost impossible in recent years. There are times that Russell Sr. struggles to even get out of bed or make it to the bathroom due to the excruciating pain he experiences in his knees in back. He could use the aid and comfort of Adrian for those times that are particularly rough.

Sadly, the health picture is not likely to improve for Russell Sr., and is only likely to continue worsening, at least eventually. Russell Sr., a disabled veteran, expresses the feeling of wanting to keep his independence, and to keep the home, in hopes that he will have it to pass along when the time comes. Russell Sr. would take comfort in knowing that Adrian was around if something were to happen to Russell Sr., to make sure Russell Sr.'s final affairs are in order.

Certainly, Russell Sr. wants Adrian home to be with him and comfort him as he faces down this stage of his life. While Russell Sr. has expressed a feeling of responsibility for how Adrian's life has developed, Adrian feels an exponentially greater

21

amount of guilt and pain for how his decisions have impacted his father. A few years, at least, to reconcile and resolve these feelings of regret and remorse, at least between each other, and for Russell Sr. to see the man that Adrian has grown up to be, would be an act of great compassion and grace for Russell Sr. However, this personal and emotional benefit of Adrian's release is secondary to the compelling need for medical care and assistance that Adrian would provide if he was released to care for his father.

### B. Mr. Peeler's youth and immaturity at the time of the offense, combined with his remarkable rehabilitation since, present extraordinary and compelling reasons for reducing his sentence.

The man that Mr. Peeler is today is certainly not the young person that helped run the DTO in the late 1990s with his brother. The Court has been provided with extensive documentation of Mr. Peeler's transformation and rehabilitation during his incarceration for the State conviction. The Court acknowledged and praised this during the 2021 First Step Act hearing.

When Mr. Peeler was indicted at the age of 22 he was still quite young. However, much of the foundation for the path that Mr. Peeler took was laid at the time that he was still legally a child. The most traumatic experience of his life—the illness and death of his mother to cancer—took place when he was 16 and 17 years old and the spiral into the lifestyle that he would establish in the following years would start rapidly from there.

While this biographical information was before the Court at the 2021 hearing, the developments in science and the law related to the sentencing of juveniles, and the application of those concepts to individuals past their 18th birthdays but not still fully mature, was not a basis for the First Step Act motion.

Mr. Peeler puts that basis directly before the Court now as a basis for compassionate release. Having served more than 23 years of continuous incarceration, from the age of

22 until now, Mr. Peeler has spent more than half of his life in prison. In those years, there has been an evolution and a revolution in our understanding of how the brain develops, and the significance of those developmental realities on sentencing.

While the *Miller-Graham* framework is often relied upon in reference to instances of impulsive and reckless actions carried out by adolescents, that is not the full scope of the factors that are relevant to the conduct of young people. Susceptibility to peer influences and the inability to weigh and appreciate risks and consequences of illegal conduct are other so-called hallmarks of youth. However, the most important element of this framework, and the one that is so clearly evident with Mr. Peeler, is that at the time of his criminal conduct in his late teens and early 20s, his character was not yet fully formed. His character has now fully formed, over 23 years of hard work and difficult self-reflection. While (currently) constitutionally applicable only to those under the age of 18 (*See e.g., United States v. Sierra*, 933 F.3d 95, 97 (2d Cir. 2019) ("Since the Supreme Court has chosen to draw the constitutional line at the age of 18 for mandatory minimum life sentences, Miller, 567 U.S. at 465, the defendants' age-based Eighth Amendment challenges to their sentences must fail.")), the scientific applicability of the *Miller-Graham* framework to Mr. Peeler displays that his rehabilitation reflects that it is only "the rare juvenile offender whose crime reflects irreparable corruption." *Graham v. Florida*, 560 U.S. 48, 68 (2010).

Broadly speaking, district courts across the country have repeatedly held that changes in relevant sentencing law may support a finding of extraordinary and compelling circumstances justifying compassionate release. *See, e.g.*, *United States v. Jones*, No. 94-CR-20079-EJD-1, 2020 WL 5359636, at *7 (N.D. Cal. Aug. 27, 2020) (citing changes in governing sentencing law—and the resulting disparity between the

sentence the defendant was serving and the "gross disparity" between the defendant's sentence "and the sentence that Congress now deems appropriate" in concluding that "changes in sentencing law weigh strongly in favor of compassionate release"); *United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at \*5 (D. Utah Feb. 18, 2020) (citing, *inter alia*, changes in the applicable sentencing law to support a finding of extraordinary and compelling circumstances warranting a reduction of sentence); *Bellamy v. United States*, No. 2:03-CR-197, 2020 WL 4208446, at \*6 (E.D. Va. July 22, 2020) (citing as a factor warranting relief the "disparity of over 200 months" between the defendant's stacked sentence and the likely term that he would face if sentenced today).

