UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA              Crim. No. 3:99cr67(JBA)

v.

ADRIAN PEELER                        February 22, 2023

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION FOR SENTENCE REDUCTION**

Fourteen months after this court reduced defendant Adrian Peeler's sentence from 35 years to 15 years, he filed this motion for compassionate release. For the reasons that follow, Peeler is not entitled to the relief he seeks. As an initial matter, many of the arguments Peeler raises were before this Court at the prior hearing and were taken into account when the Court granted him a 20-year reduction in his sentence.

As to the new arguments, neither the defendant's father's advancing age and anticipated health fragility nor Peeler's concern that his age (46) leaves him vulnerable to Covid-19 or other viruses are sufficient to establish extraordinary and compelling reasons supporting a further sentence reduction, and the § 3553(a) factors weigh decisively against him in any event. The Court should deny his motion.

I.      **BACKGROUND**

A brief summary of the factual and procedural history of this case, of which the Court is well aware, is set forth below. For a fuller statement, the Government respectfully refers to (and incorporates by reference), its prior filings related to the previous motion for a reduction in sentence. *See* Docket Nos. 398, 401, 403, 405 and 422

During the 1990s, the defendant and his brother Russell Peeler ("Russell") were the leaders of a well-organized, well-structured and extraordinarily lucrative crack distribution organization operating in Bridgeport, Connecticut. PSR at ¶ 7; *Peeler v. United States,* 2006 U.S. Dist. LEXIS 45811, *3 (2d Cir. June 28, 2006) (describing the Peeler brothers' organization as a "highly-structured narcotics trafficking organization in Bridgeport that was responsible for the distribution of approximately one-kilogram of crack cocaine per week.").

The Peelers' organization sold drugs on the streets of Bridgeport around-the-clock, seven days per week. PSR at ¶ 7. Three shifts operated each day with a "shift lieutenant" and at least four distributors working each shift. *Id.* The operation flourished -- selling approximately one kilogram of crack cocaine ***every week***. *Id* (emphasis added). *State v. Adrian Peeler,* 267 Conn. 611, 615 (Conn. 2004) ("The defendant and Russell divided the profits derived from the [drug trafficking] operation, which were estimated to be as much as $38,000 per week.").

Not only was their operation lucrative, it was well-armed. High powered weapons, including AR-15s and AK-47s were commonplace in their drug operation. PSR at ¶¶ 37, 42, 43, 50.

In August 1999, the defendant, his brother Russell, his cousin Ryan and three additional defendants (Corey King, Damon Clark and Angelina Keene) were charged in a Superseding Indictment related to drug trafficking.[1] Count One of the Indictment charged the defendants with conspiracy to distribute multi-kilogram quantities of cocaine in violation of 18 United States Code § 846. With the exception of the defendant and Russel, all of the co-conspirators pled guilty.

---

[1] There were a total of seven individuals charged as co-conspirators. David Jennings waived indictment and pled guilty. *United States v. Jennings,* 3:99cr66(AHN). Shawn Kennedy pled guilty to the Indictment prior to the federal grand jury's return of the Superseding Indictment. [Doc. No. 75].

On November 2, 1999, a jury was selected for the federal trial of the defendant and Russell. [Doc. No. 163]. On November 9, 1999, after jury selection but prior to the start of evidence, the defendant pled guilty to Count One and the trial proceeded with Russell Peeler as the sole remaining defendant.

On May 31, 2000, the District Court sentenced Peeler to 35 years' imprisonment.[2] During the sentencing hearing, Peeler moved to withdraw his plea. The district court denied this request but still credited Peeler with a two level adjustment for acceptance of responsibility-- resulting in a guideline range of 360 months to life--and imposed a sentence of 420 months imprisonment. *Id.* at 41. In so doing, the Court noted the benefit he was giving Peeler as well as the seriousness of the defendant's drug operation:

> "I must say that your comments here today would indicate to me that I would have clearly been justified in not giving you acceptance of responsibility, which would have then resulted in a mandatory sentence of life, but weighing all the considerations, I determined it was the fair thing to do, not that your conduct merits fair consideration. Y***ou certainly didn't think in terms of fairness when you pumped kilograms of cocaine into the streets of Bridgeport during all the years that you were running this drug conspiracy and filling the noses and veins of young people with crack and cocaine. That never seemed to bother you, your sense of fairness.*** So, I'm not going to sentence you at the bottom of the guideline range. You don't deserve it."

*Id.* at 53-54 (emphasis added).[3]

---

[2] On November 8, 2001, the Second Circuit affirmed the defendant's conviction and sentence. *United States v. Kennedy,* 21 Fed. Appx. 82 (2d Cir. Nov. 8, 2001). On June 28, 2006, the Second Circuit denied Peeler's petition for a writ of habeas corpus. 2006 U.S. Dist. LEXIS 45811 (2d Cir. June 28, 2006)/.