More narrowly and specific to this argument, district courts have repeatedly cited a defendant's young (but not juvenile) age at the time of the crime—and, sometimes, evolving scientific understanding of youth and crime—in supporting a finding of extraordinary and compelling circumstances for a sentence reduction. *See, e.g.*, *United States v. Cruz,* 2021 WL 1326851 at \*2 (D. Conn. April 9, 2021) (*Hall, J.)* ((reducing life sentence of defendant who was convicted of double homicide committed at the age of 18 to a term of time served after 27 years based upon "his age at the time of the crimes, the length of his sentence, his extraordinary rehabilitation, the COVID-19 pandemic, and his family circumstances"); *U.S. v. Jones*, 2020 WL 5359636, at \* 7 (N.D. Cal. Aug. 27, 2020) (*Davila, J.*)(("[B]ecause Mr. Jones was only 22 years old when he began serving his sentence, he has spent more than half his life in prison. Under these conditions, Mr. Jones's continued incarceration is unjust."); *U.S. v. Maumau*, 2020 WL 806121, at \*5 (C.D. Utah Feb. 18, 2020) (*Campbell, J.)* (citing the defendant's youth (20 years old) at the time of the crime as among the extraordinary and compelling grounds warranting

sentence reduction); *Bellamy*, 2020 WL 4208446, at *7 (citing the defendant's "relative youth at the time of the sentence"—age 21—as among the reasons forming an "extraordinary and compelling basis for relief"); *see also Brooker*, 2020 WL 5739712, at *6 (noting that defendant's "age at the time of his crime and the sentencing court's statements about the injustice of his lengthy sentence might perhaps weigh in favor of a sentence reduction").

As applied to Mr. Peeler, including the circumstances of his criminal conduct and the rehabilitative arc that he has followed during his incarceration, it is apparent that Mr. Peeler's criminal conduct can be attributed largely to his youth at the time of the conduct and less to the character of the man that he has matured into in the past several decades.

Mr. Peeler's continued incarceration, now at the beginning of his 180 month sentence in federal custody, is a particularly glaring mismatch to the person that he is today. During his lengthy incarceration in the Connecticut Department of Corrections he earned the trust and the privileges of a reformed inmate. He had access to programming and was consistently relied upon by prison officials and programming staff to mentor younger inmates and to take on roles of trust. He thrived as a star pupil in the flourishing Yale Prison Education Initiative, and is to this day known by many at MacDougall Correctional Institution in Suffield, Connecticut as a humble yet masterful intellectual. Now, at McDowell FCI he has been treated like a new admission freshly sentenced and in need of close scrutiny. Not only is this painful and tedious for Mr. Peeler, it is quite frankly a waste of resources and potential. Mr. Peeler desperately seeks to continue the process of change and restoration that has been his primary focus for several decades. For now, he sits, at the beginning once again. He continues to do

everything he can to have a positive impact on other inmates and to participate in whatever positive activities that are available to him at the facility. He spends most of his time reflecting on what seems to have been a squandered opportunity by Mr. Peeler at the 2021 hearing, and he has done everything in his power to make sure he is prepared for any positive opportunities that appear in the future.

### C. Mr. Peeler has deep and genuine remorse for all of the harm caused by his involvement in the drug trade, including the deaths of Karen Clarke and Leroy "BJ" Brown.

While the conduct of Mr. Peeler's youth was influenced by those hallmark features of youth, it was serious conduct, and that conduct went beyond simply engaging in narcotics trafficking. The November 16, 2021, hearing before the Court to consider Mr. Peeler's request for resentencing under the First Step Act was an impactful experience for Mr. Peeler. To call the hearing intense would be an understatement. The hearing presented the intersection, that manifested as a collision, between the undeniable rehabilitative arc of Mr. Peeler's incarceration, and the outcry of the relatives of Karen Clarke and Leroy "BJ" Brown, the victims in the state conspiracy conviction.

As Mr. Peeler expresses directly to the Court, he "froze" during the First Step Act hearing when he was presented with the request that he offer an apology for his role in the murders. The truth seems to be that Mr. Peeler was not prepared for the state crime to become the central focus in the sentencing for the federal trafficking matter. The reasons for that surprise are many, and none of them excuse that Mr. Peeler should have not let that moment pass without expressing his deep remorse for the deaths of Ms. Clarke and Mr. Brown.

Even though they are insufficient, those reasons ought to be reviewed: Mr. Peeler was expecting the hearing to focus on the narcotics trafficking conduct, Mr. Peeler was hoping that his absolutely relentless work on rehabilitating himself would suffice to

demonstrate his remorse, and the fact that Mr. Peeler was acquitted by a jury of the specific conduct that the victim's family accuse him of created a complexity that Mr. Peeler was not prepared to address at that hearing.