[3] In addition to the credit for acceptance of responsibility that Judge Nevas provided, the defendant received an additional benefit by pleading. The Government withdrew the 851 notice that it filed which would have resulted in a mandatory minimum of 20 years' incarceration (rather than 10 years). Docket Nos. 161 and 175.

On March 2, 2001, Peeler was convicted after a jury trial in state court for conspiracy to murder an eight–year old boy and his mother (Leroy "BJ" Brown and Karen Clarke) who had been slated to testify as witnesses against Plaintiff's brother. On April 27, 2001, Peeler was sentenced to 20 years to run consecutive to the federal sentence. His conviction and sentence was subsequently affirmed on appeal. *State v. Peeler,* 267 Conn. 611, 620, 841 A.2d 181 (2004). A further review also affirmed the imposition of the twenty-year sentence consecutive to the thirty-five year federal sentence. *State v. Peeler,* 2006 Conn. Super. LEXIS 1257 (April 25, 2006).

In May 2020, Peeler, who was still serving his state sentence and had not yet begun to serve his federal sentence, filed a motion for resentencing. There were numerous briefs filed by both parties. On November 16, 2021, this Court held a resentencing hearing on the Section 404 motion.[4] At the conclusion of the hearing, the Court reduced the defendant's sentence from 35 years to 15 and made it clear that this sentence must run consecutive to the state sentence.

On November 30, 2021, the defendant filed a notice of appeal of the Court's ruling. Docket No. 428. On December 8, 2021, the Government filed its own notice of appeal. Docket No. 431. On January 24, 2022, both parties filed consent motions to withdraw their notices of appeal. Docket Nos. 433, 434. In his motion, Peeler specifically noted that he was withdrawing his motion "[i]n consideration of the government's motion to withdraw its appeal" and included a certification by Peeler of his understanding of the consequences of his withdrawal of the appeal." Docket No. 434

---

[4] During the hearing, the Court denied the Section 603 motion for compassionate release without prejudice at the defendant's request. Transcript at 7, Docket 430 ("Tran at __").

Peeler began serving his federal sentence on December 10, 2021 but did not physically enter BOP custody until April 1, 2022 when he arrived at FCI McDowell. Exh. A. Three months later, on July 4, 2022, Peeler filed a request for compassionate release with the Warden. In his request for a reduction in sentence, Peeler relied on two grounds: (1) caring for his ailing and aging father; and (2) his own concerns about contracting the coronavirus noting that, even though he is fully vaccinated, he has a higher risk of death due to his age of 45. In addition to these grounds, Peeler also asked the Warden to consider that he had already served 23 years in state custody during which he "engage[d] in extensive (and numerous) programs and higher educational work" and his "current offense is a non-violent crack offense that took place when I was still a youth (22). I no longer pose a threat to the community or society at large; and his release plan (which included caring for his father, working from home and finishing his degree). Exh. B.

On July 21, 2022, the Warden of FCI McDowell denied the defendant's request noting that the regulations for "extraordinary and compelling circumstances" does not cover caring for an elderly parent. In addition, the Warden noted that Peeler's "concern about being potentially exposed to, contracting, or possibly contracting COVID-19 does not currently warrant an early release from your sentence." Def. Exhibit 2.

The Government agrees that administrative remedies have been exhausted in this case.

## II.     DISCUSSION

### A.     Compassionate Release Under 18 U.S.C. § 3582(c)(1)(A)(i)

A court may not modify a term of imprisonment once it has been imposed, except under 18 U.S.C. § 3582(c)(1)(A),

the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

Importantly, "[t]he defendant bears the burden of proving that he or she is entitled to a sentence reduction."." *United States v. Poupart*, 2021 U.S. Dist. LEXIS 44727 at n1, Crim. No. 11cr116, Docket No. 249 (March 10, 2021) citing *United States v. Wooten*, No. 3:13-cr-18 (SRU), 2020 U.S. Dist. LEXIS 191940, 2020 WL 6119321, at *5 (D. Conn. Oct. 16, 2020). *See also United States v. Gagne,* No. 3:18-CR-242 (VLB), 2020 WL 1640152, at *3 (D. Conn. Apr. 2, 2020). "[I]n order to be entitled to relief under this statute, [the defendant] must . . . demonstrate that 'extraordinary and compelling reasons' warrant a reduction of his sentence." *United States v. Smith,* No. 3:16-CR-48 (MPS), 2020 WL 1903160, at *2 (D. Conn. Apr. 17, 2020) (quoting *United States v. McCarthy*, No. 3:17-CR-230 (JCH), 2020 WL 1698732, at *3 (D. Conn. Apr. 8, 2020)). A court has broad discretion to determine whether a defendant's motion for compassionate release establishes extraordinary and compelling reasons for release. *United States v. Brooker,* 2020 WL5739712 (2d Cir. Sept. 25, 2020). Before granting compassionate release, the Court should consider the 18 U.S.C. § 3553 sentencing factors to the extent relevant. *Gagne*, 2020 WL 1640152, at *2 (D. Conn. Apr. 2, 2020); see also 18 U.S.C. § 3582(c)(1)(A)).