The Court's words in granting Mr. Peeler the grace of a substantial reduction of his federal sentence have been like an echo in the spirit of Mr. Peeler. Additionally, although intensely opposed to his release, Mr. Peeler recognizes that there were also tones of grace in some of the words spoken by the victim's families at that hearing.

He wishes he had been prepared to express meaningful remorse during that hearing. The complexity of trying to avoid quibbling over what he did not do while also being clear about his remorse for what he did do, and how his actions and inactions contributed to the death of the victims, seemed too fine and delicate a distinction to even attempt to approach at the hearing. Furthermore, as Mr. Peeler acknowledges in his letter to the Court, he simply lost his nerve under the circumstances. (Exhibit 3)

A final point, offered by the undersigned counsel as an observer of the record from all prior proceedings, is a reflection upon the materials offered by the state prosecuting authority in opposition to Mr. Peeler's request for a sentence reduction. It is hard to not be saddened by the view of humanity set forth by that office in their objection to Mr. Peeler's early release, even recognizing the long and emotional history wrapped into that office's prosecution of the Peeler brothers, and other associates in the organization, for the Clarke/Brown murders and other crimes that have long shaken the City of Bridgeport. Accepting that not everybody sees the world the same way, it is nonetheless difficult to not speak up in support of a worldview that allows for multiple truths that embody extreme tension, but are not completely in conflict. On the one hand, the drug trafficking organization that Mr. Peeler was a leader of in the 1990s was a violent and dangerous operation, and therefore the Adrian Peeler of the 1990s was a violent and dangerous person. On the other hand, life and the human experience are extremely complicated. Accepting those truths about Adrian Peeler at the time of the

offense do not mean that any positive description of the man that Mr. Peeler is today would be an untruth, or a "myth" as the State prosecuting authority characterized it in their letter to the Court in anticipation of the 2021 resentencing.[4]

Certainly it is no easy task to avoid something like cognitive vertigo when attempting to reconcile oneself to the possibility that these assorted realities could all be truth. There is a certain comfort that comes from believing that all those that are responsible—in whole or in part—for terrible acts can be simply categorized as "evil." This comfort is especially understandable on the part of those who have been directly impacted by grievous harm. It can be comforting for members of a community or a society impacted by a particularly painful act to simply assume that such harm was caused by some Other not a part of the community or even humanity.

But these harms are all too often caused by our neighbors and those that share many similarities with ourselves. We are all somebody, even those of us who cause harm. This excursion is not simply to present to the Court the proposition that you can "come back" from such serious conduct as Mr. Peeler has been convicted of, because the Court's grace shown at the 2021 First Step Act hearing reflect the Court's conclusion that you *can* come back from causing even serious harm. Rather, it is to set forth the complexity that Mr. Peeler has confronted in the nearly quarter century since the events that brought him to prison.

To say that Mr. Peeler was acquitted of being the principle behind the killing of Brown and Clarke is not simply a legal statement, but it is something that as a human being Mr. Peeler holds closely. This is a reflex that Mr. Peeler has developed not out of a desire to avoid accountability, but because of the depth of his remorse and his humanity. While he understands and accepts his share of responsibility for their deaths, there is a certainly a distinction between what has been said about Adrian and the truth. This

---

[4] Document 405-1, filed 12/31/2020, page 2.

distinction may be without a difference for some, especially those most closely impacted by the murders. However, because the Adrian Peeler that has been presented to this Court is not a myth, as the state prosecuting authority alleges, the distinction is nonetheless critical.

Whether the words that have been spoken by Mr. Peeler have been inadequate in the past, and whether they will be adequate in the future, it seems clear that the old truism applies with full force in the case of Mr. Peeler: *actions speak louder than words*. Although perhaps Mr. Peeler has not previously found the perfect words to fully assuage those who perceive him as unrepentant, hopefully there is consensus that he has acted exactly as someone who felt true remorse for their conduct would act. In addition, if the man that Mr. Peeler has been for all these years was truly a "myth" then one would expect that, much like Dolos running out clay for his fraudulent statue, the mask would slip at some point to reveal the supposedly true and unchanged nature of Mr. Peeler. Instead, Adrian Peeler has shown his transformation to be the genuine article, and that is reflection in the actions he has consistently undertaken throughout the years.

Some harms can never be completely undone. When a particular harm cannot be undone, one might consider the continuing purpose of mere retribution. This is especially true when an individual has displayed that they have done the work on themselves to be a productive and law abiding member of the community. In such a circumstance, concepts of obligation and restitution are powerful tools to continue the march towards justice. Whenever Mr. Peeler is released, he will be guided by the weight of the obligation that he feels towards all of the victims of his criminal conduct: the Brown / Clarke family, but also the community that he harmed with his conduct. He has a realistic plan to pursue a restorative justice focused agenda for increasing secondary education opportunities for offenders, and he hopes to work with both victim and offender stakeholders to pursue this agenda. Mr. Peeler is committed to spending the

rest of his time on earth working to prevent future harms and to use his particular experience to achieve that critical goal.