The Sentencing Commission policy statement related to compassionate release is found in U.S.S.G. § 1B1.13. The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). See First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; cf. 18 U.S.C. § 3582(c) (2012). District courts have generally considered the policy statement helpful guidance. *United States v. Smith*, No. 3:16-CR-48 (MPS), 2020 WL 1903160, at *2 n.3 (D. Conn. Apr. 17, 2020) (internal quotation marks omitted); *See also United States v. Gileno,* No. 3:19-CR-161-(VAB)-1, 2020 WL 1916773, at *2 (D. Conn. Apr. 20, 2020) (noting that courts may make a determination as to what qualifies as an "extraordinary and compelling reason" independently).

The Application Note 1 in the Commentary to the policy statement sheds light on various circumstances that may be considered as extraordinary and compelling reasons, provided the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). :

> (A) Medical Condition of the Defendant.— (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia. (ii) The defendant is— (I) suffering from a serious physical or medical condition, (II) suffering from a serious functional or cognitive impairment, or (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

> (B) Age of the Defendant-- The defendant is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.— (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children. (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons. — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

USSG § 1B1.13 Cmt. n.1.

### B. Peeler Cannot Establish "Extraordinary and Compelling Reasons" for a Reduction

In an attempt to meet his burden to show "extraordinary and compelling reasons" warranting his immediate release, Peeler repeats several issues that this Court previously considered when it granted him a 20 year reduction to his sentence (e.g. his rehabilitation and "immaturity" at the time of the offense).  In addition, he raised the following new bases: (a) that home confinement will allow him to care for his "aging and ailing father"; and (b) that his incarceration is overly harsh and dangerous due to the health risks posed by the pandemic.

### 1. COVID-19 No Longer Poses an "Extraordinary and Compelling Risk

As an individual who does not have any of the co-morbidities identified by the CDC as risk factors, Peeler cannot establish an extraordinary and compelling risk for serious consequences if he were to contract the virus.[5]  He suggests, however, that his age (46) places him at an increased risk for "serious health consequences if he is infected with the coronavirus." Def. Mem. at 31. While it is accurate to say that older individuals are more at risk for

---

[5] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#MedicalConditionsAdults CDC (last visited Feb. 25, 2023).

coronavirus, Peeler's age is well below the age group that is the highest risk of serious symptoms.[6]

Records from the BOP note that Peeler received a COVID-19 vaccination on August 5, 2021 and September 2, 2021. On April 26, 2022, he refused a COVID-19 vaccine booster. Exh C. [7]As this Court previously noted, "The opportunity for individually identifiable inmates to opt to receive the COVID-19 vaccine represents a sea change from their previous COVID-19 infection vulnerability and inability to protect themselves against the virus, even with comorbidities. Evidence that a defendant has been offered the vaccine, whether he accepts it or not, demonstrates that he had the ability and opportunity to take measures to markedly reduce his risk of severe illness or death from COVID-19 while incarcerated." *United States v. Poupart,* 2021 U.S. Dist. LEXIS 44727 at *3, Crim. No. 11cr116, Docket No. 249 (March 10, 2021) (internal citations omitted).

Defendant's speculative concern that there could be a future Monkey Pox outbreak in the BOP is insufficient to establish an extraordinary and compelling circumstance. *United States v. Sattar,* 457 F.3d 152, 156 (SDNY 2020) ("Sattar's application thus amounts to mere speculation that there might be a COVID-19 outbreak at FCI-Schuylkill and that if there is such an outbreak FCI-Schuylkill would be incapable of handling the outbreak. This kind of speculation is not a basis for compassionate release.") *citing United States v. Hidalgo*, 462 F. Supp. 3d 470, 474

---

[6] https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-who-is-at-risk/art-20483301#:~:text=Older%20age,highest%20risk%20of%20serious%20symptoms. ("People of any age can catch COVID-19. But it most commonly affects middle-aged and older adults. The risk of developing dangerous symptoms increases with age, with those who are age 85 and older are at the highest risk of serious symptoms. In the U.S., about 81% of deaths from the disease have been in people age 65 and older. Risks are even higher for older people when they have other health conditions.")

[7] This exhibit was redacted to protect the defendant's privacy as it related to other immunizations unrelated to the coronavirus.