**D.    Mr. Peeler's incarceration continues to be exceedingly harsh and dangerous due to the health risks posed by the ongoing pandemic and other health risks.**

The Court is no doubt closely familiar with the COVID-19 pandemic and how the conditions created by the pandemic have made incarceration in the past more than two years exceedingly harsh and dangerous. FCI McDowell, where Mr. Peeler is currently incarcerated, is still heavily impacted by the COVID-19 pandemic, with operations currently at a "level 2" due to the continuing COVID-19 pandemic. A "level 2" means that there are moderate modifications made at the facility due to the COVID-19 cases at the facility. This means that COVID continues to spread to inmates at the facility, placing Mr. Peeler's health in danger, and also that the COVID numbers have a severe impact on the conditions of Mr. Peeler's confinement, making his continued incarceration more punitive and less rehabilitative, to the extent that further rehabilitation is necessary.

Adding to the health concerns of being currently incarcerated in a federal prison is the emerging potential public health disaster that is the monkeypox virus. In August 2022, the Biden Administration declared the monkeypox virus a "public health emergency."[5] Public health experts have urged prison officials to take aggressive action, including providing the monkeypox vaccine to all inmates, due to the particular risks of a viral outbreak created by prison conditions: thousands of individuals crowded into tight facilities and the common laundry practices of prisons with inmates washing each other's bedding and clothing.[6] Despite urging from public health officials, the BOP has

---

[5] https://www.hhs.gov/about/news/2022/08/04/biden-harris-administration-bolsters-monkeypox-response-hhs-secretary-becerra-declares-public-health-emergency.html (accessed October 25, 2022)
[6] "Prisons and jails are 'potentially high-risk' for monkeypox but won't fall under a vaccine mandate" Kate Sosin, 19th News, August 16, 2022.

declared that federal prisons will not vaccinate the incarcerated unless they have already been exposed to monkeypox. *Id.* The risks created by the monkeypox virus to those incarcerated in federal prison has been called a "public health disaster" due to the risks created by having people "in tight quarters, inadequate health care, staff coming and going and no vaccines." *Id.* (quoting Professor Aziza Ahmed). The potential for another outbreak of another virus creates additional risk and anxiety for everyone currently incarcerated.

Mr. Peeler, at age 46, is at an increased risk for a serious health consequence if he is infected with the coronavirus. The specter of experiencing another new pandemic level threat in the monkeypox virus adds to the anxiety and the risks experienced by Mr. Peeler. Furthermore, McDowell FCI's pandemic response and overall conditions are antithetical to the rehabilitative arc that Mr. Peeler had been following for many years during the service of his state sentence. All these factors combine to make his current incarceration harsh, dangerous, and largely pointless from the perspective of the purposes of punishment.

**E.    Mr. Peeler's prior state convictions for conspiracy to commit murder and escape were not a "prior sentence" and should not have been a part of Mr. Peeler's guidelines calculations.**

Mr. Peeler elected to withdraw his appeal from the Court's 2021 resentencing. Mr. Peeler not only felt immense gratitude for the grace shown by the Court (and members of the Clarke/Brown family), but he also felt clearly that the next thing that the Court and the families should hear from him was not legal arguments, but rather those things that he could not quite bring himself to express at the hearing. The better approach, Mr. Peeler concluded, was to regroup and process the events that transpired at that hearing.

---

https://19thnews.org/2022/08/prisons-jails-incarcerated-no-monkeypox-vaccine/ (accessed October 25, 2022).

The legal argument that would have been the thrust of his appeal was that the guidelines calculation should not have included the Connecticut state conviction as a "prior sentence" for his criminal history score. The Court had indicated that it was not conducting a "plenary sentencing" and therefore the case law that would allow those two state court convictions to become "prior sentences" would not be applicable.[7] The case law on "prior sentence" calculations draws a distinction between those cases that return for a resentencing due to a limited remand or return for sentencing,[8] and when a "*de novo*" or "plenary" sentencing takes place.[9] The inclusion of the Connecticut convictions added 7 points for these prior sentences, placing Mr. Peeler in a criminal history category VI, but without the inclusion of these sentences he would be placed in a criminal history category IV. Keeping the other calculations from the amended PSR in place, this would have dropped Mr. Peeler from 262 to 327 months to a range of 210 to 262 months.

Of course, the guidelines are advisory and the sentence that the Court ultimately imposed at the 2021 hearing was significantly below both those guidelines. However, there is no question that the guidelines do operate as a framework that often anchors a court's exercise of sentencing discretion. As the Second Circuit has recounted recently

> Even where there are "significant procedural errors," this Court "will not vacate a sentence and remand if the record indicates clearly that the district court would have imposed the same sentence in any event." *United States v. Rasheed*, 981 F.3d 187, 197 (2d Cir. 2020) (internal quotation

---

[7] 11/16/2021 Tr. 13-14 ("we're certainly not doing a plenary sentencing and to recalculate the guidelines seems to me to be very helpful to bring perspective to how the law has changed and be instructive to what more, if anything, should happen with respect to a sentence to be imposed under those guidelines.").