(S.D.N.Y. 2020); *United States v. Ng Lap Seng*, 459 F. Supp. 3d 527, 542 (SDNY 2020) ("the blanket claim that BOP's action plan is ineffective is a generalization and an overstatement. Moreover, the blanket claim that the structure of BOP institutions and BOP's programing are conducive to the spread of COVID-19 assumes that the spread of COVID-19 cannot be mitigated with the implementation of BOP's action plan. Ng does not provide support for this assertion and it is at best speculation that borders on hyperbole.")

The Bureau of Prison is well prepared in the event of a Monkey Pox outbreak. *See* https://www.bop.gov/resources/news/20220808_bops_response_to_mitigate_monkeypox.jsp "The BOP has a well-established history of managing and responding to communicable disease outbreaks, like Ebola and influenza. As a result, the BOP has protocols and practices that can and will be implemented to mitigate against and, if necessary, respond to any outbreak in our environment, including monkeypox." *Id.*

The defendant suggests that the harshness of his prison conditions require compassionate release.[8] As an initial matter, the Court already granted the defendant a significant reduction in his sentence based, in part, on the harshness of his prison term during the pandemic. Tran at 72-73 ("The revised sentence that the Court will impose in a moment reflects… a harshness of his state incarceration conditions in COVID times….") The defendant has been at FCI McDowell for less than a year and he fails to make any showing that the conditions there are so

---

[8] In his briefing, the defendant shares an "anecdote" to highlight the "tragedy" of Mr. Peeler's incarceration. The defendant was approached about his violation of security policy when he discussed an upcoming medical procedure that required him to be transported from FCI McDowell. Def. Brief at 7. The defendant claims that while the officials understood that he did not intend to cause any security problems, he was subsequently threatened by a "captain or some other higher ranked prison official" if anything happened to his officers while on the medical trip. Upon receipt of this information, the Government requested the BOP attorney to determine if there was any corroboration for this statement. As an initial matter, the Captain at FCI McDowell is female, so based on the story as relayed in his brief, it was not the Captain. See Def. Brief at 7 ("He informed Mr. Peeler…"). Further, there is no documentation within FCI McDowell of either the claimed initial security concern or subsequent staff misconduct.

"extraordinary and compelling" to warrant a further reduction from 15 years to one year. Importantly, FCI McDowell currently has no active cases of COVID among the inmate population and 2 active staff cases.  https://www.bop.gov/coronavirus/ (last visited March 1, 2023).[9]

### 2. The Care of Peeler's Aging Father is Not Sufficient to Establish "Extraordinary and Compelling Reason"

The defendant maintains that his need to care for and assist his elderly father  - who he has not resided with since approximately 1996 --constitutes an extraordinary and compelling for a sentence reduction.

Even assuming Peeler's father requires (or will require) care and assistance as claimed[10], he has made no showing that he is the only person who can provide that care.  First, Peeler has not been involved in his father's care for more than 20 years.  Second, while Peeler's father

---

[9] At the time of the defendant's filing, FCI McDowell was operating at Level 2, with moderate modifications and was still offering numerous opportunities to engage in rehabilitation activities.  Shortly before filing this brief, the Government reviewed the BOP's website  and learned that FCI McDowell increased their COVID protocols from Level  2 to Level 3.  While the information regarding no inmates have active positive cases remains, the website indicates that there are 4 inmates who are currently being tested for COVID.

[10] The Government submits that the defendant fails to articulate that Peeler's release is necessary for his father's care.  Instead, the motion expresses concerns about the likely decline in his father's health and that he "would take comfort in knowing that Adrian was around if something were to happen to Russell Sr., to make sure Russell Sr.'s affairs are in order."  Def. Memo at 21.  In the letter submitted to the Court, Peeler's father expresses his remorse about his self-described failures as a parent when Adrian was younger, and that he now wants to see his son "grow and flourish".  Def. Exh. 4.  As discussed herein, this preference is not an "extraordinary and compelling reason" for release.

Importantly, the medical records submitted by the defense do not include any opinion, expert or otherwise, indicating  that Peeler's father requires a full time caregiver.  While the defendant's father explains that he has cataracts and is losing his eyesight, none of the medical records submitted with the motion provide any detail about Mr. Peeler's eyesight or whether he is a candidate for cataract surgery.  Mr. Peeler also notes that he has severe arthritis and that he needs a cane to walk.  The medical records indicate that  he was diagnosed with diabetes, hypertension, neuropathy and osteoporosis.  In addition,  in 2022 he was diagnosed with esophagitis and gastritis and was instructed to follow a GERD/ulcer diet and stop using aspirin.  The medical records fall far short of indicating that his father needs (or soon will need) a full time caregiver.

acknowledged other family members, he discounted their ability to care for him because they have their own health problems. Def. Memo at 21 (Explaining that Peeler Sr. believes his siblings could not help him, "everyone has their own set of problems to deal with. What's more, selling his home would be monumentally painful for Russel Sr.").