[8] U.S. v. Ticchiarelli, 171 F.3d 24 (1st Cir. 1999) (subsequently imposed sentence not a "prior sentence" when case is remanded for resentencing after appeal).

[9] U.S. v. Burke, 863 F.3d 1355 (11th Cir. 2017), U.S. v. Tidwell, 827 F.3d 761 (8th Cir. 2016) (distinguishing Tichhiarelli), U.S. v. Klump, 57 F.3d 801 (9th Cir. 1995).

> marks and citation omitted). However, "[i]n most cases[,] a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome." *Molina-Martinez v. United States*, 578 U.S. 189, 200, 136 S. Ct. 1338, 194 L. Ed. 2d 444 (2016).

*United States v. Joyner*, 2022 U.S. App. LEXIS 545, *12 (2d Cir. 2022). The Court expressed the importance of this clarity about the applicable guidelines range, stating "to recalculate the guidelines seems to me to be very helpful to bring perspective to how the law has changed and be instructive on what more, if anything, should happen with respect to a sentence to be imposed under those guidelines."[10]

Mr. Peeler did not raise the issue by way of a direct appeal, and he has not brought a § 2255 ineffective assistance of counsel claim due to counsel's seeming acquiescence to probation's criminal history calculation during the 2021 hearing.[11] To be clear, he is not seeking to turn this compassionate release motion into a quasi-appeal or habeas petition.[12] Again, Mr. Peeler decided that making such a petition the next chapter in this story was not in keeping with his spirit about his case and the grace that he has received. Instead, Mr. Peeler hopes that in considering all of these important bases for a reduction of his sentence, the Court might also consider that it might have ended at a different outcome if it had started in a different place with the guidelines. Mr. Peeler also hopes that the Court will consider this argument when deciding whether the requested relief is just and appropriate.

## II.     A sentence of time served is sufficient to accomplish the goals of sentencing.

---

[10] 11/16/2021 Tr. 14.
[11] 11/16/2021 Tr. 13.
[12] Mr. Peeler acknowledges that it would be dubious at best to attempt to raise a substantive legal claim as a basis for compassionate release. United State v. Amato (Oreno), 48 F.4th 61 (2d Cir. 2022) (district court does not have discretion to consider new evidence challenging conviction in deciding compassionate release motion).

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Under all of the circumstances in this case, the Court should conclude that the time that Mr. Peeler has already served is sufficient to satisfy the purposes of sentencing.

This Court is well-versed in the mandates of 18 U.S.C. § 3553(a), which provides, in pertinent part:

> **(a) Factors to be considered in imposing a sentence.** The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
> **(2)** the need for the sentence imposed—
> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> **(B)** to afford adequate deterrence to criminal conduct;
> **(C)** to protect the public from further crimes of the defendant; and
> **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> **(3)** the kinds of sentences available;
> **(4)** the kinds of sentence and the sentencing range established for—
> ...
> **(5)** any pertinent policy statement—...
> **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> **(7)** the need to provide restitution to any victims of the offense.

*Id.*

The § 3553(a) factors all weigh in favor of immediate release in Mr. Peeler's case. Under *Pepper*, the Court must consider "the most up-to-date picture" of the defendant's history and characteristics, which "sheds light on the likelihood that [the defendant] will engage in future criminal conduct." *Pepper v. United States*, 562 U.S. 476, 492 (2011).

As has been detailed repeatedly to this Court, Mr. Peeler's history and characteristics today are drastically different than they were at the time of his offense conduct in the 1990s. While Mr. Peeler came into state custody as a young man in 1999, he is now a middle-aged and matured adult. His time serving his state prison sentence was spent undergoing an extraordinary transformation. That transformation took place without any clear expectation of any sentencing relief, which meant that he worked to rehabilitate himself for its own sake, while facing down what at the time was a total effective sentence of approximately 60 years.

Coming into federal custody has been a frustrating and disrupting experience for Mr. Peeler, but his temperament and outlook allow him to take the difficult adjustment in stride. Though access to family and legal calls are much more difficult to come by in federal custody, he has remained calm and focused on his goal of returning to the community, to care for his father and to contribute to the work of repairing his community. Mr. Peeler has learned patience, among many other things over the years, but while he is grateful for being much closer to his release than he was before the 2021 hearing, it is difficult to not feel an increased level of urgency.