While the incapacitation and need to care for an immediate family member may contribute to extraordinary and compelling reasons, the need to care for a family member when alternative care is available does not alone justify release.[11] *Poupart,* 2021 U.S. Dist. LEXIS 44727 at *3-4. As an initial matter, the defendant has not shown that he "is the only available caregiver for that close family member." *United States v. McBriarty,* No. 3:16-cr-109(SRU), 2021WL1648479, at *8 (D. Conn. April 27, 2021) (denying sentence reduction where the defendant's siblings were available to care for their mother and observing that "[a]lthough it seems that McBriarty may be the *best* available caregiver for his ailing mother, he is not her *only* available caregiver" (emphasis in original)); *United States v. Yoda,* No. 15 CR 95, 2020 U.S. Dist. LEXIS 166758, 2020 WL 5502325, at *2 (S.D.N.Y. Sept. 11, 2020) (denying relief where defendant did not establish that there were not other available caregivers and, regardless, defendant remained a danger to the community); *United States v. Wooten,* No. 3:13-cr-18 (SRU), 2020 U.S. Dist. LEXIS 191940, 2020 WL 6119321, at *4 (D. Conn. Oct. 16, 2020) (recognizing grounds for reduction and collecting cases).

---

[11] The defendant cites this Court's decision in *United States v. Patrick,* Docket No. 3:12cr141(JBA), 2022 U.S. District LEXIS 126469 (D. Conn. July 18, 2022) in support of the finding the care of a family member is "extraordinary and compelling" reasons. That case, however, involved a combination of factors including Patrick's vulnerability to covid as a 77 year old with hypertension, diabetes, IBS, hyperlipidemia, incontinence, impotence, bipolar disorder, skin cancer, major depression disorder and anxiety disorder).

Finally, Peeler fails to establish that no alternative sources of care are available for his father. Importantly, Peeler's father is a disabled Vietnam veteran who was honorably discharged and has been found eligible for 100% disability benefits. Def. Exh 5, p1. As a result, Peeler's father is eligible for a 'wide-variety of benefits" including "aid and attendance" benefits, "housebound" benefits, caregiver benefits and other geriatric and long term care. See Elderly Veterans - Veterans (va.gov) (last visited February 25, 2023); *see also United States v. Rollins,* No. 19-CR-34S, 11-CR-251S, 2021WL5445772, at * (W.D.N.Y. Nov. 22, 2021) ("Rollins fails to establish that no alternative sources of care are available, including other family and friends or social service and community programs."); *United States v. Gardner,* 3:21cr90(VAB), Docket No 53 (February 23, 2022) (defendant cannot establish she is the *only* caregiver for her husband where he would remain in a skilled nursing facility until an appropriate caregiver has been identified)

While this Court understands that Peeler and his father may *prefer* that Peeler be released to provide care and assistance, their preference does not amount to an extraordinary and compelling reason for a sentence reduction. See *Rollins,* 2021 WL 5445772, at *4 (denying compassionate release to defendant who was the preferred, but not only, available caregiver); *United States v. Wilson,* 10-CR-363S (1), 2021 U.S. Dist. LEXIS 107520, 2021 WL 2327312, at *3-5 (W.D.N.Y. June 8, 2021) (denying compassionate release, in part, due to defendant's failure to demonstrate that he was mother's only available caregiver); *United States v. Pabon,* 17 Cr. 312 (JPC), 2021 U.S. Dist. LEXIS 28602, 2021 WL 603269, at *4 (S.D.N.Y. Feb. 16, 2021) (denying compassionate release for, among other reasons, defendant's failure to show that he was wife's only available caretaker); *United States v. Lindsey,* No. 13-CR-271-LTS, 2021 U.S. Dist. LEXIS 1086, 2021 WL 37688, at *3 (S.D.N.Y. Jan. 4, 2021) (denying sentence

reduction on basis that defendant failed to show that no other family member or other caretaker could provide the necessary care).

Additionally, even if the Court were to find that Peeler's father requires care and that Peeler is the only person who can provide such care, the request should be denied after consideration of the factors set forth in 18 U.S.C. § 3553, discussed in more detail below. *United States v. Lisi*, 440 F. Supp. 3d 246, 252 (S.D.N.Y. 2020) (finding extraordinary and compelling reasons where the court "received evidence from several sources indicating that [the defendant] is the only available caregiver for his mother," but still denying the motion for § 3553 reasons).ere.

3. Expressing Remorse in Generic Terms is Insufficient for Restorative Justice.

At the conclusion of the re-sentencing hearing, the Court reflected on the Defendant's failure to express remorse.

What was shockingly missing was any express remorse or apology to the families of Ms. Clarke and BJ, nothing. Most of the speakers here today expressed hurt and anger that he never expressed remorse. And they spoke before Mr. Peeler spoke. But he didn't turn around to face them and simply say "I'm sorry".