That sense of urgency is fueled by the clear sense that time is potentially running short for Russell Senior, at least for his ability to manage his own affairs and keep the home that Russell, Sr. is so proud of owning. The urgency also relates to the regret and shame that Adrian feels about having left his father on his own for so long due to his own terrible decisions. The rush of hope that came from the 2021 hearing, and the resulting feeling of his own failure to say what needed to be said, feels like he has let his father down once again. The hearing itself added to that feeling of urgency, as seeing his father at the hearing made many feelings become nearly overwhelming: his father's

health decline was more obvious to Adrian than it had ever been, and to hear his father take responsibility for parts of Adrian's path was particularly difficult for Adrian.

Other courts have addressed defendants' substantial efforts at rehabilitation post-conviction in the context of compassionate release motions. In *United States v. Ramsay*, the court had originally sentenced the defendant to life in prison for having committed murder at the age of 18 years old. *United States v. Ramsay*, No. 96-cr-1098 (JSR), 2021 U.S. Dist. LEXIS 89741 (S.D.N.Y. May 11, 2021). After thirty years of incarceration, the defendant moved for compassionate release based upon his youth at the time of his offense and his extraordinary efforts at rehabilitation. In finding that the defendant deserved a second chance, the Court noted:

> The need for "just punishment" corresponds to the moral culpability of an offense. Adolescents' immaturity, their susceptibility to peer influence, and their dependence mean "their irresponsible conduct is not as morally reprehensible as that of an adult." Thus, a "just punishment" for an adolescent is usually less severe than a "just punishment" for a similarly situated adult.
>
> Youths' immaturity -- particularly in the context of "hot cognition" decisions made in the presence of peers -- also lessens the value of deterrence because adolescents' "immaturity, recklessness, and impetuosity make them less likely to consider potential punishment."
>
> The need to incapacitate also applies with less force to younger offenders because, as noted, adolescent crime is a poor predictor of future criminal behavior, both because adolescents' characters are still developing and because adolescent crime is attributable, in part, to temporary inadequacies of the adolescent brain.
>
> Finally, rehabilitation is one of the congressionally enumerated goals of criminal sentencing, and adolescents' slow but steady development of means of self-control make rehabilitation and successful reintegration into society more likely than for similarly situated adult offenders. Moreover, Congress has "recogniz[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

*Id.* at * 31-32 (internal citations omitted). The court then concluded:

> For all these reasons, to impose a sentence that is "sufficient, but not greater than necessary," sentencing courts should generally impose lesser sentences on adolescent offenders than on similarly situated adult offenders. And this also means that ***courts cannot simply treat anyone over 18 as an "adult" for sentencing purposes but must inquire whether the human being they are about to sentence is still in many respects an adolescent.***

*Id.* at \*32 (emphasis supplied); *see also United States v. Ciprian*, 2021 U.S. Dist. LEXIS 18698, at \*10-11 (S.D.N.Y. Feb. 1, 2021) ("Ciprian's early release is also compatible with the § 3553(a) interests in general and specific deterrence and the protection of the public. The eight years that Ciprian has served in federal custody, including under the harsh conditions of the last 10 months, should suffice to deter him, and to give pause others who might emulate his conduct. *See* Sent. Tr. at 20 (noting need for substantial sentence to achieve deterrence...As the Court stated at sentencing, it is reasonable to assess that Ciprian, now at age 28, has developed greater "maturity and self control" than he exhibited at age 18. *Id.* at 22; *see id.* at 24; *see also, e.g.*, *Benjamin*, No. 15 Cr. 445 (PAE), Dkt. 1144 at 6 (defendant's maturation since commission of shooting offense as a teenager supported grant of compassionate release). The Court is encouraged by the significant number of courses Ciprian has completed while incarcerated, *see* Def. Mot. at 125, and the steps he has taken to enable him to achieve gainful employment upon release, *see id.* at 89 (letter from potential employer stating intent to give Ciprian a job).")

In addition, Mr. Peeler's request does not amount to a "free pass" for the remainder of the sentence the Court imposed. He is requesting home confinement, at least for a portion of his remaining sentence, as the Court deems appropriate, so that he may care for his father as appropriate, and begin the transition back into the community.

This case presents particularly unusual circumstances when considering how long Mr. Peeler has been incarcerated and the appropriate sentence for Mr. Peeler. While Mr. Peeler is less than a year into his 180-month sentence, he has been continuously incarcerated for approximately 24 years. Our District has repeatedly granted motions for compassionate release for defendant's at less than 50% of their max dates, including for violent offenses.[13] Specifically, it is not without precedent for a