Restorative justice is repairing harm. Mr. Peeler didn't successfully try to do that today, but maybe this can happen in the future. The revised sentence that the Court will impose in a moment reflects the changes in the law, the changes in the man, a harshness of his state incarceration conditions in COVID times*, but Mr. Peeler is far from being entitled to be released. He has much more rebuilding work left to do, to rebuild, to earn forgiveness.*

Tran. 72-73 (emphasis added).

With the Court's explicitly comments regarding Peeler's need to do "much more rebuilding work," it is surprising that the defendant appears to believe that, after such a short

period of time, he has *already* accomplished this rebuilding and has earned forgiveness for his role in the conspiracy to kill an innocent child and his mother in order to prevent them from testifying in a homicide case against his brother. The defendant seems to have skipped over the part about him being "far from being entitled to be released" and having "much more rebuilding work left to do." Instead, he zeroed in on the Court's comments about the lack of an apology and is now attempting to rectify it with a generic and passive statement of remorse.

The defendant indicated that he was impressed by Miss Gordon's wise words, "In order to correct your mistakes or even more forward, first you have to admit to what you do, apologize and then you can make the changes." Def. Exh. 3. But, the defendant wants to skip the first step. He does not want to admit what he has done. In his letter, he discusses at some length about having failed to give Karen Clarke and BJ's families the sincere apology they deserved and then turns to explain why he did not do so. There is an important distinction between Peeler admitting with specificity his role in the conspiracy to murder Karen Clarke and BJ and what Peeler is offering, which is "feelings of remorse and responsibility for the Brown and Clarke murders that were the basis for the state conviction." Def. Mem. at 16.[12] There is not a single sentence in the defendant's brief or in his personal letter explaining what role he played in the conspiracy to murder of Karen Clarke and BJ and, without such an admission, there is no next step.

As detailed in the previous filings and during the prior hearing, the state of Connecticut prosecuted three individuals, in separate jury trials, for the murder of Karen Clarke and BJ Brown. In each case, the state presented the same theory: Russell Peeler asked the defendant

---

[12] "While he understand and accepts his share of responsibility for their deaths, there is [] certainly a distinction between what has been said about Adrian and the truth." Def. Mem. at 28.

and Garner to murder BJ Brown and Karen Clarke to prevent their testimony in his upcoming homicide trial.  In each case, the state's theory was that Adrian Peeler was the shooter and Gary Garner was the lookout.[13]  Garner and Russell were both convicted of murder.  Peeler was acquitted of the murder and convicted of the conspiracy.[14]  It appears from Peeler's conduct during the hearing and in references made in the briefing before this Court that he disputes being responsible for pulling the trigger.[15]  But it is decidedly unclear what he admits to doing.[16]  And, as State's Attorney Corradino pointed out, his failure to admit can be seen as a strategic decision to benefit Russell Peeler who still has a habeas motion pending with the State of Connecticut. See Docket No. 405 at 16, n7.

Finally, the defendant suggests that the Court should look to his decision "to withdraw his appeal from the Court's resentencing" as evidence that he was considering the "grace shown by the Court (and members of the Clarke/Brown family)".  Def. Mem. at 31.  Respectfully, the

---

[13] *See e.g. State v. Garner,* 270 Conn. 458, 476 (Conn. 2004) ("the defendant was "scoping out" the area around the Clarke residence for witnesses, that he knew Adrian's purpose was to kill Clarke and Brown, and that he believed that watching for witnesses would help Adrian by preventing any interruption of the murder plan and by facilitating Adrian's escape." *Russell Peeler v. Comm'r of Corrections,* 170 Conn. App. 654 (2017) (writ of habeas corpus).

[14] The state judge who presided over Peeler's murder trial made the following remarks at his sentencing, "There isn't a lot that needs to be said about this. I know in my heart what the defendant did, and he does, too. He might not be the worst that I've ever met in this work, but he's right up there.  This crime was committed for an evil motive. The victims were innocent people, a child and his mother. This scheme was senseless, represents a lot of what's wrong with our society; use of drugs, the prevalence of guns, individuals like Mr. Peeler and his brother who have no morals, no values. Anyone who would be willingly involved in an offense of this nature is a monster. The victims should have been allowed to live their lives happily. That's every American's right. The little boy should have been getting ready for a summer of Little League baseball and swimming in a lake, riding a bike, and he won't because you were involved in a scheme to kill him and his mother.*" State v. Peeler,* 2006 Conn. Super. LEXIS 1257, *5 (April 25, 2006). His conviction and sentence was subsequently affirmed on appeal. *State v. Peeler,* 267 Conn. 611, 620, 841 A.2d 181 (2004).

[15] Tran. at 64-65 (disputing victim statements that Peeler committed that murder when he was not found guilty of murder; but acknowledging he was found guilty of conspiracy to commit murder).