---

[13] See Order on Motion for Sentence Reduction under 18 U.S.C. § 3582(c)(1)(A), United States v. Hanks, No. 3:13CR229 (JCH), ECF No. 918 (D. Conn. 2022) (Hall, J.) (granting compassionate release for defendant who served 98 months out of his 204 month sentence); United States v. Rios, Docket No. 3:94cr112 (JBA), 2020 U.S. Dist. LEXIS 230074 (D. Conn. Dec. 8, 2020) (Arterton, J) (granting compassionate release to defendant who had served 26 years of life sentence.) ; United States v. Perez, Docket No. 3:02cr7 (JBA), 2021 U.S. Dist. LEXIS 41040, at *1 (D. Conn. Mar. 4, 2021) (Arterton) (granting compassionate release to defendant who had served 23 years of life sentence); Ruling & Order on Motion for Compassionate Release at 3, 12, United States v. Nazario, No. 3:16-CR-186 (VLB), ECF No. 510 (D. Conn. Oct. 21, 2020) (Bryant, J.) (granting compassionate release for defendant who "served 7 months of his 24-month sentence"); United States v. Jones, No. 3:18-CR-211 (VAB), 2020 WL 5983276, at *7 (D. Conn. Oct. 8, 2020) (Bolden, J.) (granting compassionate release for defendant who served approximately 25 months of 64-month sentence for bank robbery by force or violence); Order on Motion for Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A), United States v. Cramer, No. 3:19-CR-74 (JCH), ECF No. 1661 (D. Conn. Sept. 3, 2020) (Hall, J.) (granting compassionate release for defendant who served less than 18 months of 60-month sentence); Order on Motion for Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A) (Compassionate Release), United States v. Rotante, No. 3:17-CR-269 (JCH), ECF No. 71 (D. Conn. Aug. 12, 2020) (Hall, J.) (granting compassionate release for defendant who served approximately 25 months of 60-month sentence); United States v. Johnson, No. 3:18-CR-162 (MPS), 2020 WL 4449797, at *1, *4 (D. Conn. Aug. 3, 2020) (Shea, J.) (granting compassionate release for defendant who served "just over 24 months of his 78-month sentence"); Ruling and Order on Motion for Immediate Release and To Modify Conditions of Supervised Release, at 11, United States v. Bruno, No. 3:18-CR-61-VAB, ECF No. 137 (D. Conn. Aug. 3, 2020) (Bolden, J.) (granting compassionate release for defendant who served approximately 29 months of 102-month sentence); Order on Defendant's Motion for Sentence Reduction Under First Step Act (Compassionate Release) at 7, United States v. Basir, No. 3:18-CR-81 (SRU), ECF No. 1083 (D. Conn. June 17, 2020) (Underhill, C.J.) (granting compassionate release for defendant who served less than 26 months of 60-month sentence); Ruling and Order on Motion for Compassionate Release at 3, 10, United States v. Brickhouse, No. 3:16-CR-114-VAB, ECF No. 470 (D. Conn. May 14, 2020) (Bolden, J.) (granting compassionate release for defendant who "when, including good time credit, has served roughly half" of 120-month sentence); Order on Motion To Reduce Sentence, United States v. Humphrey, No. 3:19-CR-96 (MPS), ECF No. 95 (D. Conn. May 14, 2020) (Shea, J.) (granting compassionate release for defendant who served approximately 4 months of 12-month sentence); Ruling and Order on Motion for Compassionate Release at 9, United States v. DiMenna, No. 3:17-CR-202 (VAB), ECF

Court in the District to grant compassionate release in appropriate circumstances where a defendant has severed less than 10% of their sentence. *See e.g.* Order on Motion for Reduction in Sentence Under 18 U.S.C. § 3582(c)(1)(A), *United States v. Reed*, No. 3:19-CR-74 (JCH), ECF No. 1586 (D. Conn. June 30, 2020) (Hall, J.) (granting compassionate release for defendant who served less than 6 months of 97-month sentence). What is common amongst all of the compassionate release decisions from the District, and around the country, is that there is no precise formula for *when* compassionate release might be appropriate, but rather, the analysis begins and ends with the suitability of the circumstances for compassionate release. In this case, considering the total period of incarceration that Mr. Peeler has served, including the State case, is appropriate when weighing the circumstances for granting of compassionate release.

The time that Mr. Peeler has already served in custody, followed by ten years of supervised release—including a period of time (to be determined by the Court) on home confinement—is "sufficient, but not greater than necessary," to serve the purposes of sentencing under § 3553(a). At this point, the purposes of sentencing are best served by allowing Mr. Peeler to provide assistance and care for his father, and to begin his

---

No. 71 (D. Conn. May 11, 2020) (Bolden, J.) (granting compassionate release for defendant who served approximately 18 months of 85-month sentence); United States v. Delgado, 457 F. Supp. 3d 85, 87, 93 (D. Conn. Apr. 30, 2020) (Bolden, J.) (granting compassionate release for defendant who served "roughly twenty-nine months of his 120-month sentence"); Order on Motion for Reduction in Sentence Under 18 U.S.C. § 3582(c)(1)(A), United States v. Williams, No. 3:19-CR-117 (JCH), ECF No. 76 (D. Conn. Apr. 30, 2020) (Hall, J.) (granting compassionate release for defendant who served less than 14 months of 46-month sentence). See also Ruling and Order at 2, 3, United States v. Hammett, No. 3:10-CR-128 (RNC), ECF No. 1125 (D. Conn. Oct. 6, 2020) (Chatigny, J.) (granting compassionate release for defendant who served "approximately 124 months (including time spent in pretrial detention)" of 240-month sentence); United States v. Rivernider, No. 3:10-CR-22, 2020 WL 2393959, at *1 (D. Conn. May 12, 2020) (Chatigny, J.) (granting compassionate release for defendant who served "over 50% . . . (65% with credit for good time" of 144-month sentence).