[16] Peeler's description of his offense as a "nonviolent drug offenses" is particularly painful when viewed in the totality of this case. Exh. B.

defendant's own motion to withdraw reflects that he withdrew his notice of appeal in

consideration of the Government's withdrawal of its notice of appeal.  Docket No. at 434.[17]

The surviving family members of Karen Clarke and BJ Brown, who have spent much of

their lives trying to assure that the Peelers will serve the sentences that the federal and state

courts imposed (just as they are forced to live the life sentence without Karen and BJ that the

Peelers imposed on them), reviewed the letter Peeler wrote and provided letters for this Court to

consider.  Exh. D and E.

> *Regarding the written apology, made by Mr. Adrian Peeler, I do not accept it. An apology is an acceptance and admittance. He mentioned "his actions". What were those actions? He murdered two individuals in cold blood.*
>
> *I applaud Mr. Adrian Peeler's tremendous educational advancements, but I have not seen a change in the behavioral patterns that is indicative of someone who has been reformed.*
>
> Exh D (letter by KerryAnn Casanova)
>
> *Again I am asking the judge to resolutely ignore and reject Adrian's come to (not Jesus) moment.*
>
> *because it is disingenuous and dangerous and makes other violent criminals believe they can do the same.*
>
> Exh E. (letter by Oswald Clarke)

---

[17] Defendant suggests that his appeal would have focused on the Court's recalculation of his criminal history despite not conducting a "plenary" resentencing.  While not conceding in any respect to the defendant's argument and reserving the right to make any arguments later, if needed, the Government respectfully submits that a full reading of the transcript demonstrates that the Court's calculation of the higher criminal history meant that the murder of an innocent child and his mother in cold blood, and the attack on the judicial system as a whole, as well as his later conviction for assault were "related now in this case as counted as a conviction in the calculation of his criminal history."  Tran. at 70.  If the Court had proceeded with the defendant's lower criminal history, the Court would have reached the same sentence by factoring these convictions into the defendant's history and characteristics.

4. Peeler's Age at the Time of the Offense and Subsequent
   Rehabilitative Efforts are Insufficient to Establish Extraordinary
   and Compelling Circumstances

The defendant asks this Court to reduce his sentence further due to his youth at the time of

the offense and his subsequent rehabilitative efforts. As an initial matter, the Government

submits that the Court already considered Peeler's age and subsequent growth when it credited

him with 20 years off his sentence. Tran. at 72 ("The revised sentence… reflects… the changes

in the man….").

But, to be clear, Peeler was not an impulsive child when he ran a large-scale drug trafficking

operation that ruined lives. He was not a reckless youth when he conspired to execute a child

and his mother in their own home to protect his brother from being prosecuted for the homicide

of Rudy Snead. He was already 22 years old with several prior arrests and convictions. While

he was operating this sophisticated drug trafficking operation, there was an active warrant for his

arrest due to his escape from a halfway house . These are not youthful or impulsive mistakes.

This background is vastly different than those presented in the cases in the defendant's brief.[18]

For example, *United States v. Cruz,* 2021 U.S. Dist. LEXIS 68857 (D. Conn. April 9, 2021)

the District Court reduced the sentence of a defendant from life to 31 years based, in part, on his

---

[18] In addition to the Cruz and Morris cases, the defendant cites several courts who granted compassionate release
motions where the original sentence involved then-mandatory stacking of certain firearms offenses. *United States v.
Jones,* 2020 WL 5359636(ND Cal. August 2020) (Defendant was sentenced for several robbery and firearms
charges and was sentenced principally to 357 months (or 29.75 years) due to then-mandatory stacking. At the time
of the compassionate release decision, Jones had served almost the entire sentence. He received a reduction of only
15 months in order to effectuate an immediate release due to his heightened risk of complications from COVID-19
due to his essential hypertension); *United States v. Maumau,* 993 F.3d 821 (20th Cir. 2021) (three stacked 924(c)
charges for robberies conducted in one day led to a mandatory sentence of 57 years for Maumau who was then 20
years old. The sentence reduction to time served (10 years) was affirmed based on the Court's consideration of a "a
combination of factors" including: "Maumau's young age at the time of" sentencing; the "incredible" length of his
stacked mandatory sentences under § 924(c); the First Step Act's elimination of sentence-stacking under § 924(c);
and the fact that Maumau, "if sentenced today, . . . would not be subject to such a long term of imprisonment.")

age at the time of sentencing.  Cruz joined the Latin Kings when he was 15 was threatened by his gang sponsor into participating in the murder of two other gang members, one of whom the leadership believed was an informant.  *Id* at * 5.  Notably, the expert in that case testified that a person's cognitive development is still ongoing between the ages of 18 and 21, Peeler was 22.  *Id* at * 16.