transition back into the community, where he will eventually take up opportunities to demonstrate the growth, rehabilitation, and remorse that is reflected in the work that he has done during his incarceration. An additional extended period of incarceration will not serve the purposes of sentencing or the ends of justice.

There is no doubt that Mr. Peeler committed serious offenses leading to his incarceration. However, he was not yet fully a man at that time, and the choices that he made back then were largely tied into the attendant circumstances of youth—including susceptibility to peer influences and the inability to meaningful evaluate and weigh risks. Mr. Peeler is no longer that young person, in fact, he is no longer young at all, having given up a large portion of his life as a consequence of those actions. He is now a grown man who has reflected deeply on the harm his conduct has caused and the meaning of remorse, responsibility, and the hope of restorative justice. He has walked a long path during his incarceration, but he knows that the journey will just be at its beginning upon his release.

<u>Release Plan</u>:

If released, Mr. Peeler proposes to remain on home confinement, at the residence of his father, with GPS monitoring, for whatever period of time the Court deems appropriate, with the allowance that he be permitted to attend the medical appointments and other personal business of his father.

Beyond this short term / immediate plan for his re-entry, Mr. Peeler has a host of other ambitious yet realistic plans for his future. A key priority, after the care of his father, is to re-enroll in a degree track college program in order to complete his degree in communications that he began while he was in custody in Connecticut. Mr. Peeler also plans to work with his life partner, Kathryne Robinson, to mirror and learn

recruiting strategies from her given her more than two decades in the industry. The goal for Mr. Peeler and Ms. Robinson is to start their own recruiting firm, and to provide specialized workshops for recently released returning citizens and to other underrepresented groups in the field.

An even larger scale goal that Mr. Peeler has is to work with prisoner and victim's rights groups to expand quality higher education to every prison in America. Mr. Peeler, in traveling his own journey of rehabilitation, has become closely attuned to the promise of expanding educational opportunities for incarcerated and formerly incarcerated individuals. He is closely familiar with, and largely driven by, the statistics that demonstrate that the attainment of post-secondary degrees reduces the rates of recidivism to nearly zero.[14] When Mr. Peeler thinks about demonstrating remorse and rehabilitation through action upon his release, working with the network of individuals that he has connected with through the Yale prison education initiative program, and others similarly interested in developing this issue, this drives and inspires Mr. Peeler.

For his own educational goals, Mr. Peeler will seek to complete his degree in English, and to pursue his dream of teaching literature to young people in at-risk communities. To Mr. Peeler, an opportunity like that would place him in a unique position to use his personal journey as an opportunity to reach those who might be best served by hearing his particular voice and perspective.

Another one of Mr. Peeler's priorities will be to seek out and engage with professional therapy to deal with the adjustment after an extended period of

---

[14] See e.g. Dennis J. Stevens & Charles S. Ward, College Education and Recidivism: Educating Criminals Is Meritorious, 48 J. CORRECTIONAL EDUC. 106, 109 (1997)

incarceration. Mr. Peeler is committed to meet with a mental health professional at least once a week for at least the first 6 months after his release.

Mr. Peeler is eager to seek out opportunities to apply his experiences and insights to the betterment of the community. Mr. Peeler also understands that if he is granted compassionate release his immediate mandate will be to care for his father, and that any further privileges would be at the discretion of probation and the Court.

## CONCLUSION

For the foregoing reasons, Mr. Peeler respectfully requests that the Court grant a reduction in his sentence to time served and allow him to begin his ten-year term of supervised release, with a period of home confinement to be determined by the Court as a condition of supervised release.

Respectfully Submitted,

THE DEFENDANT,
Adrian Peeler


/s/ *Michael W. Brown* .
Michael W. Brown
Fed. Bar #ct30802

Koch, Garg & Brown
8 W. Main Street, Suite 2-10
Niantic, CT 06357
Phone: 860-452-6863
Fax: 860-452-6865
mike@kgb-law.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 11, 2023, a copy of the foregoing Memorandum of Law in Support of Motion for Compassionate Release was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent via e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CV/ECF Filing System.


/s/_____
Michael W. Brown
Fed. Bar #ct30802

Koch, Garg & Brown
8 W. Main Street, Suite 2-10
Niantic, CT 06357
Phone: 860-452-6863
Fax: 860-452-6865
mike@kgb-law.com