Similarly, the decision in *United States v. Morris,* Docket No. 3:99cr264-17(VAB), 2022 U.S. Dist. LEXIS 153822 (D. Conn. Aug. 26 2022) is very different from Peeler.  Morris was 18 years old, when he murdered another adult who allegedly stole money from him. *Id.* at *16. Among the factors the court noted was Morris's unstable childhood and persistent poverty who began selling drugs at a young age and was pressured by a lieutenant in the drug selling operation to get the money back.[19]  *Id.*  By stark contrast, this Court noted that Peeler's child hood was not one of "privation or neglect or trauma as the Court so frequently sees"  Tran. At 71.  Moreover, Peeler was in a vastly different position than Morris, as the leader of the drug operation, he was the person who gave orders and whose directives were followed.

The defendant's reliance on *United States v. Bernard*, 3:97cr48(RNC), 2020 U.S. Dist. LEXIS 138658 (D. Conn. August 4, 2020) is similarly flawed as that case involved a defendant who (prior to any vaccinations being available) was identified as "high risk" of serious illness or death if he contracted Covid due to his numerous preexisting medical conditions and he had expressed genuine, heartfelt remorse for his criminal conduct and accepted full responsibility for his wrong doing and he participated in several victim impact courses.

III.     THE SECTION 3553(a) FACTORS ARE UNCHANGED SINCE PEELER'S
         PREVIOUS MOTION FOR A REDUCTION IN SENTENCE

Even if the Court were to find that Peeler both exhausted his administrative remedies and

demonstrated extraordinary and compelling reasons to justify his release, the Court's inquiry does

not end there. The Court must also consider the 18 U.S.C. § 3553(a) factors before modifying

Peeler's sentence. *See e.g. United States v. Sturgis*, No. 21-261-CR, 2021 WL 5972490 at *1 (2d Cir.

Dec. 16, 2021).

Here, the assessment of the § 3553(a) factors has not materially changed since the Court

considered those factors at the resentencing hearing in November 2022.  Peeler received an

enormous benefit from this Court when it reduced his sentence from 35 years to 15.  He has

served less than 10% of that sentence.  Exh. F.  [20]  Most importantly, the families of Karen

Clarke and BJ Brown continue to implore this Court to deny the defendant's motion for release.

Exh. D and E.

The revised sentence reflected this Court's consideration of all of the Section 3553 factors

including Peeler's leadership role in a violent and lucrative drug trafficking operation that

terrorized the City of Bridgeport.  In addition, the Court was aware and considered the

defendant's age at the time of the offense.

The Court's sentence reflected an assessment of the defendant's history and characteristics,

including its finding of rehabilitative efforts which, again, are substantially unchanged.

---

[20] Defendant relies on one case, *United States v. Reed,* 3:19cr74(JCH), ECF 1586 (D. Conn. June 30, 2020) as an
example where the Court granted compassionate release to a defendant who served less than  10% of her sentence.
In that case, however, the Government did not object to release where the defendant's mother – who was the sole
caregiver for defendant's daughter – passed away unexpectedly.  Docket No. 1575, Govt's Memo at 14.

In addition, the sentence considered all of the remaining factors, including the seriousness of the offense, promotion of respect for the law, just punishment, protection of the public[21], specific and general deterrence.

The Court need not, and should not, reweigh these facts, especially given the relatively short period of time that has passed since the Court spent significant time considering all of the exacerbating and mitigating factors at re-sentencing.

**CONCLUSION**

Wherefore, for all the foregoing reasons, the Government respectfully requests the Court deny Peeler's Motion for Compassionate Release.

Respectfully submitted,

VANESSA ROBERTS AVERY
 UNITED STATES ATTORNEY

*Nancy V. Gifford*

NANCY V. GIFFORD
ASSISTANT U.S. ATTORNEY
Fed. Bar. No ct16324
Nancy.Gifford@usdoj.gov
450 Main Street
Hartford, CT 06103
Tel.: 860-947-1101

---

[21] To this point, the Government reminds the Court that Peeler previously provided the Court with a psychological evaluation (the "Report") in an effort to demonstrate that he is psychologically and emotionally well-adjusted. The Government submits that the Report demonstrates that Peeler continues to deny and/or minimize his conduct. See Report at Docket No. 417, at 4-5. For example, he describes his conviction for risk of injury as retribution for someone shooting at his parents' house -- without any acknowledgement of the harm he caused to the children inside. The Report appears to recognize this concern by describing Peeler as engaging in "positive impression management." Report at 11, 12. In addition to his unwillingness to fully accept responsibility and acknowledge the severity of his crimes, the Government is concerned with the safety of the community. The psychologist reported that Peeler "[o]n occasion, []may become frustrated by circumstances outside his control and may react to what appears to be unusual, adversarial situations." *Id* at 12. The Government submits that, when considered with Peeler's violent past, such an observation is an ominous warning.

CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2023 a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*Nancy V. Gifford*

_____
NANCY V. GIFFORD
ASSISTANT U.S. ATTORNEY